UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES COLLITON,

                              Plaintiff,

                    v.

CRAVATH, SWAINE & MOORE LLP,

                              Defendant.

---

ECF CASE

No. 08 Civ. 0400 (NRB)

**DECLARATION OF ROBERT H. BARON IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

I, ROBERT H. BARON, hereby declare as follows:

1.      I am a member of the firm of Cravath, Swaine & Moore LLP, defendant pro se in this action.  I submit this declaration in support of Defendant's Motion to Dismiss the Amended Complaint.

2.      Attached hereto as Exhibit 1 is a true and complete copy of an article by Nate Raymond entitled "Shameless:  The Lolita Lawyer Sues Cravath in Longhand", published in the February 2008 edition of American Lawyer.

3.      Attached hereto as Exhibit 2 is a true and complete certified plea transcript in New York v. Colliton, Indictment Nos. 0861/06, 1748/06, dated October 2, 2007.

4.      Attached hereto as Exhibit 3 is a true and complete copy of a letter from Robert H. Baron to The Hon. Naomi Reice Buchwald, United States District Judge, dated January 16, 2008.

5.     Attached hereto as Exhibit 4 is a true and complete copy of a letter from The Hon. Naomi Reice Buchwald, United States District Judge, to James Colliton and Robert H. Baron, dated January 23, 2008.

6.     Attached hereto as Exhibit 5 is a true and complete copy of the verified Complaint and Summons in <u>Colliton v. Cravath, Swaine & Moore LLP</u>, Index No. 07604246, dated December 26, 2007 and December 27, 2007, respectively.

7.     Attached hereto as Exhibit 6 is a true and complete certified copy of a felony arrest warrant in <u>New York v. Colliton</u>, dated February 16, 2006.

8.     Attached hereto as Exhibit 7 is a true and complete certified copy of the Decision and Order of Justice A. Kirke Bartley in <u>New York v. Colliton</u>, Indictment Nos. 861/06, 1748/06, dated June 20, 2007.

9.     Attached hereto as Exhibit 8 is a true and complete certified copy of Indictment No. 0861-2006 in <u>New York v. Colliton</u>, dated February 24, 2006.

10.    Attached hereto as Exhibit 9 is a true and complete copy of a letter from Patricia Geoghegan to James Colliton, dated November 9, 2000.

11.    Attached hereto as Exhibit 10 is a true and complete copy of the 2004 Summary Plan Description for the Savings Plan for Senior Attorneys and Associates of Cravath, Swaine & Moore LLP.

12.    Attached hereto as Exhibit 11 is a true and complete copy of a letter from James Colliton to The Hon. Naomi Reice Buchwald, United States District Judge, dated January 18, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2008.

Robert H. Baron

# EXHIBIT 1



American Lawyer
Vol. 30, No. 2
Copyright 2008 ALM Properties, Inc. All rights reserved.


February 2008

Bar Talk
Jailhouse Lawyer

SHAMELESS

THE LOLITA LAWYER SUES CRAVATH IN LONGHAND

Nate Raymond


 Former Cravath, Swaine & Moore associate James Colliton, a.k.a. the Lolita lawyer, has kept busy in the few weeks he's been out of jail. The tax lawyer and pedophile has used the time to file a lawsuit against his former employer.

 Colliton pled guilty to statutory rape after he paid a woman to let him have sex with her 13- and 15-year-old daughters. He served 19 months in jail. He is now a registered sex offender and the author of a 22-page handwritten complaint, which was filed in New York state court just before the end of the year. Colliton is seeking $1.45 million in back pay and damages. Among other things, he says he is owed a bonus for the portion of the year he worked before his arrest.

 Holed up in a Super 8 motel just outside New York, Colliton says that he has a computer but decided to handwrite the complaint in the same style he says he taught to hundreds of Riker's Island prisoners. 'I hope Cravath views that it's personal,' he says. Colliton says he plans to take this case to trial. 'I have all the time in the world because I doubt I'll be reinstated to the bar if I ever tried,' he says.

 In addition, Colliton claims that Cravath eavesdropped on his communications and gave the information to third parties. He says that Cravath has as many as two dozen employees whose only job is to monitor e-mails and phone calls. Cravath declined to comment.

2/2008 AMLAW 18

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 2
# Withheld Pending Decision on Motion to File Under Seal

# EXHIBIT 3

# CRAVATH, SWAINE & MOORE LLP

ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON

JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III

### WORLDWIDE PLAZA
### 825 EIGHTH AVENUE
### NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

—————

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1422

WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN

DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE

SPECIAL COUNSEL

SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III
THOMAS D. BARR

OF COUNSEL

CHRISTINE BESHAR

January 16, 2008

### Colliton v. Cravath, Swaine & Moore LLP,
### No. 08 Civ. 0400 (NRB)

Dear Judge Buchwald:

Pursuant to Your Honor's Individual Practices No. 2.A., we respectfully submit this letter pro se to set forth the bases for our anticipated motion to dismiss the complaint in the above-referenced action, which was removed to this Court yesterday. Our response to the Complaint is currently due on Wednesday, January 23, 2008. We respectfully request that the Court either (1) grant us leave to file our motion to dismiss on that date or, in the alternative, (2) schedule a pre-motion conference and enter an order adjourning our obligation to respond to the Complaint.

Plaintiff James Colliton was an attorney employed by this firm ("Cravath") from December 26, 2000, until March 1, 2006. On December 27, 2007, plaintiff commenced this action against Cravath in the Supreme Court, State of New York, and served us with a summons and complaint. Plaintiff purports to assert claims relating to his employment with Cravath, for breach of contract (First, Second, Fifth, Sixth, Seventh and Eighth Causes of Action), promissory estoppel or misrepresentation (Third and Fourth Causes of Action), intentional infliction of emotional distress (Ninth Cause of Action), and breach of fiduciary duty with respect to the defendant's pension plan (Tenth Cause of Action).

On January 15, 2008, we removed the action to this Court pursuant to 28 U.S.C. § 1441, on the basis of federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff's claim for breach of fiduciary duty is pre-empted by federal statute, the Employee Retirement Income Security Act of 1974 ("ERISA"), and thus, removal is proper. A copy of the removal papers, including the Complaint, is attached for the Court's convenience.

We anticipate moving to dismiss with prejudice all of plaintiff's claims, each of which is incurably defective as a matter of law.

Breach of Contract. The New York Court of Appeals has held that there is an implied-in-law obligation in the relationship between a law firm and its associates that both the associates and the firm will comply with the ethical standards of the profession. See *Wieder v. Skala*, 80 N.Y.2d 628, 635-36 (1992). Unbeknownst to Cravath, plaintiff breached that obligation both immediately before and during his employment by engaging (repeatedly) in felonious criminal activity. We will request that the Court take judicial notice of the following facts, which is mandatory under Federal Rule of Evidence 201(d).

On October 2, 2007, plaintiff pled guilty to charges of statutory rape. (10/2/2007 Plea Tr. at 12-13.) He admitted having sex with a girl under the age of 17 on numerous occasions between December 25, 2000, and January 14, 2001, and having sex with a girl under the age of 15 on numerous occasions between February 1, 2005, and March 1, 2005. (Id. at 10-12.) Plaintiff also pled guilty to charges of patronizing a prostitute. (Id. at 12-13.) He admitted having sex in exchange for money with another girl under the age of 17 on numerous occasions between August 1, 2000, and February 11, 2004. (Id. at 11-12.) Plaintiff was sentenced to one year in prison, concurrent on each charge. (Id. at 10.)

Plaintiff's admitted crimes constituted misconduct under the New York Code of Professional Responsibility and the rules of the Appellate Division, First Department. See DR 1-102(a)(3); 22 NYCRR § 603.2. Had he disclosed his criminal behavior, he would have been suspended from practice prior to his employment at Cravath. See 22 NYCRR §§ 603.4(e)(1)(ii), (iii). Indeed, he would have been disbarred, his name would have been stricken from the roll of attorneys, and he would have been ordered to desist from practicing law. See N.Y. Jud. Law §§ 90(2)(a), (2)(b), (4)(a), (4)(b). He could never have held himself out to Cravath as an attorney. See id.

Plaintiff's breach of contract claims must be dismissed as a matter of law. His criminal misconduct violated his obligation to comply with the ethical standards of the legal profession, precluding him from enforcing any alleged employment agreement between plaintiff and Cravath. *First*, plaintiff fraudulently induced Cravath to hire him by concealing his pre-employment criminal misconduct, and fraudulently induced Cravath to continue to employ him by concealing his continued commission of additional crimes during his employment. Thus, any alleged employment agreement was, as a matter of law, the product of fraudulent inducement and cannot be enforced by plaintiff. *Second*, plaintiff committed a prior material breach of any such agreement through his criminal misconduct. *Third*, plaintiff's crimes and his subsequent concealment of those crimes bar his recovery of employment compensation under New York law.

Promissory Estoppel/Misrepresentation. The Complaint does not satisfy the pleading requirements of Rule 9(b), Fed. R. Civ. P., because it fails to allege the particularized facts necessary to plead a cause of action based on misrepresentation. Further, plaintiff's claims fail as a matter of law. New York law does not recognize a cause of action for promissory estoppel in this employment context. On its face, the Complaint does not allege any cognizable injury caused by plaintiff's alleged reliance on any purported promise or misrepresentation by Cravath. Finally, to the extent plaintiff's claim is equitable in nature, any recovery is barred by his admittedly unclean hands as a convicted felon whose criminal misconduct violated the ethical standards of the legal profession.

       <u>Intentional Infliction of Emotional Distress.</u>  Plaintiff's claim for intentional infliction of emotional distress is barred by the applicable one-year statute of limitations. Moreover, plaintiff has failed to state a claim as a matter of law because Cravath's alleged breaches of his asserted privacy rights in the workplace are not actionable under New York law and because the Complaint neither alleges that Cravath engaged in extreme or outrageous conduct nor pleads any of the other required elements of the claim.

       <u>Breach of Fiduciary Duty.</u>  The Complaint does not satisfy even the notice pleading standard of Rule 8, Fed. R. Civ. P., because it provides no notice of the specific conduct for which Cravath is allegedly liable, much less how that conduct purportedly caused plaintiff's losses.  Further, plaintiff has failed to state a claim as a matter of law because his cause of action is pre-empted by the federal ERISA statute, under which Cravath is not liable for his poor investment choices.

       We are prepared to file our motion to dismiss on January 23, 2008.  If Your Honor would prefer a pre-motion conference before we file, however, we respectfully request that the date be adjourned until after that conference.

Respectfully,

Robert H. Baron

The Honorable Naomi Reice Buchwald
    United States District Court
      Southern District of New York
      United States Courthouse
      500 Pearl Street
        New York, NY 10007

Encls.

BY FACSIMILE

Copy w/encls. to:

Mr. James Colliton
    28 Millbank Road
      Poughkeepsie, NY 12603

BY FEDERAL EXPRESS

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

212-805-0194

January 23, 2008

James Colliton
28 Millbank Road
Poughkeepsie, NY 12603

Robert H. Baron, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

BY MAIL AND FACSIMILE

Re:   Colliton v. Cravath, Swaine & Moore LLP,  08 Civ. 0400 (NRB)

Dear Mr. Colliton and Mr. Baron:

We have received defendant's letter, dated January 16, 2008, requesting leave to file a motion to dismiss the above-captioned suit, as well as plaintiff's letter dated January 18, 2008 requesting leave to file an amended complaint. At this time, we wish to afford plaintiff the opportunity to amend his complaint if he believes he can do so consistently with Fed. R. Civ. P. 11 and in a fashion that addresses the issues identified by defendants. We do so in the interest of avoiding an unnecessary round of motion practice and without making any determination on the merits of any of the defendant's arguments. Further, having been afforded the opportunity to amend his complaint in response to defendants' submission, plaintiff should not anticipate being granted a further opportunity to amend, should we find that there is merit in some or all of defendants' arguments.

Plaintiff will have until February 29, 2008 to submit an amended complaint. In light of this letter, defendant's time to answer or move is adjourned without date. However, if an amended complaint is not filed, defendant may file its proposed motion without further direction from this Court.

Very truly yours,

Naomi Reice Buchwald
United States District Judge

# EXHIBIT 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------x

James Colliton

_____

**[your name(s)]**          Plaintiff(s)

- against -

Cravath, Swaine & Moore LLP

_____

**[name(s) of party being sued]**      Defendant(s)

--------------------------------------------------x

**SUMMONS**

**Index Number**

07604246

**Date Index Number purchased**

December 27, 200 7

To the Person(s) Named as Defendant(s) above:

     PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to answer the complaint of the plaintiff(s) herein and to serve a copy of your answer on the plaintiff(s) at the address indicated below within 20 days after service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

     YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the complaint.

Dated: December 27, 200 7
**[date of summons]**

_____
**[sign your name]**

James Colliton
**[print your name]**

28 Millbank Road
Poughkeepsie, New York 12603
845-518-0754
**[your address(es), telephone number(s)]**

Defendant(s) Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019-7475
**[address(es) of defendant(s)]**

Venue: Plaintiff(s) designate(s) New York County as the place of trial. The basis of this designation is: **[check box that applies]**
   □ Plaintiff(s) residence in New York County
   □ Defendant(s) residence in New York County
   X Other **[See CPLR Article 5]:** The Defendant is a partnership which, under

7-06  § 503(d), is deemed a resident of New York County because its principal office i

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK ___x
JAMES COLLITON,

Plaintiff,

— against —

CRAVATH, SWAINE & MOORE LLP,

Defendant. __x

Index No.
07604246

**COMPLAINT**

TO THE SUPREME COURT OF THE STATE OF NEW YORK

The complaint of the plaintiff, James Colliton, respectfully shows and alleges as follows:

## FIRST CAUSE OF ACTION

1. The plaintiff herein, James Colliton, is, and at all times mentioned was, a resident of Dutchess County, New York, residing at 28 Millbank Road, Poughkeepsie, New York 12603.

2. The defendant herein, Cravath, Swaine & Moore LLP, is, and at all times mentioned was, a partnership or a limited liability partnership with a principal office in New York County, New York, located at the Worldwide Plaza, 825 Eighth Avenue, New York, New York 10019-7475.

Page 2

3. Defendant is, and at all times mentioned was, a law firm engaged in the business of providing legal services.

4. Upon information and belief, each of the defendant's partners is entitled to lawfully act on behalf of, and legally bind, the defendant.

5. Plaintiff was continuously employed as an attorney by the defendant between December 26, 2000, and March 1, 2006.

6. In consideration for his services, the defendant committed to compensate plaintiff pursuant to various agreements, arrangements and understandings in fact put into and continuously maintained in practice and as a course of conduct by the defendant.

Page 3

7. The compensation-related agreements, arrangements and understandings referred to in paragraph 6 were entered into, revised and/or supplemented on an annual or less frequent basis by the defendant and/or one or more of the defendant's partners (such agreements, arrangements and understandings, as so revised and/or supplemented, shall hereafter be referred to, in the aggregate, as the "Compensation Promise").

8. Under the Compensation Promise, plaintiff was to be compensated by the defendant each year in several ways, including the payment of salary, the payment of an annual bonus, the provision of time off (or the payment of compensation in lieu thereof), and the provision of other benefits and perquisites.

Page 4

9. The entire Compensation Promise was, at least annually, in fact put into and continuously maintained in practice and as a course of conduct by the defendant.

10. Plaintiff entered into his employment with the defendant, and continued his employment with the defendant each year, in reliance upon the defendant's undertaking and promise to pay him all of the compensation, benefits and perquisites envisioned in the annual Compensation Promise.

11. Throughout the tenure of plaintiff's employment with the defendant, plaintiff duly performed for the defendant all of the services and other duties which he had undertaken and promised to do.

Page 5

12. Each year during the plaintiff's employment with the defendant, multiple of the defendant's partners, as part of the Compensation Promise for such year, promised plaintiff that the total dollar value of the compensation and benefits that would actually be paid to him in respect of such year would equal or exceed the total dollar value of the compensation and benefits that would actually be paid to any other non-partner attorney employed in the tax/executive compensation department of the defendant in respect of such year.

13. Each year during the plaintiff's employment with the defendant, after the defendant had actually paid out all compensation and benefits in respect of the preceding year, multiple of the defendant's partners represented to plaintiff that the promise referred to in paragraph 12 with respect

Page 6

to such preceding year had not been breached or violated, fully expecting plaintiff to rely on the truth of such representation.

14. Throughout the tenure of plaintiff's employment with the defendant, Lawrence Witdorchic was employed by the defendant as a non-partner attorney in its tax/executive compensation department.

15. Upon information and belief, the total dollar value of the compensation and benefits that were actually paid to Lawrence Witdorchic in respect of 2004 exceeded the total dollar value of the compensation and benefits that were actually paid to plaintiff in respect of 2004 by approximately #350,000.00.

Page 7

16. By reason of the facts and circumstances stated above, the defendant has breached the promise and the contract referred to in paragraph 12 with respect to 2004 materially.

17. By reason of the facts and circumstances stated above, plaintiff has been damaged by the defendant in the sum of $350,000.00.

18. Despite plaintiff's repeated demands therefore, the defendant has refused and continues to refuse, without cause or justification, to pay to plaintiff any part or parts of the aggregate amount so owing.

19. On account of the defendant's breach, plaintiff has been required to incur certain legal fees, costs and expenses, and will hereafter be further required to incur additional such fees, costs and expenses.

Page 8

20. As a consequence of the defendant's breach, there is now due and owing from the defendant to plaintiff the sum of $350,000.00, together with interest thereon from December 31, 2004.

## SECOND CAUSE OF ACTION

21. Plaintiff repeats paragraphs 1 through 20.

22. Each year during the plaintiff's employment with the defendant, plaintiff relied upon the representations referred to in paragraph 13, and such reliance was reasonable.

23. Each year during the plaintiff's employment with the defendant, plaintiff relied upon the promises referred to in paragraph 12, and such reliance was reasonable.

Page 9

24. In early 2005, in reasonable reliance upon the defendant's promises with respect to 2005 and representations with respect to 2004, plaintiff did not seek or accept alternative employment opportunities.

25. Upon information and belief, the total dollar value of the compensation and benefits that were actually paid to Lawrence Witdorchic in respect of 2005 exceeded the total dollar value of the compensation and benefits that were actually paid to plaintiff in respect of 2005 by approximately $350,000.00.

26. By reason of the facts and circumstances stated above, the defendant has breached the promise and the contract referred to in paragraph 12 with respect to 2005 materially.

Page 10

27. By reason of the facts and circumstances stated above, plaintiff has been damaged by the defendant in the sum of $350,000.00.

28. Despite plaintiff's repeated demands therefore, the defendant has refused and continues to refuse, without cause or justification, to pay to plaintiff any part or parts of the aggregate amount so owing.

29. On account of the defendant's breach, plaintiff has been required to incur certain legal fees, costs and expenses, and will hereafter be further required to incur additional such fees, costs and expenses.

30. As a consequence of the defendant's breach, there is now due and owing from the defendant to plaintiff the sum of $350,000.00, together with interest thereon from December 31, 2009.

Page 11

## THIRD CAUSE OF ACTION

31. Plaintiff repeats paragraphs 1 through 30.

32. Upon information and belief, the defendant breached the promises referred to in paragraph 12 with regard to 2004, 2006 and 2005, and the defendant's representations referred to in paragraph 13 with respect to 2004 and 2005 were, in fact, misrepresentations.

33. In early 2005, in reasonable reliance upon such promises with regard to 2005 and such misrepresentations with respect to 2004, plaintiff sustained substantial damages by failing to seek or accept alternative employment opportunities.

34. By reason of the facts and circumstances stated above, the defendant should be estopped from denying its obligation to pay plaintiff the amounts specified in paragraph 20.

Page 12

## FOURTH CAUSE OF ACTION

35. Plaintiff repeats paragraphs 1 through 34.

36. In early 2006, in reasonable reliance upon the defendant's promises with respect to 2006 and representations with respect to 2005, plaintiff did not seek or accept alternative employment opportunities.

37. In early 2006, in reasonable reliance upon the defendant's promises with regard to 2006 and misrepresentations with respect to 2005, plaintiff sustained substantial damages by failing to seek or accept alternative employment opportunities.

38. By reason of the facts and circumstances stated above, the defendant should be estopped from denying its obligation to pay plaintiff the amounts specified in paragraph 30.

Page 13

## FIFTH CAUSE OF ACTION

39. Plaintiff repeats paragraphs 1 through 38.

40. Upon information and belief, the total dollar value of the compensation and benefits that were actually paid to Lawrence Witdorchic in respect of January 1, 2006, through March 1, 2006, exceeded the total dollar value of the compensation and benefits that were actually paid to plaintiff in respect of such period by approximately $50,000.00.

41. By reason of the facts and circumstances stated above, the defendant has breached the promise and the contract referred to in paragraph 12 with respect to 2006 materially.

42. By reason of the facts and circumstances stated above, the defendant has damaged plaintiff in the sum of $50,000.00

Page 14

43. Despite plaintiff's repeated demands, the defendant has refused and continues to refuse, without cause or justification, to pay to plaintiff any part or parts of the aggregate amount so owing.

44. As a consequence of the defendant's breach, there is now due and owing from the defendant to plaintiff the sum of $50,000.00, together with interest thereon from March 1, 2006.

## SIXTH CAUSE OF ACTION

45. Plaintiff repeats paragraphs 1 through 44.

46. On some date within the preceding five years, the defendant promised all of its attorney employees a "make-up bonus", but never paid such a bonus to plaintiff.

Page 15

47. By reason of the facts and circumstances stated above, the defendant has breached its promise to pay plaintiff a "make-up bonus", and plaintiff has therefore been damaged by the defendant in the sum of approximately $50,000.00.

48. Despite plaintiff's repeated demands therefore, the defendant has refused and continues to refuse, without cause or justification, to pay to plaintiff any part or parts of the aggregate amount so owing.

49. As a consequence of the defendant's breach, there is now due and owing from the defendant to plaintiff the sum of $50,000.00, together with interest thereon from the date "make-up bonuses" were actually paid to the defendant's other attorney employees.

Page 16

## SEVENTH CAUSE OF ACTION

50. Plaintiff repeats paragraphs 1 through 49.

51. The defendant promised plaintiff a pro-rata annual bonus in respect of any year with respect to which he did not remain employed for the full year.

52. The defendant did not pay plaintiff a pro-rata annual bonus in respect of the period beginning on January 1, 2006, and terminating on March 1, 2006.

53. By reason of the facts and circumstances stated above, the defendant has breached its promise to pay plaintiff a pro-rata annual bonus, and plaintiff has therefore been damaged by the defendant in the sum of approximately $15,000.00.

Page 17

54. Despite plaintiff's repeated demands therefore, the defendant has refused and continues to refuse, without cause or justification, to pay to plaintiff any part or parts of the aggregate amount so owing.

55. As a consequence of the defendant's breach, there is now due and owing from the defendant to plaintiff the sum of $15,000.00, together with interest thereon from March 1, 2006.

## EIGHTH CAUSE OF ACTION

56. Plaintiff repeats paragraphs 1 through 55.

57. Multiple of defendant's partners repeatedly represented that plaintiff, upon termination of employment, would be paid by the defendant for all accrued but unused time off, including, without limitation, vacation, sick leave, holidays and bereavement leave, for all preceding years.

Page 18

58. In response to plaintiff's demands therefore, the defendant, in 2007, finally paid plaintiff a portion of the amount so owing, but only with respect to certain accrued but unused vacation days in 2004, 2005 and 2006.

59. Despite plaintiff's repeated demands therefore, the defendant has refused and continues to refuse, without cause or justification, to pay to plaintiff any part or parts, of the aggregate amount of remaining payments in lieu of time off so owing.

60. As a consequence of the defendant's breach of its promise to pay to plaintiff amounts for all accrued but unused time off, there is now due and owing from the defendant to plaintiff the sum of $120,000.00, together with interest thereon from March 1, 2006.

Page 14

## NINTH CAUSE OF ACTION

61. Plaintiff repeats paragraphs 1 through 60.

62. During plaintiff's employment with the defendant, plaintiff had a reasonable expectation of privacy with regard to personal communications and the storage of personal property in locked drawers at the defendant's building.

63. The defendant breached such privacy rights of plaintiff by listening to plaintiff's communications, by reading plaintiff's personal communications, and by looking at, and disclosing to and distributing to third parties, plaintiff's personal property, without any lawful justification, thereby intentionally inflicting emotional distress on plaintiff.

64. As a consequence of the defendant's infliction of emotional distress on plaintiff, there is now due and owing from the defendant to plaintiff compensatory damages in the sum of $500,000.00.

Page 20

## TENTH CAUSE OF ACTION

65. Plaintiff repeats paragraphs 1 through 64.

66. The defendant maintained, and was a fiduciary with respect to, a pension plan participated in by plaintiff.

67. The defendant never complied with the rules necessary to transfer to plan participants the responsibility for investment decisions under the plan.

68. The defendant is therefore responsible for poor investment choices by plan participants.

69. The defendant breached its fiduciary duties with respect to the plan by failing to offer adequate investment alternatives, by failing to prudently appoint other plan fiduciaries and by failing to prudently monitor the performance of other plan fiduciaries.

Page 21

70. Plaintiff suffered losses under the plan as a result of the defendant's breaches.

71. Despite plaintiff's attempt to appeal the amount of benefits he was entitled to under the plan, the defendant has refused for over 10 months, and continues to refuse, without cause or justification, to consider plaintiff's appeal or to pay to plaintiff an amount to compensate plaintiff for the losses he suffered under the plan.

72. As a consequence of the defendant's breaches, there is now due and owing from the defendant to plaintiff the sum of $15,000.00, to compensate plaintiff for losses suffered under the defendant's pension plan.

Page 22

WHEREFORE, plaintiff demands
judgment against the defendant
in the sum of $1,450,000.00,
plus interest from the dates specified
herein, and costs and disbursements,
together with any other relief
the Court finds to be just
and proper.

Dated: December 26, 2007

James Colliton
James Colliton
28 Millbank Road
Poughkeepsie, NY 12603
845-518-0754

## VERIFICATION

James Colliton , being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know

the contents thereof. The same are true to my knowledge, except as to matters therein stated

to be alleged on information and belief and as to those matters I believe them to be true.

James Colliton
_____
[sign your name In front of a Notary]

James Colliton
_____
[print your name]

Sworn to before me this

26th day of December , 2007

_____
Notary Public

JAMES A. MARTIN
Notary Public, State of New York
No. 01MA6076079
Qualified in Dutchess County
Commission Expires Aug. 12, 2010

SampleCompl4-06

# EXHIBIT 6
# Withheld Pending Decision on Motion to File Under Seal

# EXHIBIT 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:   PART 94
-----------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                 -against-

                **DECISION and ORDER**
                Indictment Nos.   861/06
                                1748/06

JAMES COLLITON,

                Defendant.
-----------------------------------------------------------------X
JUSTICE A. KIRKE BARTLEY

      In Indictment number 861/06, the defendant is charged with multiple counts of Rape in

the Second Degree, among other charges; in Indictment number 1748/06, the defendant is

charged with multiple counts of Rape in the Third Degree, among other charges.  Omnibus

motions were served and filed in Part 52. The motions were granted to the extent of ordering a

*Huntley* hearing with regard to statements made to Canadian officials, limited to the issue of

voluntariness, a *Huntley* hearing with regard to statements made following defendant's arrest in

New York City, limited to the issues of voluntariness, right to counsel and Miranda, and a *Mapp*

hearing as to property recovered from the defendant's hotel room in New York City, limited to

the issue of whether the seizure of the property was incident to the defendant's arrest.

      The matter was sent to Part 94 for hearings, which were conducted on May 29, 2007 and

May 30, 2007. At the hearing, Canadian Police Officials Detective Michael McGivern and Police

Constable Oliver Williams, and New York City Police Detective Edwin Gomez testified for the

People. Based on the testimony of the witnesses at the hearing, the court makes the following

Findings of Fact and Conclusions of Law:

### Findings of Fact

      Detective Michael McGivern has served for 19 years in the Toronto Police Service and is

the supervisor of the Toronto Police Service Fugitive Squad. The Fugitive Squad assists foreign

law enforcement in apprehending individuals who may be using Toronto as a safe haven and

extraditing individuals who are accused of crimes abroad. The Fugitive Squad has joint forces

1

operations with the Canadian immigration services, known as the Canadian Border Services agency. Police Constable Oliver Williams has been a member of the Toronto Police department for 32 years. In February, 2006, he was assigned to the fugitive squad, and his supervisor was Detective McGivern. Detective Edwin Gomez has been a member of the New York City Police Department for fifteen years. He has been a detective for 5 ½ years. All three witnesses that testified at the hearing were credible.

On February 22, 2006, Constable Williams was assigned the case of James Colliton. He called a police officer in charge of the case in New York City and learned that an arrest warrant for James Colliton had been issued in New York City. He was provided with a photograph of Mr. Colliton and then spoke to Canadian Immigration Authority Agent Lorenzo Censoni, who informed Constable Williams that he had the authority from Canadian officials to arrest Mr. Colliton for deportation purposes. It had been determined that Mr. Colliton had misrepresented himself when he crossed the border because the Canadian immigration authority was unaware of his presence in Canada and there was a warrant for his arrest in New York. A Canada-wide immigration arrest warrant was issued for the purpose of removing Mr. Colliton from Canada to the United States.

On the evening of Friday, February 24, 2006, Constable Williams received a telephone call from an individual working at a Petro Canada gas station in the area of Grimsby, Ontario. The caller stated that a man matching the description of the defendant and driving a green Aurora vehicle with New York license plates had just purchased gas. Constable Williams was approximately 1 ½ to 2 hours away from the Grimsby area when he received the call. He contacted Detective McGivern, who was at his home, approximately ½ hour from the town of Grimsby. Detective McGivern reached Grimsby in in approximately 30 minutes, and went to the Super 8 motel in Grimsby to investigate whether Mr. Colliton was staying there. Detective McGivern saw the defendant's green vehicle parked at the Super 8, called the local police, and waited for back-up to arrive.

Once Constable Williams, Immigration Agent Censoni, and a sergeant and a constable from the local police arrived, everyone was briefed, and the five law enforcement officers entered the motel. Detective McGivern, Constable Williams and Immigration Agent Censoni went in

2

plainclothes; the local police sergeant and constable were in uniform. They showed the photograph of Mr. Colliton to the clerk at the front desk who indicated that James Colliton was staying in room 307. Detective McGivern and the other law members of enforcement went up to the hallway where room 307 was located. Detective McGivern called the front desk clerk on his cell phone and asked to be put through to room 307. A man answered the telephone in room 307 and Detective McGivern asked him whether he was James, to which the person responded yes. The detective then told him that he was a police officer and that they have a warrant for his arrest, they are heavily armed, and they want him to come out of the room immediately or they will assume he is armed. The defendant complied very quickly and exited the motel room naked, with his hands in the air.

At the time the defendant exited the room, approximately 11:30 p.m., Detective McGivern was the only one displaying a weapon and he was standing in front of the four other members of law enforcement. The defendant was handcuffed immediately by Constable Williams. Constable Williams informed the defendant that he was under arrest. The defendant was informed of his Canadian charter rights, which are: you have a right to retain counsel; you have the right to have any lawyer you wish; if you do not have a lawyer a 1-800 number is available for you to phone and call and speak to a lawyer, free of charge. The defendant indicated that he understood his rights, and he did not request a lawyer.

The defendant was then brought back into his motel room and was seated in a chair. Constable Williams asked the defendant again whether he understood he had a right to a lawyer, and the defendant indicated he did not need to call a lawyer. Constable Williams told the defendant that there was a Canadian immigration warrant for his arrest and that he was in the country illegally. According to Constable Williams, Agent Censoni spoke to the defendant at that point for a short period of time, but he could not remember the subject of the conversation Agent Censoni was having with the defendant. Constable Williams then asked the defendant why he was in the Toronto area, why his vehicle was not noted as crossing the border and he asked about where he crossed the border into Canada. Constable Williams also asked the defendant where he was during the day since the police had been through the Grimsby area a few times earlier that day and had not seen the defendant's vehicle. The defendant did not divulge his

3

whereabouts during the day other than to say he was with family members on his wife's side. Constable Williams asked him for names and addresses of whom he had been with, but the defendant refused to give him any further information. Constable Williams did not ask him any questions about the arrest warrant in New York or the underlying crimes alleged to have occurred in New York. Nor did Constable Williams ever threaten the defendant or make him any promises in an attempt to get him to speak.

Nevertheless, the defendant stated to Constable Williams that he did not want to return to the United States, and that he was wanted to serve twelve years down there. He stated he wanted to move his charges up to Canada and wanted to do the time in Canada because the system is more lenient. He indicated he would not be bothered by gang members in Canada, and that there are gang problems in New York City. He said parole was more lenient in Canada and he wanted to have his charges sent to Toronto.

After the other members of law enforcement checked the room for weapons, the defendant was uncuffed, permitted to get dressed and was handcuffed again. Immigration officials took money that was in the motel room, and the defendant was taken by uniformed police officers to the local police station. Constable Williams arrived at the police station at approximately the same time as the defendant. After about twenty minutes, Constable Williams went into the interview area where Agent Censoni was with the defendant to ask if they needed anything. They did not, and Officer Williams briefly overheard the defendant and Agent Censoni discussing the possibility of making arrangements with the governments to have the defendant stay in Canada to do his time.

At some point in the days following his arrest in Canada, the defendant was mistakenly released by the United States Department of Homeland Security. On the morning of March 3, 2006, Detective Edwin Gomez of the New York City Police Department was on duty at the 9th precinct with his partner Detective Nigro. Detective Nigro received a telephone call from the manager of the St. Marks Hotel stating that he believed that the person on the front page of the Daily News was staying at his hotel. Detective Gomez bought a copy of the Daily News which had a photograph of the defendant on the cover. He spoke to other detectives in his squad and then went to the St. Marks Hotel with Detectives Nigro, Villanueva and Lombardi. At the

4

detectives were in plainclothes. When they arrived at the hotel between 9:45 and 10:00 a.m., Detective Gomez spoke to the manager who gave them a key to the room in which the defendant was staying.

Detective Gomez opened the door with the key while displaying his shield and identifying himself as a police officer. None of the detectives had their guns drawn. The defendant was sitting on the edge of the foot of the bed wearing only a teeshirt and immediately jumped off the bed as the detectives approached. The room was approximately eight feet by ten feet, most of which was taken up by the bed. There was approximately two feet of space on either side of the bed. Detective Gomez entered first with the other officers directly behind him, as there was very little space in the room. Detective Gomez walked very quickly to the defendant and grabbed him and put him back down on the bed. There was a large shopping bag to the right of where the defendant was seated in the two foot gap between the bed and the wall. The bag was opened and close to the defendant. The detective looked into the bag to make sure that there was nothing in the bag that could harm the officers. There were approximately thirty American Express gift cards worth a total of about two thousand dollars, approximately ten thousand dollars of U.S. currency, hygiene gear, underclothes and assorted paperwork in the shopping bag. Detective Gomez grabbed the defendant from one side and Detective Nigro handcuffed the defendant as soon as the detectives were able to get the bag away from the defendant. Detective Gomez looked at the photograph in the paper and asked the defendant if that was him. The defendant nodded and stated that he was James.

Detective Gomez stood the defendant up. Defendant asked to put on his pants. Once the detectives made sure the room was secure, the defendant was uncuffed, permitted to put on his pants, and handcuffed again. A supervisor was called to the scene, the detectives gathered all of defendant's property that was in plain view, which was primarily the bag and its contents, and the defendant was brought to the 9th precinct by the sergeant. The defendant was brought to the precinct and was placed in the Detective Squad interview room. Detective Gomez spoke to Detective Martello, the lead detective on the case, when he called the New York County District Attorney's office immediately after he arrived at the precinct. The door of the interview room where the defendant was seated remained closed and the defendant was alone inside the room. Detective

5

Gomez went into the room a few times to make sure the defendant was not harming himself, and to ask whether he needed something to eat or drink or to use the bathroom. Defendant responded that he was fine.

Once Detective Martello arrived at the 9th precinct, Detectives Gomez and Martello went into the interview room for the purpose of Detective Martello introducing himself. Within seconds of them entering the room, Mr. Colliton stated "I just want you guys to know I'm surrendering myself." Prior to him stating that, neither detective had asked him a question. That statement was made approximately within an hour of the defendant's arrival at the precinct.

**Conclusions of Law**

*Huntley* Hearing

The only issue for this court to decide with regard to the defendant's initial apprehension in Canada is whether the statements that the defendant made in the motel room to Constable Williams were voluntary. At a *Huntley* hearing, the People bear the burden of proving the voluntariness of each statement beyond a reasonable doubt (*People v Huntley*, 15 NY2d 72 [1965]). "An involuntary statement includes one that has been physically or psychologically coerced, obtained by a promise or statement that creates a risk of falsely incriminating oneself or obtained by the failure to give *Miranda* warnings (CPL 60.45)." (*People v. Chase*, 85 NY2d 493, 500 [1995]).

There is no evidence suggesting that the defendant's statement about wanting to serve his time in Canada was a result of coercive, threatening, or inappropriate behavior on the part of any Canadian official. While the defendant was indeed handcuffed pursuant to the Canadian immigration arrest warrant, there is no evidence that he was treated in a particularly rough manner, that unnecessary force was used to apprehend him or that he was threatened or promised anything in order to induce him to speak. Nor does the fact that he was held in a foreign country, or that he was nude when he was arrested, indicate that he was at any mental or psychological disadvantage that would result in him falsely incriminating himself. To the contrary, the content of the statement made by defendant indicates that the defendant was well aware of his fugitive status in the United States and that he was using the circumstance of his

6

apprehension in Canada in a conscious attempt to utilize the Canadian justice system for his own benefit.

While the defendant was not read *Miranda* warnings by Canadian officials, "foreign law enforcement officials are not bound by the mandates of *Miranda v. Arizona*" (*People v. Webster*, 248 AD2d 738 [2D 1998]; *see also People v. Mejia*, 162 Misc2d 679 [NY Co. Sup. 1994]; *U.S. v. Welch*, 455 F2d 211 [2nd Circ. 1972]; *U.S. v. Maturo*, 982 F2d 57 [2nd Circ. 1992]). Absent an indication that the statement was in fact coerced, "the fact that the defendant was not given Miranda warnings before questioning by foreign police will not, in itself, render his confession inadmissible" (*U.S. v. Chavarria*, 443 F2d 904 [9th Circ. 1971]).

Although Constable Williams did not read actual *Miranda* warnings, he did apprise the defendant of his charter rights under Canadian law. These charter rights included that the defendant not only had a right to a lawyer, but that he had the right to call and speak to a lawyer at a toll free number which presumably would have provided him with immediate access to the advice of an attorney prior to answering any questions. The defendant, an attorney himself, chose not to utilize the toll free number and speak to a lawyer. He was then asked a series of questions about his whereabouts and actions in the Toronto area, most of which he chose not to answer. While he stated that he had been with relatives of his wife who live in Canada, he refused to give Constable Williams any names or addresses for those purported individuals, or any specific details about his whereabouts in Canada. Significantly, while the defendant chose not to give Constable Williams information in response to the specific questions posed to him, he did volunteer that he was facing jail time in New York and wanted to serve his time in Canada based upon his belief that the prison and parole conditions in Canada were less harsh than in the United States. His choice not to answer the questions asked of him and to instead attempt to speak to the officers about a different subject of his own choosing demonstrates that the statement was not a result of any "improper conduct or undue pressure which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement" (*CPL* 60.45[2]).

Nor is there any evidence that the statement was made in response to a promise or statement of fact made to the defendant by any Canadian official which would have made him

7

falsely incriminate himself (*see id.*). In point of fact, the defendant was not asked any questions about the New York warrant or anything relating to the charges against him in New York. Nevertheless, he himself brought up the subject of his criminal liability in New York in a seemingly calculated effort to create a better environment for his potential future imprisonment. That this statement, which he made in an attempt to further his own interest, was on a different subject altogether than the one about which he was asked questions by Constable Williams, clearly demonstrated his ability to make a choice about whether or not and about what subject to speak. Hence, this court finds that the statements Mr. Colliton made to Canadian officials were voluntary.

  With regard to the statement made to Detectives Gomez and Martello at the 9th precinct on March 3, 2006, this decision is limited to the issues of voluntariness, right to counsel and *Miranda*. Before an individual can be subjected to custodial interrogation, he must be advised of his right to remain silent and other rights under *Miranda v Arizona,* 384 US 436 [1966]. However, when a statement is spontaneous and is not the product of custodial interrogation or its functional equivalent, it is admissible even in "the absence of *Miranda* warnings" (*People v. Johnson*, 240 AD2d 432 [2D 1997]; *see also People v. Rosario*, 245 AD2d 470 [2D 1997]). The statement the defendant made to Detectives Gomez and Martello that he was surrendering himself was clearly spontaneous. No questions were posed to him by either Detective Gomez or Detective Martello prior to making the statement. While Detective Gomez had gone into the room in which the defendant was seated a few times to check on the defendant, he never asked the defendant a single question about his criminal warrant or the underlying charges. The few questions posed by the detective regarding the defendant's condition and if he needed anything were innocuous and could not be considered reasonably likely to elicit an incriminating response (*See, e.g., People v. Daniels*, 6 AD2d 245 [1D 2004]; *People v. Paul*, 272 AD2d 269 [1D 2000]; *People v. Wilson*, 149 AD2d 376 [1D 1989]). To the contrary, the evidence indicates that the defendant simply blurted out that he was surrendering himself when the detectives entered the room. It was preceded by nothing on the part of either detective that constituted interrogation or its functional equivalent (*See, e.g. People v. Reese*, 248 AD2d 411 [2D 1997]; *People v. Wilson*, 248 AD2d 411 [2D 1997]). Nor is there evidence that the defendant ever invoked his right to

8

counsel prior to making the statement. Hence, this court finds that the statement was voluntary and there was no right to counsel or *Miranda* violation.

In conclusion, the People established beyond a reasonable doubt that all of the statements were voluntary, and therefore admissible. The motion to suppress statements is denied.

*Mapp* Hearing

On a motion to suppress physical evidence, the People have the burden of going forward to show the legality of police conduct in the first instance. Once they have made this showing, the defendant bears the ultimate burden of proving that the conduct was illegal (*People v Berrios*, 28 NY2d 361, 367 [1971]).

The sole issue for this court to decide regarding the physical evidence recovered in the hotel room on March 3, 2006, is whether the seizure of the property was incident to the defendant's arrest. The defendant's large shopping bag containing money, gift cards and numerous other items was in plain view within feet of the defendant when the detectives entered the hotel room. The defendant had been seated at the foot of the bed and the shopping bag was open and close to him in the small two foot space between the bed and the wall. The defendant had not yet been handcuffed when Detective Gomez first recovered and looked into the bag to make sure that there was nothing in the bag that could harm any of the detectives. As the bag was in the defendant's "grabbable area," and its seizure and search was contemporaneous to the defendant's arrest, the search was a lawful search incident to defendant's arrest (*See People v. Temple*, 165 AD2d 748 [1D 1990]; *People v. Jakakas*, 110 AD2d 660 [1D 1985]; *People v. Capellan*, 38 AD3d 393 [1D 2007]; *People v. Wylie*, 244 AD2d 247 [1D 1997]; *People v. Valenzuela*, 226 AD2d 154 [1D 1996]).

The motion to suppress the physical evidence recovered on March 3, 2006, is denied. This constitutes the decision and order of the court.

DATED:        June 20, 2007
              New York, N.Y.


                                    JUSTICE, SUPREME COURT

9

# EXHIBIT 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

THE PEOPLE OF THE STATE OF NEW YORK

-against-

JAMES COLLITON,
████████████████

Defendants.

---

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuse

the defendant JAMES COLLITON of the crime of **RAPE IN THE SECOND DEGREE**, in

violation of Penal Law §130.30(1), committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of

from on or about January 13, 2004 to on or about February 01, 2005, being eighteen years old or

more, engaged in sexual intercourse with ████████ a person who was less than fifteen years

old.

SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the

defendant JAMES COLLITON of the crime of **RAPE IN THE SECOND DEGREE**, in

violation of Penal Law §130.30(1), committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of

from on or about February 01, 2005 to on or about March 01, 2005, being eighteen years old or

more, engaged in sexual intercourse with ████████ a person who was less than fifteen years

old.

THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant JAMES COLLITON of the crime of **RAPE IN THE SECOND DEGREE**, in violation of Penal Law §130.30(1), committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of from on or about March 01, 2005 to on or about March 12, 2005, being eighteen years old or more, engaged in sexual intercourse with ████████ a person who was less than fifteen years old.

FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant JAMES COLLITON of the crime of **RAPE IN THE SECOND DEGREE**, in violation of Penal Law §130.30(1), committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of from on or about January 03, 2006 to on or about January 10, 2006, being eighteen years old or more, engaged in sexual intercourse with ████████ a person who was less than fifteen years old.

FIFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant JAMES COLLITON of the crime of **PATRONIZING A PROSTITUTE IN THE SECOND DEGREE**, in violation of Penal Law §230.05, committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of from on or about December 01, 2004 to on or about March 12, 2005, being over eighteen years of age, patronized a prostitute, and the person patronized was less than fourteen years old.

SIXTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant JAMES COLLITON of the crime of **PATRONIZING A PROSTITUTE IN THE THIRD DEGREE**, in violation of Penal Law §230.04, committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of from on or about August 01, 2000 to on or about February 11, 2004, being over twenty-one years of age, patronized a prostitute and the person patronized was less than seventeen years old.

SEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant JAMES COLLITON of the crime of **BRIBING A WITNESS**, in violation of Penal Law §215.00(a), committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of from on or about February 07, 2006 to on or about February 15, 2006, conferred, offered and agreed to confer, a benefit upon ███████████ a witness and a person about to be called as a witness in an action and proceeding upon an agreement and understanding that the testimony of ███████████ would thereby be influenced.

EIGHTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant JAMES COLLITON of the crime of **BRIBING A WITNESS**, in violation of Penal Law §215.00(b), committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of from on or about February 07, 2006 to on or about February 15, 2006, conferred, offered and agreed to confer, a benefit upon ████████ a witness and a person about to be called as a witness in an action and proceeding upon an agreement and understanding that she would absent herself from, and otherwise seek to avoid appearing and testifying at, such action and proceeding.

NINTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant JAMES COLLITON of the crime of **BRIBING A WITNESS**, in violation of Penal Law §215.00(a), committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of from on or about February 07, 2006 to on or about February 15, 2006, conferred, offered and agreed to confer, a benefit upon ████████ a witness and a person about to be called as a witness in an action and proceeding upon an agreement and understanding that the testimony of ████████ would thereby be influenced.

TENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant JAMES COLLITON of the crime of **BRIBING A WITNESS**, in violation of Penal Law §215.00(b), committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of from on or about February 07, 2006 to on or about February 15, 2006, conferred, offered and agreed to confer, a benefit upon ▮▮▮▮▮▮▮▮ a witness and a person about to be called as a witness in an action and proceeding upon an agreement and understanding that she would absent herself from, and otherwise seek to avoid appearing and testifying at, such action and proceeding.


ELEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant JAMES COLLITON of the crime of **TAMPERING WITH A WITNESS IN THE FOURTH DEGREE**, in violation of Penal Law §215.10, committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of from on or about February 07, 2006 to on or about February 15, 2006, knowing that ▮▮▮▮▮ ▮▮▮▮ was and was about to be called as a witness in an action and proceeding, wrongfully induced and attempted to induce such person to absent herself from and otherwise to avoid and seek to avoid appearing and testifying at, such action and proceeding.

TWELFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the

defendant JAMES COLLITON of the crime of **TAMPERING WITH A WITNESS IN THE**

**FOURTH DEGREE**, in violation of Penal Law §215.10, committed as follows:

The defendant JAMES COLLITON, in the County of New York, during the period of

from on or about February 07, 2006 to on or about February 15, 2006, knowing that ▓▓▓▓

▓▓▓▓ was and was about to be called as a witness in an action and proceeding, wrongfully

induced and attempted to induce such person to absent herself from, and otherwise to avoid and

seek to avoid appearing and testifying at, such action and proceeding.


THIRTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the

defendant ▓▓▓▓▓▓▓▓ of the crime of **PROMOTING PROSTITUTION IN THE**

**THIRD DEGREE**, in violation of Penal Law §230.25(2), committed as follows:

The defendant ▓▓▓▓▓▓▓▓ in the County of New York, during the period of from

on or about August 01, 2000 to on or about February 11, 2006, knowingly advanced and

profited from prostitution of a person who was less than nineteen years old.

FOURTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant ▮▮▮▮▮▮▮▮▮ of the crime of **PROMOTING PROSTITUTION IN THE SECOND DEGREE**, in violation of Penal Law §230.30(2), committed as follows:

The defendant ▮▮▮▮▮▮▮▮▮ in the County of New York, during the period of from on or about December 01, 2004 to on or about January 10, 2006, knowingly advanced and profited from prostitution of a person who was less than sixteen years old.

FIFTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant ▮▮▮▮▮▮▮▮▮ of the crime of **ENDANGERING THE WELFARE OF A CHILD**, in violation of Penal Law §260.10(1), committed as follows:

The defendant ▮▮▮▮▮▮▮▮▮ in the County of New York, during the period of from on or about December 01, 2004 to on or about February 07, 2006, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of ▮▮▮▮▮▮▮ child less than seventeen years old.



ROBERT M. MORGENTHAU
District Attorney

I hereby certify that the foregoing paper is a true copy of the original thereof, filed in my office.

DATE APR 0 9 2008

County Clerk and Clerk of the Supreme Court New York County
-OFFICIAL US-

GJ #6 *Cee #16*

PART 70    FEB 24 2006

**6th GRAND JURY**

No.
0861-2006

Filed:

NO ARREST WAIVED

2006NY011275,
2006NY009887

THE PEOPLE OF THE STATE OF NEW YORK

-against-

JAMES COLLITON,

Defendants.

INDICTMENT

RAPE IN THE SECOND DEGREE, P.L. §130.30(1) - DEF. J. COLLITON
PATRONIZING A PROSTITUTE IN THE THIRD DEGREE, P.L. §230.04 - DEF. J. COLLITON, 4 Cts
PATRONIZING A PROSTITUTE IN THE SECOND DEGREE, P.L. §230.05 - DEF. J. COLLITON
BRIBING A WITNESS, P.L. §215.00(a) - DEF. J. COLLITON, 2 Cts
BRIBING A WITNESS, P.L. §215.00(b)- DEF. J. COLLITON, 2 Cts
TAMPERING WITH A WITNESS IN THE FOURTH DEGREE, P.L. §215.10 - DEF. J. COLLITON, 2 Cts
PROMOTING PROSTITUTION IN THE THIRD DEGREE, P.L. §230.25(2) - DEF.
PROMOTING PROSTITUTION IN THE SECOND DEGREE, P.L. §230.30(2) - DEF.
ENDANGERING THE WELFARE OF A CHILD, P.L. §260.10(1) - DEF.

ROBERT M. MORGENTHAU, District Attorney



A True Bill

Foreman

DATE    APR 09 2008
I hereby certify that the foregoing
paper is a true copy of the original
thereof, filed in my office.

County Clerk, and Clerk of the
Supreme Court New York County,
OFFICIAL US~

Rachel Hochhauser
Family Violence/Child Abuse Bureau
ASSIGNED TO PART 82 ON 4/14/06

# EXHIBIT 9

# CRAVATH, SWAINE & MOORE

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III
THOMAS D. BARR
MELVIN L. BEDRICK
GEORGE T. LOWY
ROBERT ROSENMAN
ALAN J. HRUSKA
FREDERICK A.O. SCHWARZ, JR.
ROBERT S. RIFKIND
DAVID O. BROWNWOOD
PAUL M. DODYK
THOMAS R. BROME
ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN W. WHITE
JOHN E. BEERBOWER

EVAN R. CHESLER
PATRICIA GEOGHEGAN
D. COLLIER KIRKHAM
MICHAEL L. SCHLER
DANIEL P. CUNNINGHAM
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
NEIL P. WESTREICH
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON
JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN

W. CLAYTON JOHNSON
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
WILLIAM B. BRANNAN
LEWIS R. STEINBERG
SUSAN WEBSTER
WILLIAM H. WIDEN
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
JOHN T. GAFFNEY
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
GEORGE W. BILICIC, JR.
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
STEPHEN L. BURNS

KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE T. SPELLMAN

OF COUNSEL:
CHRISTINE BESHAR

33 KING WILLIAM STREET
LONDON EC4R 9DU ENGLAND
TELEPHONE: 44-207-453-1000
FACSIMILE: 44-207-860-1150

SUITE 2609, ASIA PACIFIC FINANCE TOWER
3 GARDEN ROAD, CENTRAL
HONG KONG
TELEPHONE: 852-2509-7200
FACSIMILE: 852-2509-7272

WRITER'S DIRECT DIAL NUMBER

(212) 474-1584

November 9, 2000

Dear Jim:

I am delighted to confirm our offer to you to join the Benefits group in the Tax Department at Cravath, Swaine & Moore as a special associate.

Your compensation will consist of a base salary of $350,000 per annum and a 2001 year-end bonus of $50,000 per annum.

The Firm will not make any retirement or 401(k) contributions on your behalf, but you will become eligible to make Deferred Contributions with pre-tax dollars and Voluntary Contributions with after-tax dollars and beginning as soon as practicable following your first date of employment.

You will participate in our health benefits plan and be eligible for our group life insurance program.  In addition, you will be entitled to 20 days of vacation in 2001.

We cannot guarantee employment for any fixed period of time because, as a matter of longtime policy and practice here, all lawyers are employees at will.  While either of us may terminate this employment at any time, we hope that you would give us as much notice as possible if you decide to leave, and we shall give you as much notice as possible if we ask you to leave.

For good order's sake, I would appreciate your returning a copy of this letter signed below to acknowledge that I have accurately expressed our foregoing understanding.

Very truly yours,

Patricia Geoghegan

Acknowledged:

James Colliton

# EXHIBIT 10

SUMMARY PLAN DESCRIPTION

FOR THE

SAVINGS PLAN FOR SENIOR ATTORNEYS

AND ASSOCIATES

OF

CRAVATH, SWAINE & MOORE LLP

Table of Contents

                                                                        Page

The Plan at a Glance ...................................................................................3

Who Is Eligible? ........................................................................................3

Deferred Contributions with Pre-tax Dollars ............................................4

Voluntary Contributions ............................................................................5

Firm Contributions.....................................................................................6

Rollover Contributions...............................................................................7

Investment of Contributions ......................................................................8

      1.   Common Stock Funds...................................................8

      2.   Fixed Income Fund ....................................................11

      3.   Bond Fund.................................................................11

Accounts ..................................................................................................13

Vesting.....................................................................................................14

Payment of Benefits.................................................................................15

Withdrawals During Employment ...........................................................16

Tax Withholding.......................................................................................18

Loans........................................................................................................19

Beneficiary...............................................................................................20

If Your Service Is Interrupted ..................................................................21

Plan Amendment and Termination ..........................................................21

Assignment of Benefits ............................................................................22

How to Apply for Benefits........................................................................22

Plan Sponsor ............................................................................................23

Plan Administrator ...................................................................................23

Plan Trustee .............................................................................................23

Type of Plan.............................................................................................24

Agent for Service of Legal Process .........................................................24

Plan Year..................................................................................................24

Government Filings...................................................................................24

Your ERISA Rights ..................................................................................24

Plan Operation .........................................................................................25

Guaranteed Rights....................................................................................25

Enforcing Your Rights..............................................................................25

Further Assistance ...................................................................................26

[[NYADMIN:2242671v1:3156C:08/06/04--11:59 a]]

## SAVINGS PLAN FOR SENIOR ATTORNEYS
## AND ASSOCIATES OF
## CRAVATH, SWAINE & MOORE LLP

Effective January 1, 2002, the Savings Plan for Senior Attorneys and Associates of Cravath, Swaine & Moore LLP (the "Plan") has been revised to reflect various changes to the law. In general, the contribution limits have been increased and the Plan has been made more flexible.

Effective June 1, 2002, Milliman USA ("Milliman") is the Plan's recordkeeper. You may access your account either by calling the Milliman hotline at 1-888-271-8689 or by visiting its website at www.millimanonline.com.

This summary describes the benefits provided under the Plan as amended through January 1, 2002. Should there be any conflict between this summary and the official text of the Plan, the official text will govern.

<u>The Plan at a Glance</u>

Under the Plan:

(a)  you may elect to have "Deferred Contributions" (pre-tax) made on your behalf--this feature effectively allows you to make contributions with pre-tax dollars up to an annual limit of $11,000 (as adjusted after 2002);

(b)  if you attain age 50 before the end of the year, you may also make additional "Catch-up Contributions" with pre-tax dollars subject to certain limits;

(c)  you may also make additional "Voluntary Contributions" with after-tax dollars that will accumulate on a tax-deferred basis;

(d)  you will always be fully vested in your entire account attributable to "Deferred Contributions," "Catch-up Contributions" and "Voluntary Contributions;" and

(e)  benefits are provided at retirement or termination of employment and, under certain conditions, you may withdraw amounts before then.

<u>Who Is Eligible?</u>

As an associate or senior attorney of the Firm, you are eligible to have Deferred Contributions (see below) made on your behalf and/or to make Voluntary Contributions (after-tax) and Rollover Contributions beginning as soon as practicable following your first date of employment.  Certain senior attorneys and associates designated by the Firm may also become eligible to receive nonelective Firm Contributions as of the first day of the month after they complete one Year of Eligibility Service.

Deferred Contributions with Pre-tax Dollars

   As a participant in the Plan, you may direct the Firm to contribute on your behalf a specific amount or percentage of your total Compensation to the Plan and your Compensation will be reduced by a corresponding amount. Your maximum Deferred Contributions each year are limited to the annual dollar limit described below, but your maximum Deferred Contributions, Voluntary Contributions and Firm Contributions also cannot exceed 100% of your Compensation. The Administrative Committee reserves the right to limit the amount of Deferred Contributions withheld from your Salary in the event there are insufficient funds available to accommodate other required payroll deductions (such as medical insurance premiums, loan repayments, domestic garnishments, etc.). Deferred Contributions are not subject to Federal income tax, state income tax in New York, New Jersey or Connecticut or New York City income tax. Deferred Contributions are, however, subject to Social Security taxes. Your Deferred Contributions are not considered to reduce your salary for purposes of the nonelective Firm Contribution, if any, made to the Plan on your behalf. Effective for 2002, your Deferred Contributions are limited to $11,000 per calendar year. This $11,000 cap will increase $1,000 annually until it reaches $15,000 in 2006 and may be further increased after 2006, based on increases in the cost of living. In addition, if you have reached age 50 by the end of a Plan Year, you may direct the Firm to contribute additional pre-tax dollars on your behalf, called Catch-up Contributions, up to a maximum of $1,000 in 2002 (this limit will increase by $1,000 annually until it reaches $5,000 in 2006), subject to certain limits. If you contribute less than the full dollar amount in any year, the omitted contributions may not be made up in a subsequent year.

   The following is a schedule containing the contribution limits for the next few years:

4

| Year | Under Age 50 | Age 50 or Older [1] |
|------|------------|------------------|
| 2002 | $11,000 | $12,000 |
| 2003 | $12,000 | $14,000 |
| 2004 | $13,000 | $16,000 |
| 2005 | $14,000 | $18,000 |
| 2006 and thereafter[2] | $15,000 | $20,000 |

As a result of certain nondiscrimination rules under the Internal Revenue Code, it is possible that you may not be able to contribute the full $11,000. You will be informed if this limitation applies.

If you wish to direct the Firm to make Deferred Contributions on your behalf (and to reduce your Compensation accordingly) or to change your rate of contributions, you may either call the Milliman hotline at 1-888-271-8689 or visit the website at www.millimanonline.com. You may increase or decrease your Deferred Contributions at any time.

Voluntary Contributions

You may also elect to make additional Voluntary Contributions to the Plan with after-tax dollars either through a lump-sum contribution or by payroll deductions.

Voluntary Contributions will not be permitted to the extent that the sum of (a) the Firm's Contributions (including Deferred Contributions, but excluding Catch-up Contributions) made on your behalf for the calendar year plus (b) your Voluntary Contributions for such year

---

[1] These amounts include Catch-up Contributions as described above.

[2] For years beginning after 2006, the $15,000 and $20,000 limits will be indexed based upon increases in the cost of living.

5

exceeds the lesser of $40,000 or 100% of your total pay prior to reduction for Deferred Contributions you have made and/or reductions in your compensation due to your participation in the Expense Reimbursement Plan of Cravath, Swaine & Moore LLP (the "Expense Reimbursement Plan") or the Premium Payment Plan of Cravath, Swaine & Moore LLP (the "Premium Payment Plan") for such year.

Although all Voluntary Contributions that you make will be with after-tax dollars, the earnings on those contributions will accumulate on a tax-deferred basis.

As a result of certain nondiscrimination rules under the Internal Revenue Code, it is possible that some highly compensated participants may be limited as to the amount of permitted after-tax contributions. You will be informed if you are affected by this limitation.

If you wish to direct the Firm to make Voluntary Contributions on your behalf (and to reduce your pay accordingly) or to change your rate of contributions, you may either call the Milliman hotline at 1-888-271-8689 or visit the website at www.millimanonline.com. You may increase or decrease your Voluntary Contributions at any time.

Firm Contributions

If you are designated by the Firm and have completed one Year of Eligibility Service, the Firm will contribute on your behalf 7-½% of the Compensation[3] you received while a participant entitled to share in nonelective Firm Contributions since the later of (a) the last Allocation Date (June 30 and December 31) or (b) the first day of the month after you have completed one Year of Eligibility Service and attained age 21. (An associate who is on a regular

---

[3] Your Compensation consists of your salary plus bonuses prior to any reduction due to your participation in the Expense Reimbursement Plan, the Premium Payment Plan or this Plan up to an annual maximum. For 2002, Compensation is limited to $200,000. This limit will be adjusted by law to reflect increases in the cost of living.

partnership track will not be eligible to have Firm Contributions made on his or her behalf.)  If eligible, you will be entitled to have a contribution made on your behalf only if you are employed by the Firm on the Allocation Date.  This means, for example, that a contribution based on your Compensation after July 1, 2002, will not be made if you leave the Firm before December 31, 2002.

A Year of Eligibility Service is a 12-month period beginning on your first date of employment with the Firm (or any January 1 after that date) in which you are credited with at least 1,000 Hours of Service.  Generally, you are credited with one Hour of Service for each hour for which you are paid, including any paid leaves of absence (limited to the number of Hours of Service for which you are entitled to payment under the Firm's regular pay practices).  Additionally, you will receive credit for your service with respect to a break in service due to "qualified military service."

Rollover Contributions

If you received or are eligible to receive a lump-sum distribution from a qualified pension or profit-sharing plan, a qualified 403(b) annuity contract or a 457 governmental plan maintained by another employer, you may be able to transfer your benefit from your former plan to this Plan.  Such transfers, including any employee after-tax contributions, may be made directly from your former plan to this Plan, in which case you avoid any income tax withholding.  Alternatively, if you elected to receive your lump-sum distribution from another qualified pension or profit-sharing plan, a 403(b) annuity plan or a 457 governmental plan, you may transfer your benefit, not including employee after-tax contributions, to this Plan if it is transferred to this Plan within 60 days after you receive it.  Additionally, you may also transfer any deductible Individual Retirement Account ("IRA") to this Plan, subject to certain limitations.

7

You should contact the Milliman hotline at 1-888-271-8689 or visit the website at www.millimanonline.com if you wish to obtain a rollover form and instructions in order to make a rollover to this Plan.

Investment of Contributions

Contributions are used to purchase units in one or more of the Plan's investment funds, as you elect. One investment election will apply to all types of future contributions (other than Rollover Contributions).

You may elect to have all or some of the units you hold in any fund redeemed and the proceeds invested in units of another fund or funds. Investment elections, either for future contributions or to transfer existing funds, may be made at any time by calling the Milliman hotline at 1-888-271-8689 or visiting the website at www.millimanonline.com. You may make only one transfer election every 30 days. A change of investment choices for future contributions will be effective for the next contribution if the new election is completed by 4:00 p.m. (ET) on the market day preceding the date of the future contribution. A transfer election will be effective as of the close of the next market day if the transfer election is completed by 12:00 p.m. (ET)(noon). If a transfer election is completed after noon, it will be processed as of the second following market day.

Your account under the Plan may be invested in one or more of the following investment funds (none of which bears a load or initial sales charge but each of which does incur an annual cost for managerial and other expenses which reduces the investment return):

1.    Common Stock Funds. The following funds invest primarily in common stocks:

A.    Vanguard Institutional Index Fund. The fund employs a passive management strategy designed to track the performance of the Standard & Poor's 500

Index, which is dominated by stocks of large U.S. companies. The fund attempts to replicate the target index by investing all or substantially all its assets in the stocks that make up the Index. An investment in this fund could lose money over short or even long periods. You should expect the fund's share price and total return to fluctuate within a wide range, like the fluctuations of the overall stock market. The ticker symbol is **VINIX.**

B.     Ruane, Cunniff & Goldfarb Common Stock Fund. This fund, a large cap value fund, is managed by Ruane, Cunniff & Goldfarb Inc., which seeks to invest on a relatively concentrated basis in the stocks of quality companies when their market prices are deemed to be modest relative to the long-term economic prospects of the underlying business. Quality companies are defined generally as businesses which earn an unusually high sustainable return on capital, enjoy pricing flexibility and are net cash generators. The fund's investment horizon is very long-term and, as a result, portfolio turnover tends to be low.

C.     Pacific Financial Common Stock Fund. This fund, a large cap value fund, is managed by Pacific Financial Research Co., which is a "value investor." The fund is invested in long-term investments chosen on the basis of the long-term intrinsic value of the underlying company and seeks to purchase such investment at a discounted price. Companies that have high intrinsic value usually dominate expanding or growth oriented markets, have strong shareholder-oriented management and have sufficient cash flow available for growth, repurchasing of shares and shareholder dividends. The fund maintains a concentrated portfolio of such investments, subject to reasonable portfolio diversification.

D.     First Manhattan Common Stock Fund. This fund, a large cap value fund, is managed by First Manhattan Capital Management, which seeks to invest in companies with strong financial characteristics and superior returns on equity that are selling significantly below their assessed basic business value. The fund's objective is to outperform the rate of inflation over an economic cycle and compete well against both active and passive equity investment styles over the long term. Risk is controlled by diversifying the portfolio on a limited basis, a consistently applied sale discipline and holding some cash uninvested in stocks if suitable investment opportunities are not available.

E.     American Funds Growth Fund R3. This fund, a large cap growth fund, is managed by Capital Research and Management Company. It seeks to provide growth of capital by investing primarily in common stocks of companies that appear to offer superior opportunities for growth of capital. The ticker symbol is **RGACX.**

F.     Amerindo Technology Fund. This fund, a mid-cap growth fund, is managed by Amerindo Investment Advisors Inc. ("Amerindo"). Amerindo is an emerging technology stock manager specializing in leading edge technology-oriented companies, including companies involved in electronics and software, companies benefiting from technological advances and biotechnology and allied small health care companies.

9

Amerindo's style is to invest in emerging technology stocks and then to "let the winners run." This style is a specialized investment vehicle designed for the long-term investor who can accept above average levels of price fluctuation and understand that volatility is inherent to growth investing. Emerging technology stocks can be subject to rapidly shifting sentiment accompanied by price dislocations during short and intermediate periods of correction, weakness or instability. If you seek an aggressive approach to capital growth and if your reason for investing is to participate in the long-term growth of emerging technology businesses of the next several years, however, the Amerindo strategy may be an appropriate addition to your investment portfolio.

G.    Calamos Growth Fund A.    This fund, a mid-cap growth fund, is managed by Calamos Asset Management Inc. It targets securities of companies that offer above-average potential for earnings growth. In seeking to meet its objective, the Fund utilizes highly disciplined institutional management strategies that emphasize in-depth proprietary analysis of the securities and their issuing companies, and diversification across companies of various sizes and sectors of the market. The ticker symbol is **CVGRX**.

H.    Heartland Value.    This fund, a small cap value fund, is managed by Heartland Advisors, Inc. It seeks long-term capital appreciation through investing in small companies. The Value Fund invests primarily in common stocks of companies with market capitalizations of less than $1.5 billion selected on a value basis, and may invest a significant portion of its assets in companies with market capitalizations of less than $300 million. The ticker symbol is **HRTVX**.

I.    Baron Growth Fund.    This fund, a small cap growth fund, is managed by Bamco Inc. It invests primarily in common stocks selected for their capital appreciation potential. At least 80% of the Funds total assets are invested in the securities of smaller companies based on the market size of the investment at the time of purchase. A small sized company is defined as having a market value of under $2.5 billion. The Adviser seeks to purchase securities that the Adviser expects could increase in value 100% within four years. Technology stocks rarely meet the fund's criteria, but the business-services, media, and communications sectors have been favorites in the past. The Ticker symbol is **BGRFX**.

J.    Tweedy, Browne Global Value Fund.    This fund, a global value fund, is managed by Tweedy, Browne Company LLC. It seeks long-term growth of capital. The fund invests primarily in equity securities. It focuses on foreign issues, but may also invest in the United States. The fund generally invests in securities issued by established companies with at least three years of operations that management judges to be undervalued relative to the company's underlying assets, earning power or private market value. The fund may invest in government and supranational-organization debt. Additionally, it may invest up to 15% of its assets in debt securities rated below investment-grade. The ticker symbol is **TBGVX** and the Wall Street Journal abbreviation is **TweedyGlVal**.

10

K.     <u>Scudder International S Fund.</u>  This fund, an international equity fund, is managed by Scudder Kemper Investments, Inc.  It seeks long-term growth of capital.  The fund invests primarily in equity securities of established companies that are listed on foreign exchanges.  It may also invest up to 20% of its assets in fixed-income securities of foreign governments, supranational organizations and corporations.  The fund attempts to diversify investments among several countries and does not concentrate investments in any particular industry.  Prior to August 14, 2000, the fund was named Scudder International Fund.  The ticker symbol is **SCINX** and the Wall Street Journal abbreviation is **Scudder Funds: Intl Fd**.

The value of your account invested in a common stock fund will fluctuate with stock market conditions.  In return for accepting stock market risk, however, there is the opportunity for earning a greater return on your investment.

2.     <u>Fixed Income Fund.</u>  The following fund invests in fixed-income investments which generally provide a relatively stable and predictable rate of return.  The trade-off is that, historically, their returns have been lower (on average) than those of bonds or stocks.

<u>Vanguard Prime Money Market Fund - Institutional Shares.</u>  The fund seeks to provide current income while maintaining liquidity.  The fund invests in high-quality, short-term money market instruments, including certificates of deposit, banker's acceptances, commercial paper and other money market securities.  The fund will maintain a dollar-weighted average maturity of 90 days or less.  The Ticker Symbol is **VMRXX**.

Investments in this fund are not deposits or obligations of, or guaranteed by, Security Trust Company or any of its affiliates, and are not insured by the Federal Deposit Insurance Corporation or any other agency of the U.S. government.  The fund is subject to investment risks, including possible loss of the principal amount invested.  The value may be higher or lower than the amount originally invested.

3.     <u>Bond Fund.</u>  Bond funds offer steady income and, historically, higher returns than fixed-income accounts.  Their value, however, can rise or fall, depending on such things as overall interest rates, quality of the bond issues and other market conditions.  Accordingly, you can potentially lose principal.  The value of your principal invested in a bond

[[NYADMIN:2242671v1:3156C:08.06.04--11:59 a]]

fund generally will fluctuate with interest rates.  If interest rates rise, your principal will decline, and vice versa.  Bonds tend to be less volatile than stocks and, therefore, less risky.  Historically, their returns have not kept pace with those of the overall stock market.

      <u>PIMCO Total Return Fund.</u>  This fund is managed by Pacific Investment Management Company ("PIMCO").  Administrative Shares seek total return consistent with preservation of capital.  The fund invests at least 65% of its assets in debt securities, including U.S. government securities, corporate bonds and mortgage-related securities.  It may invest up to 20% of its assets in securities denominated in foreign currencies.  The portfolio duration generally ranges from three to six years.   The ticker symbol is **PTRAX** and the Wall Street Journal abbreviation is: **PIMCO Funds Admin: TotRtAd**.

      The Plan is intended to comply with the requirements of Section 404(c) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the related regulations issued by the United States Department of Labor.  The investment funds described above are provided to enable you to diversify your savings, but you are fully responsible for selecting the funds that are best for you.  Neither the Firm, the Plan's trustee, the Administrative Committee nor anyone else will have any liability for any losses that result from your investment elections.

      It is therefore important that you carefully read all the information provided for you regarding the available investment options.  Nine of the funds  (Vanguard Institutional Index Fund, American Funds Growth Fund R3, Calamos Growth Fund A, Heartland Value, Baron Growth Fund, Tweedy, Browne Global Value Fund, Scudder International Fund, Vanguard Prime Money Market Fund - Institutional Shares and PIMCO Total Return Fund) are mutual funds and have prospectuses.  The remaining four funds (Ruane, Cunniff & Goldfarb Common Stock Fund, Pacific Financial Common Stock Fund, First Manhattan Common Stock Fund and Amerindo Technology Fund) are actively managed stock funds and issue quarterly investment reports.  A copy of the most recent prospectus or investment report for the funds will be provided (without cost) upon request or when you invest in any of the funds for the first time.  You may

obtain copies (without cost) by contacting the Milliman hotline at 1-888-271-8689 or visiting the website at www.millimanonline.com for the most recent annual reports and information about unit values including historical performance data provided for each investment fund, a description of annual operating expenses of each fund, an up-to-date prospectus or investment report, a list of assets (and their values) in each fund as well as any other related materials received from the funds by the Plan.

Some investment funds are less risky than others but no investment is totally risk-free. Investment funds such as the Scudder International Fund and the Tweedy, Browne Global Value Fund are subject to the greater risks (as detailed in each fund's respective prospectus or investment report) of buying foreign securities as well as foreign currency risks. Emerging technology funds, such as the Amerindo Technology Fund, are also very risky as they are more volatile than the overall equity market. You should bear in mind that market conditions can fluctuate rapidly and past performance is not a guarantee of similar results in the future.

You will not have the ability to vote the shares of the funds in which your account is invested. The exercise of voting, tender and other similar shareholder rights will remain with the Plan's Trustee or applicable investment manager.

It is your responsibility to monitor the performance of your investments. Investment performance may be reviewed by calling the Milliman hotline at 1-888-271-8689 or visiting the website at www.millimanonline.com. Be sure to review this information carefully.

Accounts

An account will be maintained for you that will separately reflect the amount, if any, of your Deferred Contributions (including any Catch-up Contributions), Voluntary

13

Contributions, Rollover Contributions and nonelective Firm Contributions (if you are eligible to receive them), as adjusted for any earnings or losses based on your investment elections.

The value of each investment fund is determined by the Trustee, as of each business day ("Valuation Date"). Such value is the basis for determining the value of each unit in that fund.

Vesting

You are always fully (100%) vested in the portion of your account attributable to Deferred, Catch-up, Voluntary and Rollover Contributions.

If you were in the employ of the Firm on December 31, 1993, or were a participant prior to 1994, you are also fully vested in the portion of your account, if any, attributable to nonelective Firm Contributions.

Otherwise, you will be vested in a percentage of the portion of your account attributable to nonelective Firm Contributions based on your completed Years of Service in accordance with the following schedule:

| Years of Service | Vested Percentage |
|---|---|
| Less than 2 | 0% |
| At least 2 but less than 3 | 20% |
| At least 3 but less than 4 | 40% |
| At least 4 but less than 5 | 60% |
| At least 5 but less than 6 | 80% |
| 6 or more years | 100% |

If, while you are in the employ of the Firm, you attain age 65 or die, you will be fully vested in your entire account including the portion attributable to nonelective Firm Contributions regardless of your Years of Service.

14

A Year of Service is any calendar year in which you are paid for 1,000 Hours of Service, whether or not you are a participant in the Plan.

If you terminate your employment with the Firm, you will forfeit the nonvested portion of your account on the earlier of the date you (a) receive 100% of the vested portion of your account or (b) incur five consecutive one-year Breaks in Service.

A one-year Break in Service is a 12-month period beginning on your first day of employment (or any subsequent January 1) in which you are credited with fewer than 501 Hours of Service. If you terminate your employment with the Firm due to pregnancy or in order to care for a child immediately following the child's birth or adoption, or if you are on an unpaid leave of absence due to maternity or paternity reasons, you will not incur a Break in Service unless you are absent for more than two full calendar years. Additionally, credit for your service due to "qualified military service" will be provided.

Payment of Benefits

Benefits will be payable as soon as practicable after termination of your employment with the Firm if the amount in your account does not exceed $5,000. If your account is over $5,000, you may elect to defer the receipt of your benefits to a later date. Rollover Contributions are disregarded in calculating whether the amount in your account exceeds $5,000. In no event will payment be made or will payments begin later than the April 1 of the year following the year in which you reach age 70-½ or retire, whichever occurs later.

Your vested account will be paid to you (or, in the event of your death, to your beneficiary) in either a lump sum or in installments or you may elect a direct rollover to another qualified plan, an IRA, a 403(b) annuity plan or a 457 governmental plan.

15

If you elect to defer distribution of your benefit following your termination of employment, you may elect to make a withdrawal from your account at any time. However, the withdrawal must be for at least $1,000.

Amounts paid to you (except amounts contributed as Voluntary Contributions) will generally be subject to ordinary income tax in the year in which you receive the distribution. In general, any withdrawal of a taxable amount before you are age 59-½ will be subject to an additional 10% penalty tax. The 10% penalty tax will not apply to any payment: (i) made upon death to a beneficiary, (ii) made on account of your disability, (iii) which is part of a series of substantially equal periodic payments for your life or the joint lives of you and your beneficiary, (iv) made after you have terminated employment after attaining age 55 or (v) to the extent such payment is used to pay deductible medical expenses. Under current tax law, medical expenses are deductible only to the extent they exceed 7-½% of your adjusted gross income.

<u>Withdrawals During Employment</u>

Subject to the rules described below, you may request a withdrawal from the investment funds by calling the Milliman hotline at 1-888-271-8689 or by visiting the website at www.millimanonline.com.

Your entire interest attributable to your Voluntary Contributions (including earnings) may be withdrawn at any time without penalty or restriction. If you made or make voluntary after-tax contributions after 1986, however, and subsequently withdraw those contributions, a portion of the withdrawal will be deemed to be earnings on those contributions and thus will be taxable income to you when received and could be subject to the 10% penalty tax for early withdrawal. The amount of the withdrawal that will be considered exempt from tax is determined by multiplying the amount of the distribution by the ratio of your after-tax

16

contributions made after 1986 to your account balance attributable to such contributions (including earnings thereon). For this purpose, you are treated as having a separate account that includes your Voluntary Contributions made after 1986 plus related earnings. If you made any after-tax contributions before 1987, you may recover the principal amount of those contributions tax-free before recognizing any taxable income on the post-1986 contributions.

If you are over age 59-½, you may also withdraw all or part of your remaining vested interest in the Trust Fund, except that if you have been an active participant for fewer than five years, you may not withdraw any Firm Contributions (including Deferred, Catch-up or nonelective Firm Contributions) unless they were made more than two years before the date of withdrawal. Prior to age 59-½, withdrawals during employment of vested Firm Contributions (including Deferred, Catch-up or nonelective Firm Contributions) and earnings thereon are allowed only if you experience a "hardship" (but no withdrawals may be made of earnings on Deferred and Catch-up Contributions earned after December 31, 1988).

Under Treasury regulations, "hardship" is defined as an immediate and heavy financial need of the employee for specified purposes and the distribution from the Plan must be necessary to satisfy such need. This means that you must withdraw all Voluntary Contributions and take out the maximum loan available before you can withdraw your Deferred, Catch-up or nonelective Firm Contributions. A hardship distribution may only be for uninsured medical expenses, the purchase (excluding mortgage payments) of your principal residence, payment of tuition for the next 12 months of post-secondary education for you, your spouse or dependents, or amounts needed to prevent eviction or to prevent foreclosure on the mortgage of your principal residence. The amount that may be withdrawn as a result of hardship may not exceed

17

the amount required to satisfy your financial need (including any taxes or penalties), after reduction for other amounts withdrawn from the Plan.

In the event of a withdrawal for hardship during 2001 and thereafter, no Voluntary Contributions, Deferred Contributions or Catch-up Contributions may be made by you or on your behalf until the later of six months following the date of your withdrawal or January 1, 2002, although nonelective Firm Contributions (if applicable) and earnings/losses will continue to be credited to your account.

Amounts paid to you (except amounts contributed as Voluntary Contributions) will generally be subject to ordinary income tax in the year in which you receive the distribution. In addition, any withdrawal of a taxable amount while you are still working before you are age 59-½ will be subject to an additional 10% penalty tax except to the extent the withdrawal is used to pay deductible medical expenses. Under current tax law, medical expenses are deductible only to the extent they exceed 7-½% of your adjusted gross income.

In addition to the limits described above, you may not withdraw any contributions attributable to compensation earned while employed at the Firm's London office.

Tax Withholding

If you terminate employment and elect to have your benefit paid to you directly or if you withdraw any taxable amount while you are an employee, you will receive only 80% of the taxable amount, because Federal law requires the Plan to withhold 20% for taxes. The 20% withholding requirement does not apply to the extent that you elect a direct rollover to another qualified plan, an IRA, a 403(b) annuity plan or a 457 governmental plan, or to the extent a distribution is due to a hardship withdrawal while employed.

Loans

        You may apply for a loan from the Plan by calling the Milliman hotline at 1-888-271-8689 or visiting the website at www.millimanonline.com.  Residential loans with a term of more than five years will require completion of a form with documentation.  Your loan check and advice will be mailed within three days after the day your loan is processed.  The principal amount of all outstanding loans and accrued interest may not exceed the lesser of (i) 50% of your vested interest in the Trust Fund or (ii) 50,000 reduced by the excess of the highest outstanding balance of all loans within the 12-month period ending on the day before the new loan is made over the outstanding balance of the loans on the date the loan is made.  You may not have more than three loans outstanding at any time nor may you borrow any amount that is secured by contributions based on Compensation earned while employed at the Firm's London office.

        The principal amount of any loan must be for at least $1,000.  The amount actually distributed to you will be reduced by a $50 loan origination fee.  New loans will be taken pro rata from the investment funds in which you have an interest.  Repayments of principal and interest on new loans are invested in the same manner as new contributions.

        Loans must be repaid within five years unless the loan is used to acquire your principal residence and the loan term is greater than five years.  In any event, the loan and accrued interest thereon will become payable when you receive your distribution from the Plan or when due, if earlier.  Interest will accrue at an interest rate equal to one percentage point above the U.S. prime rate as published in The Wall Street Journal on the first business day of the month before the calendar quarter during which the loan is made and will not change during the term of the loan.  The principal and interest must be paid in substantially equal installments through payroll deductions based on an amortization table provided by the trustee.  Your loan repayments may be suspended, however, during periods of "qualified military service."

You may submit a mortgage on your personal residence as additional security for a loan from the Plan if the outstanding balance of the principal amount of your loans secured solely by your Firm Contributions and/or Voluntary Contributions total at least $5,000. The sole purpose of providing the additional security is to enable you to deduct the interest paid on the loan as qualified residence interest. It is your responsibility to determine if the interest qualifies as qualified residence interest. No deduction is allowed if any portion of a post-1986 loan is secured by your Deferred Contributions. You may submit a mortgage even if the proceeds of the loan are not used to purchase your residence. Special rules apply to co-ops. Contact Serap Asantugrul (x3091) if you would like additional information on the mortgage program.

If you terminate employment and have an outstanding loan, you may repay the loan and accrued interest with other funds and receive your full distribution from the Plan or you may have your distribution reduced by the outstanding balance of the loan and accrued interest. Unless you repay your loan with other funds, your distribution will be reduced and the amount that is used to repay the loan is treated in the same way as a cash distribution (i.e., it is taxable income to you unless rolled over into another qualified plan, an IRA, a 403(b) annuity plan, or a 457 governmental plan and will be subject to the 10% penalty tax for early distributions if you are under age 55 (at termination) unless an exception applies).

Beneficiary

You may designate one or more persons (or trusts) as the beneficiary of your interest under the Plan, and this designation may be changed at any time. If you are married, however, your beneficiary will be deemed to be your spouse unless you have designated a different beneficiary on a form filed with Serap Asantugrul. Such form must include a notarized statement signed by your spouse in which he or she consents to the designation of someone else

20

as beneficiary.  If you have previously designated someone other than your spouse as your beneficiary on a form that did not include your spouse's consent (for instance, if you were not married at the time you designated someone else but are now married), this designation is now invalid and a new designation should be filed with Serap Asantugrul.

If you do not have a spouse and do not designate a beneficiary or if your spouse or beneficiary does not survive you, your interest under the Plan at your death will be paid to your estate.

## If Your Service Is Interrupted

If you are rehired after you incur a Break in Service, your prior Years of Service will be restored if you complete a Year of Service after your date of rehire and either (a) you were vested in all or part of your account before you left the Firm or (b) the number of your Break in Service years is less than five years.  If you received a distribution from your account, the amount forfeited will be restored if you are reemployed before your consecutive one-year Breaks in Service equals or exceeds five years.  If you do not meet either (a) or (b) above, credit for your Years of Service before your Break in Service will be canceled.

## Plan Amendment and Termination

The Firm intends to continue the Plan indefinitely but it reserves the right to amend or terminate the Plan in whole or in part at any time for any reason.  Any such amendment or termination shall be by action of any partner specifically authorized by the partners of the Firm to take such action.

If the Plan is terminated in whole or in part, your account will be liquidated and you or your beneficiary may receive a lump-sum payment based on the value of your units in each fund as of the Valuation Date immediately preceding the time payment is made.

21

Since benefits are related to the amount of contributions credited to your account and the funds' investment performance, there is no plan termination insurance provided by the Pension Benefit Guaranty Corporation.

Assignment of Benefits

Your benefits under the Plan are not subject to garnishment or attachment and cannot be assigned except as may be required by law to be paid to the Plan or to satisfy family support obligations in accordance with a qualified domestic relations order. A "qualified domestic relations order" is a judgment, order or decree that recognizes the right of an alternative payee to all or a portion of your benefit to satisfy family support obligations. You may request a copy of the qualified domestic relations order procedures from the Plan Administrator, without any charge.

How to Apply for Benefits

Your application (or your beneficiary's) for benefits should be made by calling the Milliman hotline at 1-888-271-8689. If you have any questions you should call Serap Asantugrul (ext. 3091). If your claim is denied, you or your beneficiary will be notified within 90 days after your claim was received. A full written explanation of any denial will be provided. The person filing the claim, or his or her duly authorized representative, will have the right to review pertinent documents that affect the claim and to request a review of the denial of benefits. This request must be made in writing within 60 days after receipt of notice of the denial and should be sent to:

>Administrative Committee of Employee Benefit Plans
>    of Cravath, Swaine & Moore LLP
>Worldwide Plaza
>825 Eighth Avenue
>New York, New York 10019-7475

Any such request may be accompanied by documents or records in support of the request.

Within 60 days of receipt of the request for review of your claim, the Administrative Committee will review your claim and, if it sustains the denial, give you written notice explaining why your claim was denied and citing the Plan provisions on which the decision was based. The Administrative Committee shall have the exclusive discretionary authority to determine eligibility for benefits and to construe the terms of the Plan.

The Administrative Committee may extend this 60-day period for up to an additional 60 days in special circumstances by giving written notice of the extension to the person making the claim before the expiration of the initial 60-day period.

Plan Sponsor

    Cravath, Swaine & Moore LLP
    Worldwide Plaza
    825 Eighth Avenue
    New York, New York 10019-7475

Plan Administrator

    Administrative Committee of Employee Benefit Plans
       of Cravath, Swaine & Moore LLP
    Worldwide Plaza
    825 Eighth Avenue
    New York, New York 10019-7475
    (212) 474-1000

consisting of at least three partners appointed by the Firm.

Plan Trustee

    The Charles Schwab Trust Company
    425 Market Street
    7th Floor
    San Francisco, California 94105

23

Type of Plan

       This plan is a defined contribution plan with a 401(k) feature, which permits self-directed investments in accordance with Section 404(c) of ERISA.

Agent for Service of Legal Process

       If you have a legal action against the Plan, process should be served on:

Patricia Geoghegan, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019-7475

       Service of process may also be made on the Plan Administrator or Plan Trustee.

Plan Year

       The Plan Year is the calendar year.

Government Filings

       Information regarding the Plan is filed with the United States Department of Labor under the Firm's Employer Identification Number 13-5015405 and Plan Number 005. These numbers should be used in any government-related correspondence about the Plan.

Your ERISA Rights

       As a participant in the Plan, you have certain rights under ERISA (the Employee Retirement Income Security Act of 1974).

       For instance, you automatically receive this summary of the Plan and other pertinent information.  You have the right to examine or receive, without charge, a copy of all documents governing the Plan, including a copy of the Plan's latest annual report (Form 5500

24

Series) and/or Summary Annual Report.  If you would like a copy of the Plan or other related documents, you should request one in writing from Serap Asantugrul (ext. 3091).

Plan Operation

In addition to establishing certain rights of Plan participants, ERISA imposes duties on the persons who operate the Plan, who are called "fiduciaries."  They have a duty to operate the Plan prudently and in the interests of all Plan members and beneficiaries.

Guaranteed Rights

To see that all employees are treated fairly, the law provides that no one, including the Firm, may fire you or otherwise discriminate against you in order to prevent you from exercising your rights under ERISA or receiving your benefits under the Plan.

Enforcing Your Rights

There are steps you can take to enforce your ERISA rights.  For instance, if you request materials from the Plan Administrator and do not receive them within 30 days, you may file suit in a Federal court.  In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive them, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.  In addition, if your claim for benefits is denied or ignored, in whole or in part, you have the right to know why this was done, to obtain copies of documents relating to the decision without charge and to appeal any denial within the time noted above, and you may file suit in a state or Federal court. If you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or medical child support order you may file suit in a Federal court.

[[NYADMIN:2242671v1:3156C:08-06-04--11:59 a]]

If it should happen that you are discriminated against for asserting your rights or if the Plan fiduciaries misuse the Plan's money, you may file suit in a Federal court or seek assistance from the Department of Labor.  The court will decide who should pay court costs and legal fees.  If you are successful, the court may order the person you have sued to pay these costs and fees.

If you lose, the court may order you to pay the costs and fees if, for example, it finds your claim to have been frivolous.

Further Assistance

If you have any questions about your ERISA rights or obtaining documents from the Plan Administrator, you should contact the nearest area office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210.  You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline for the Pension and Welfare Benefits Administration.

# EXHIBIT 11

28 Millbank Road

Poughkeepsie,New York 12603

January 18, 2008

Colliton v. Cravath, Swaine & Moore LLP,

No. 08 Civ.0400(NRB)

Dear Judge Buchwald:

I respectfully submit this letter pro se to request that the Court (1) grant me leave to file and serve an amended Complaint and (2) enter an order adjourning defendant's initial obligation to respond until a reasonably subsequent date.

I commenced this action on December 27, 2007, in the Supreme Court, State of New York; however, on January 15, 2008, defendant removed the action to this Court and, on January 16, 2008, defendant submitted a letter (the "Letter") to this Court setting forth the bases for defendant's anticipated motion to dismiss the Complaint. I am merely attempting to economically and efficiently minimize the total number of tasks the Court must undertake to entertain defendant's desires.

I am but a non-attorney pro se plaintiff while defendant is arguably the most prestigious law firm on Earth.

Immediately after converting the action from State Court to Federal Court (while my head was still spinning trying to figure out how that could happen without providing me any right to oppose it), defendant, in the Letter, complained that the Complaint does not satisfy the pleading requirements of Rule 9(b), Fed. R. Civ. P., or the notice pleading standard of Rule 8, Fed. R. Civ. P. Of course, since I commenced the action in State Court, I did not, as a mere pro se plaintiff, envision that I was required to ensure that the Complaint so complied. I imagine that the application of any equitable principles would preclude the Court from dismissing the action with prejudice sans granting me the ability to modify the Complaint to render it compliant with the rules of the new forum that defendant directed it into.

It is self-evident that defendant knows that it could not have made a viable motion to dismiss the Complaint had it remained in State Court - otherwise, defendant would not have bothered to remove the action (defendant could have simply made the motion in State Court). Accordingly, it follows that the Complaint, as originally written, was strong enough to survive a motion to dismiss in State Court. Defendant should not be permitted to unfairly gain a fatal advantage by changing forums - leave to amend will help to even

the playing field.

Consequently, I respectfully request leave to refresh the Complaint before defendant moves, thereby limiting the total number of actions required by the Court. More actions would be required (1) to dismiss without prejudice, refile a revised Complaint, defendant files a new response to the new Complaint, (2) to allow the motion, then allow leave to amend the Complaint, then defendant has to file a new response to the new Complaint, etc.

Additionally, the Letter provides notice that defendant intends to advocate a position which could certainly not result in any dismissal without leave to amend the Complaint. Defendant states that "the New York Court of Appeals has held that there is an implied-in-law obligation in the relationship between a law firm and its associates that both the associates and the firm will comply with the ethical standards of the profession" and that, therefore, my "misconduct violated [my] obligation to comply with the ethical standards of the legal profession, precluding [me] from enforcing any alleged employment agreement between [me] and [defendant]". Equity would presumably absolutely motivate the Court to grant me some means to address factually the following considerations before relying upon such argumentation to dismiss my Complaint with prejudice: (1) was I even an associate, or did I occupy a unique position with defendant that was not even contemplated by the New York Court of Appeals, such that this action is not even covered by its holding, (2) did defendant, on numerous occasions, direct me to engage in conduct which did not comply with such ethical standards, thereby precluding defendant from being free to take the position that I should be precluded from enforcing the employment agreements between me and defendant and (3) did defendant, itself, continuously engage in misconduct which constituted substantial and numerous violations of defendant's obligation to comply with such ethical standards, thereby precluding defendant from being free to take the position that I should be precluded from enforcing the employment agreements between me and defendant? The New York Court of Appeals certainly did not hold or contemplate that a firm with extremely unclean hands itself could successfully relieve itself of its contractual obligations by exhibiting the far less unclean hands of the associate. Furthermore, note that nowhere in the Letter does defendant ever deny that it breached its contractual duities as alleged in my Complaint. Consequently, to dismiss with prejudice without a trial (or leave to present relevant facts) would result in nothing more than granting the second or third most profitable firm in the World a monetary windfall at the expense of an unemployed plaintiff with five children to feed, notwithstanding the fact that such firm's hands were vastly more dirty than plaintiff's. Defendant will not deny (1) its obligation to pay the asserted amounts, (2) the fact that I performed brilliantly for defendant every task defendant ever directed me to tackle (as evidenced by the fact that people my very rarely work that long for defendant) or (3) the fact that defendant enjoyed all of the fees I generated throughout my career with defendant.

With leave to amend the Complaint, I will not only conform it to the Federal Rules but I will also allege enough relative to ethical standards (and their violation) to facilitate an informed decision by the Court should the Court desire to render a decision without the benefit of a trial.

I note also the numerous magazine, newspaper and Internet journalists that have written, are writing, and will write articles about the action (I have expended multiple hours within just the preceding five days discussing the action with journalists), exhibiting indicia that the People, nationally, have a substantial interest in the action. Only with an even playing field will I possess any opportunity to meaningfully debate the substance of the action, covering issues which are of such national interest.

I respectfully request leave to amend, file and serve the Complaint until March 14, 2008, and that the Court enter an order adjourning defendant's initial obligation to respond to the Complaint until April 14, 2008. I request such duration because I am currently working on a memorandum of law opposing a motion to dismiss my complaint in Colliton v. Donnelly, et al., No. 07 Civ. 1922 (LTS) (THK), before the Honorable Laura Taylor Swain, United States District Judge, Southern District of New York, which is due on February 14, 2008.

Respectfully submitted,

*James Colliton*

James Colliton

The Honorable Naomi Reice Buchwald

United States District Court

Southern District of New York

United States Courthouse

500 Pearl Street

New York, New York 10007

BY FACSIMILE

Copy to:

Cravath, Swaine & Moore LLP

825 Eighth Avenue

New York, New York 10019

Attn: Robert H. Baron, Esq.

BY FACSIMILE