UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES COLLITON,

                              Plaintiff,

                    v.

CRAVATH, SWAINE & MOORE LLP,

                              Defendant.

ECF CASE

No. 08 Civ. 0400 (NRB)

## NOTICE OF MOTION FOR SANCTIONS PURSUANT TO RULE 11

PLEASE TAKE NOTICE that, upon the Amended Complaint, dated February 28, 2008, a copy of which is annexed hereto, the accompanying declaration of Robert H. Baron, executed April 14, 2008, with exhibits thereto, the accompanying Memorandum in Support of Defendant's Motion for Sanctions Pursuant to Rule 11, dated April 14, 2008, and the Memorandum in Support of Defendant's Motion to Dismiss the Amended Complaint, dated April 14, 2008, Defendant Cravath, Swaine & Moore LLP hereby moves this Court before the Honorable Naomi Reice Buchwald in Courtroom 21A at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York, 10007, for an order pursuant to Fed. R. Civ. P. 11 sanctioning Plaintiff, and granting such other and further relief as the Court deems just and proper.

April 14, 2008.

CRAVATH, SWAINE & MOORE LLP

by

                           Stuart W. Gold (SG-1291)
                           Robert H. Baron (RB-3765)
                           Members of the Firm

825 Eighth Avenue
New York, NY 10019
(212) 474-1000
sgold@cravath.com
rbaron@cravath.com

*Defendant pro se*

To:

Mr. James Colliton
28 Millbank Road
Poughkeepsie, NY 12603

*Plaintiff pro se*

# *United States District Court*
# *Southern District of New York*

08 Cv. 0400 (NRB)

JAMES COLLITON

*Plaintiff,*

*-against-*

CRAVATH, SWAINE & MOORE LLP,

*Defendant.*

# AMENDED COMPLAINT

JAMES COLLITON
PLAINTIFF Pro  Se
28 Millbank Road
Poughkeepsie, NY 12603
(845) 518-0754

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------)

JAMES COLLITON,                                               )
                                                             ) AMENDED COMPLAINT
                                          Plaintiff,          )
                                                             )   08 Cv. 0400 (NRB)
                         - against -                          )
                                                             )   Jury Trial Demanded
CRAVATH, SWAINE & MOORE LLP,                                  )
                                                             )
                                          Defendant.          )
-------------------------------------------------------------)

Plaintiff, James Colliton, proceeding pro se and complaining of
defendant, Cravath, Swaine & Moore LLP ("CSM"), respectfully
alleges as follows:

I. PRELIMINARY STATEMENT

1. Plaintiff, James Colliton, brings this action against CSM, his former
employer. The claims arise from incidents which occurred on or
about January 1, 2002, through January 23, 2007. Plaintiff seeks: (a)
equitable relief; (b) special, compensatory and punitive money
damages; (c) an award of costs; and, (d) such other and further relief
as the Court deems just and proper. Since plaintiff is proceeding pro
se in this action, the Court is required to afford this Amended
Complaint a liberal construction. Haines v. Kerner, 404 U.S. 519,
520-21 (1972).

II. JURISDICTION

2. Plaintiff commenced this action in the Supreme Court of the State
of New York, County of New York, on December 27, 2007 (Index
Number 07/604246). On January 15, 2008, CSM removed this action
to this Court pursuant to 28 U.S.C. § 1441, on the basis of federal
question jurisdiction under 28 U.S.C. § 1331. Jurisdiction is conferred
upon this Court by 28 U.S.C. § 1331 because plaintiff's Seventh
Cause of Action falls within the scope of the civil enforcement
provisions of the Employee Retirement Income Security Act of 1974,
as amended ("ERISA"), which specifically authorize pension plan
participants, such as plaintiff, to bring suits for breach of fiduciary

duty in connection with pension plans. 29 U.S.C. §§ 1132(a)(2), 1109(a).

3. Plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide plaintiff's remaining Causes of Action, which arise under New York State law.

## III. VENUE

4. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims specified herein occurred in New York County, which is within the Southern District of New York.

## IV. JURY DEMAND

5. Plaintiff respectfully demands a trial by jury of all issues in this action pursuant to Fed. R. Civ. P. 38(b). Plaintiff demanded a trial by jury of all issues in this action when he commenced this action on December 27, 2007, and stated such demand in his original Complaint, which was served on CSM, along with a summons, on December 27, 2007.

## V. PARTIES

6. Plaintiff, James Colliton, is, and at all times herein mentioned was, a citizen and resident of the State of New York, County of Dutchess. Plaintiff resides at 28 Millbank Road, Poughkeepsie, New York 12603. Plaintiff's telephone number is (845) 518-0754.

7. Defendant, CSM, is, and for nearly two centuries has been, THE premier American law firm. CSM is, and at all times herein mentioned was, a partnership or limited liability partnership organized and existing under the laws of the State of New York, with a principal office and place of business located at 825 Eighth Avenue, New York, New York 10019-7475. The phone number for CSM is (212) 474-1000. On the CSM website, CSM represents: "For nearly two centuries, OUR FIRM has been known as the premier American law firm."

## VI. STATEMENT OF FACTS

## A. DISCLAIMER CONCERNING THE FACTS MENTIONED HEREIN

8. The following is a summary set forth for the sole purpose of

affording CSM fair notice of the claims being asserted against CSM by plaintiff. Plaintiff has not set forth each and every fact concerning the incidents described below.

## B. GENERAL INFORMATION CONCERNING CSM AND THE CSM PARTNERS

9. CSM is, and at all times herein mentioned was, a law firm engaged in the business of providing legal advice and services.

10. Each person who was regarded as a partner in CSM at any time during the times herein mentioned was, at all times herein mentioned when such person was so regarded as a partner, actually and apparently authorized and legally entitled (a) to act independently on behalf of CSM; (b) to legally bind CSM; and (c) to independently enter into agreements, arrangements, contracts, commitments, understandings and other obligations that legally bind and obligate CSM.

11. Each of CSM's partners is actually and apparently authorized and legally entitled (a) to act independently on behalf of CSM; (b) to legally bind CSM; and (c) to independently enter into agreements, arrangements, contracts, commitments, understandings and other obligations that legally bind and obligate CSM.

12. CSM is legally obligated (a) to honor any act entered into on behalf of CSM by one or more of CSM's partners; and (b) to honor, satisfy and assume legal liability for, each agreement, arrangement, contract, commitment, understanding and other obligation that one or more of CSM's partners entered into, or became a party to, on behalf of CSM.

## C. PLAINTIFF'S EMPLOYMENT WITH, AND SERVICES TO, CSM

13. Plaintiff was continuously employed as an attorney and as a specialist by CSM between December 26, 2000, and March 1, 2006 (the "Employment Period").

14. Throughout the Employment Period, plaintiff was affiliated with CSM's Executive Compensation and Benefits Department (the "Department").

15. Throughout the Employment Period, Lawrence I. Witdorchic ("LIW") was employed by CSM as a non-partner employee in the

Department.

16. Plaintiff's services to CSM as an attorney (the "Attorney Services") consisted of providing legal advice and services to CSM's clients.

17. Plaintiff's services to CSM as a specialist (the "Specialist Services") consisted of a wide array of services that did NOT constitute the provision of legal advice or services to CSM's clients.

18. Plaintiff did NOT have to be a practicing attorney or a member of the Bar to provide the Specialist Services.

19. Plaintiff's provision of the Specialist Services did NOT constitute the practice of Law.

20. During various periods within the Employment Period, the Specialist Services constituted in excess of 85% of the total services plaintiff provided to CSM.

21. Throughout the Employment Period, the Specialist Services constituted, in the aggregate, 65% of the total services plaintiff provided to CSM, based on time expended.

22. CSM, throughout the Employment Period, referred to plaintiff by the title "Specialist". Plaintiff was never, at any time during the Employment Period, an associate, a senior attorney or counsel.

23. CSM gave plaintiff the "Specialist" title to signify the importance of the non-legal Specialist Services that plaintiff was providing to CSM. Although the Specialist Services constituted, in the aggregate, 65% of the total services plaintiff provided to CSM, based on time, they constituted 85% of the total value of plaintiff's total services to CSM.

24. The Specialist Services provided by plaintiff included, without limitation, (a) training and advising associates in the Department, (b) advising associates in the Department on a wide array of legal and non-legal matters, (c) advising CSM and CSM attorneys about non-legal matters and various market conditions, (d) performing internal tasks for the sole benefit of CSM (unrelated to any clients), (e) performing internal tasks and non-legal services for the exclusive personal benefit of partcular CSM partners and retired partners, (f) providing financial and investment-related advice and analysis to

4

CSM attorneys and staff, because plaintiff held a B.S. degree, magna cum laude, in Finance, (g) reviewing and researching non-legal matters, events and developments, and advising CSM attorneys of such non-legal matters, events and developments, (h) advising CSM partners about talent at other law firms, (i) assisting CSM in recruitment efforts, and (j) interacting with legal head hunters for the benefit of CSM.

25. When CSM recruited plaintiff, the Department was VERY poorly regarded by CSM, CSM's clients and CSM's adversaries. The quality of the Department's services was extremely low. The relevant CSM partners informed plaintiff that his Specialist Services were more highly valued and desired than his Attorney Services, and that CSM hoped that plaintiff could utilize his Specialist Services to attract and retain talented associates in the Department. Throughout the Employment Period, plaintiff, through the provision of the Specialist Services, DID successfully attract and retain VERY talented associates in the Department, thereby vastly improving the Department's quality and reputation. The relevant CSM partners continuously praised plaintiff for his outstanding performance with regard to the Specialist Services, in this regard.

26. Evidence of the value CSM placed on plaintiff's Specialist Services is found in the fact that plaintiff, throughout the Employment Period, had approximately the lowest number of total hours billed to clients by any non-partner at CSM, but was continously praised by CSM partners for his contributions to CSM.

27. On numerous occasions, various CSM partners praised plaintiff as the one person responsible for the successful turnaround of the Department during the Employment Period.

28. Prior to the commencement of plaintiff's employment with CSM, CSM had an extremely difficult time recruiting associates into the Department and retaining associates there; however, principally as a result of the provision of plaintiff's Specialist Services, the Department enjoyed excellent recruiting and retention as the Employment Period evolved.

29. CSM partners disclosed to plaintiff that the Department almost certainly would have been eliminated if plaintiff's Specialist Services had not "saved" the Department.

30. By the time plaintiff commenced employment with CSM, certain of CSM's major clients had already started utilizing the executive compensation and benefits departments at other firms for the executive compensation and benefits work on transactions, rather than the services of the Department, even though CSM handled all of the other aspects of the transaction - this practice was almost unheard of and a source of profound humiliation for CSM.

31. If CSM clients had continued to remove the Department from transactions handled by CSM and to substitute executive compensation and benefits departments at other firms, CSM would have to have disbanded and eliminated the Department. CSM would then have to ensure that each client retained another law firm for the executive compensation and benefits work on every transaction it handled for them. This is very poor for business, as it would have humiliated CSM and angered every client, who would then have to take extra steps in every transaction.

32. However, as a result of plaintiff's Specialist Services, the Department began attracting and retaining excellent talent, and CSM clients no longer had to retain other law firm's executive compensation and benefits departments to handle the executive compensation and benefits work on their transactions.

33. Accordingly, the Department, during the Employment Period, was solidified rather than disbanded, principally because of plaintiff's provision to CSM of the Specialist Services.

34. Immediately prior to the commencement of the Employment Period, the Department: (a) consisted entirely of two experienced associates (LIW and Lawrence A. Pasini ("LAP")), one junior associate (Michael E. O'Brien ("MEO"), one novice associate (Colleen Cassidy Hart ("CCH"), who graduated from law school in 2000), and one novice associate (David J. Passey ("DJP"), who graduated from law school in 1999), who was splitting his time with another department and (b) was headed by a tax partner, Patricia Geoghegan ("PG"), with minimal executive compensation and benefits experience, who continued her tax practice while running the Department. The near-dead condition of the Department at the commencement of the Employment Period is evident from the fact that within approximately one year from the beginning of such Period three of the five existing associates terminated employment with

6

CSM - LAP, CCH and DJP. Remarkable efforts by plaintiff were required to turn the Department around. Currently, the Department: (a) consists of four experienced associates and five other full-time associates and (b) is headed by a full-time executive compensation and benefits partner. Principally as a result of plaintiff's Specialist Services, the Department has evolved from a struggling group consisting of a part-time partner and 4.5 associates into a powerhouse group consisting of a full-time partner and 9 associates. Accordingly, the Department is currently stronger than it has ever been, in terms of recruitment, retention and quality, despite adverse events involving plaintiff subsequent to the Employment Period. Consequently, plaintiff's actions saved the Department, thereby providing a vitally significant benefit to CSM, and NOTHING plaintiff has done or caused has in any manner whatsoever diminished such result.

35. Plaintiff's provision of the Specialist Services to CSM was separate and distinct for all purposes from plaintiff's provision of the Attorney Services to CSM.

36. CSM could, and would, have employed plaintiff throughout the Employment Period solely for his Specialist Services even if plaintiff was not an attorney.

## D. CSM'S GENERAL COMPENSATION OBLIGATIONS TO PLAINTIFF

37. In consideration for his Attorney Services and his Specialist Services, CSM, and partners of CSM on CSM's behalf, committed to compensate plaintiff pursuant to a wide array of various agreements, arrangements, contracts, commitments, understandings and other obligations (the "Compensation Arrangements"), which Compensation Arrangements were, in fact, put into, and continuously maintained in, practice and as a course of conduct by CSM.

38. The principal CSM partners who made such commitments were PG, Lewis Steinberg ("LS"), Stephen Gordon("SG"), William Brannan, Andrew Needham and Michael Schler("MS") (in the aggregate, the "Tax Partners"). The Tax Partners sometimes made the commitments by themselves, and sometimes in combination.

39. The Compensation Arrangements were entered into, revised and/or supplemented at various times during the Employment Period,

7

sometimes on an annual or even less-frequent basis, by various
CSM partners, individually or in combination with each other (the
Compensation Arrangements, as so revised and/or supplemented,
and as in effect at any particular time during the Employment Period,
the "Compensation Promise").

40. Pursuant to the Compensation Promise in effect at any particular
time during the Employment Period, CSM was to compensate plaintiff
each year in consideration for his performance of the Specialist
Services and the Attorney Services, in several ways, including,
without limitation, (a) the payment to plaintiff of a base salary, (b) the
payment to plaintiff of an annual bonus and possibly a special bonus,
(c) the provision to plaintiff of time off, or the payment to plaintiff of
cash amounts in lieu of the provision of time off, and (d) the provision
to plaintiff of other employee benefits and perquisites (such items, in
the aggregate, the "Consideration").

41. The entire Compensation Promise was, at least annually, in fact,
put into, and continuously maintained in, practice and as a course of
conduct by CSM.

42. Plaintiff entered into his employment with CSM and continued his
employment with CSM throughout the Employment Period in reliance
upon CSM's commitment to pay or provide to him all of the
Consideration that CSM and the CSM partners promised to pay or
provide to him as part of, and in satisfaction of, the Compensation
Promises in effect from time to time.

43. Throughout the Employment Period, plaintiff duly performed the
Specialist Services and the Attorney Services that he had undertaken
to perform for CSM with excellence and outstanding skill and talent.
No CSM partner ever represented to plaintiff that CSM was other
than fully pleased with plaintiff's performance of such Services, and,
in fact, continuously praised and complemented plaintiff's
performance and attributed the outstanding success of the
Department to plaintiff's remarkable rendering of his Specialist
Services.

44. CSM's Compensation Arrangements for plaintiff, Compensation
Promises to plaintiff and payment and provision of Consideration to
plaintiff relative to plaintiff's Specialist Services were separate,
independent and distinct from CSM's Compensation Arrangements
for plaintiff, Compensation Promises to plaintiff and payment and

provision of Consideration to plaintiff relative to plaintiff's Attorney Services.

45. 85% of CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff related to plaintiff's Specialist Services while 15% of CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff related to plaintiff's Attorney Services.

E. CSM'S SPECIFIC ECONOMIC OBLIGATIONS TO PLAINTIFF

46. Each year during the Employment Period, multiple Tax Partners, as part of the Compensation Promise for such year, promised plaintiff and guaranteed that the total current dollar value of the Consideration that would actually be paid and provided to plaintiff in respect of such year would equal or exceed the total current dollar value of the Consideration that would actually be paid and provided to any other non-partner employed in the Department in respect of such year (such promise for each year, the "Guarantee").

47. Each year during the Employment Period, after CSM had actually paid out all or substantially all of the Consideration due to CSM employees employed in the Department in respect of the immediately preceding year, multiple Tax Partners, as part of the Compensation Promise, represented to plaintiff and guaranteed that the Guarantee with respect to such preceding year had not been breached or violated by CSM (such representation for each year, the "Representation"), fully expecting plaintiff to rely on the truthfulness of the Representation.

48. Each year during the Employment Period, plaintiff relied upon the Guarantee and the Representation with respect to such year, and such reliance was reasonable.

49. In 2004, in reasonable reliance upon CSM's Guarantee with respect to 2004, plaintiff did not seek or accept alternative employment opportunities, and thereby sustained substantial monetary damages.

50. In 2005, in reasonable reliance upon CSM's Guarantee with respect to 2005 and CSM's Representation in regard to 2004, plaintiff did not seek or accept alternative employment opportunities, and

thereby sustained substantial monetary damages.

51. In 2006, in reasonable reliance upon CSM's Guarantee with respect to 2006 and CSM's Representation in regard to 2005, plaintiff did not seek or accept alternative employment opportunities, and thereby sustained substantial monetary damages.

52. Upon information and belief, the total then-current dollar value of the Consideration that was actually paid and provided to LIW in respect of the year 2004 exceeded the total then-current dollar value of the Consideration that was actually paid and provided to plaintiff in respect of the year 2004 by $350,000.00.

53. Upon information and belief, the total then-current dollar value of the Consideration that was actually paid and provided to LIW in respect of the year 2005 exceeded the total then-current dollar value of the Consideration that was actually paid and provided to plaintiff in respect of the year 2005 by $350,000.00.

54. Upon information and belief, the total then-current dollar value of the Consideration that was actually paid and provided to LIW in respect of the period that commenced on January 1, 2006, and terminated on March 2, 2006, exceeded the total then-current dollar value of the Consideration that was actually paid and provided to plaintiff in respect of such period by $50,000.00.

55. Upon information and belief, CSM's Compensation Promises, Guarantees and Representations to plaintiff in respect of 2004, 2005 and 2006 constituted fraud and misrepresentations, and CSM should, as a matter of equity, be estopped from denying its obligation to satisfy its commitments to plaintiff with regard to such years.

56. CSM's Guarantees and Representations to plaintiff relative to plaintiff's Specialist Services were separate, independent and distinct from CSM's Guarantees and Representations to plaintiff relative to plaintiff's Attorney Services.

57. 85% of CSM's Guarantees and Representations to plaintiff related to plaintiff's Specialist Services while 15% of CSM's Guarantees and Representations to plaintiff related to plaintiff's Attorney Services.

58. On a certain date during the Employment Period, subsequent to January 1, 2002, CSM promised all of its attorney employees a

make-up bonus (the "Make-Up Bonus").

59. The Make-Up Bonus due to plaintiff was $50,000.00.

60. The Make-Up Bonus promise to plaintiff constituted part of the then-applicable Compensation Promise, but was never paid to plaintiff.

61. Throughout the Employment Period, CSM and certain Tax Partners, including PG and LS, continuously (including in 2005) promised to pay plaintiff a pro-rata annual bonus (the "Pro-Rata Bonus") in respect of any year with respect to which plaintiff did not remain employed by CSM for the complete year.

62. The Pro-Rata Bonus due to plaintiff in respect of the period commencing on January 1, 2006, and terminating on March 1, 2006, was $15,000.00.

63. The Pro-Rata Bonus promise to plaintiff in respect of the period commencing on January 1, 2006, and terminating on March 1, 2006, constituted part of the then-applicable Compensation Promise, but was never paid to plaintiff.

64. Throughout the Employment Period, CSM and certain Tax Partners, including PG and LS, continuously (including in 2005) promised to pay plaintiff, upon termination of employment with CSM, a cash amount (the "Time-Off Payment") to compensate plaintiff for all of the time off that plaintiff accrued throughout the Employment Period but did not use, including, without limitation, vacation, sick leave, holidays, and bereavement leave.

65. PG promised plaintiff that the Time-Off Payment would be calculated: (a) based on ALL of plaintiff's unused time off; (b) without regard to conditions and limitations set forth in CSM documents (such as those stating that certain unused time off would be lost if not used by certain dates); and (c) using plaintiff's compensation data at termination of employment (i.e., if plaintiff had "X" total hours coming and plaintiff's final compensation rate was "$Y" per hour, then the Time-Off Payment would equal X multiplied by $Y).

66. In 2007, CSM paid plaintiff a portion of the Time-Off Payment, but only in respect of certain vacation days accrued in 2004, 2005 and 2006.

11

67. The unpaid portion of the Time-Off Payment due to plaintiff is $120,000.00.

68. The unpaid portion of the Time-Off Payment promise to plaintiff constituted part of the then-applicable Compensation Promise, but was never paid to plaintiff.

F. APPLICABLE AND INAPPLICABLE ETHICAL STANDARDS

69. In Wieder v. Skala, 80 N.Y.2d 628, 635-36 (1992), the New York Court of Appeals stated: "[I]n any hiring of an attorney as an associate to practice law with a firm there is implied an understanding so fundamental to the relationship and essential to its purpose as to require no expression: that both the associate and the firm in conducting the practice will do so in accordance with the ethical standards of the profession."

70. For purposes of this action, "the ethical standards of the profession" are those set forth in the New York Lawyer's Code of Professional Responsibility (the "Code").

71. The obligation of both CSM and plaintiff to "practice [law] ... in accordance with the [Code]" (the "Obligation") exists when they are "conducting the practice [of law]" or are otherwise engaging in conduct which is subject to the explicit provisions of the Code.

72. CSM's Obligation to plaintiff was applicable whenever CSM's conduct was subject to the Code.

73. Plaintiff's Obligation to CSM whenever he was performing Attorney Services was applicable whenever his conduct as an attorney was subject to the Code.

74. Plaintiff did NOT have an Obligation to CSM whenever he was performing Specialist Services because: (a) plaintiff's Specialist Services consisted of services that did NOT constitute the provision of legal advice or services to CSM's clients; (b) plaintiff did NOT have to be a practicing attorney or a member of the Bar to provide the Specialist Services; and (c) plaintiff's provision of the Specialist Services did NOT constitute the practice of Law.

75. CSM must NOT be relieved of any of its financial liabilities to plaintiff relative to his provision of Specialist Services even if plaintiff breached his Obligation to CSM relative to his provision of Attorney

Services because: (a) plaintiff's provision of the Specialist Services to CSM was separate and distinct for all purposes from plaintiff's provision of the Attorney Services to CSM; (b) CSM could, and would, have employed plaintiff throughout the Employment Period solely for his Specialist Services even if plaintiff was not an attorney; (c) CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff relative to plaintiff's Specialist Services were separate, independent and distinct from CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff relative to plaintiff's Attorney Services; and (d) CSM's Guarantees and Representations to plaintiff relative to plaintiff's Specialist Services were separate, independent and distinct from CSM's Guarantees and Representations to plaintiff relative to plaintiff's Attorney Services.

## G. CSM MATERIALLY VIOLATED ITS OBLIGATION TO PLAINTIFF BY MATERIALLY VIOLATING THE CODE RELATIVE TO ITS MISTREATMENT OF JEWISH ATTORNEYS

76. DR 1-102(A)(6) of the Code, entitled "Misconduct," states: "A lawyer or law firm shall not unlawfully discriminate in the practice of law, including in hiring, promoting or otherwise determining conditions of employment, on the basis of ... race."

77. Upon information and belief, CSM materially violated DR 1-102 (A)(6) of the Code by unlawfully discriminating against Jewish attorneys.

78. In one article entitled "Suing Hitler's Willing Business Partners: American Justice and Holocaust Morality," by Michael Bazyler, published in the Fall 2004 edition of The Jewish Political Studies Review, and another entitled "New York Law Firm [i.e., CSM] to Advise Swiss Bank Accused of Laundering Nazi Loot," by Blaine Harden, published in the February 28, 1997, edition of the Washington Post, the authors described how, "over the heated objections of many of its lawyers, the high-priced New York law firm of Cravath, Swaine & Moore is representing a Swiss bank that wartime U.S. officials described as 'the most frequent violator' of rules against laundering looted Nazi gold." The authors note that CSM's representation of the client bank led to "an angry internal dispute," but that it took CSM just "an hour and a half of discussion"

13

to accept the retention. However, the authors state that such decision was not accepted quietly, and that "one Cravath employee, speaking on condition of anonymity, said ... that a number of associate lawyers at Cravath remain angry, but are afraid to speak out for fear of being denied promotions to partner." They quote another CSM associate as stating, "If we are so generous-minded on this subject, why not represent Holocaust survivors?" Such associate described himself as "angry and I also happen to be Jewish." Upon information and belief, Jewish associates WERE "afraid to speak out for fear of being denied promotions to partner" because CSM has a long history of denying associates such promotions solely because they are Jewish. Each such denial would constitute a separate violation of DR 1-102 (A)(6) of the Code, because it would constitute "unlawful[] discriminat [ion] in the practice of law, including in ... promoting ... on the basis of ... race."

79. Linda Z. Swartz ("Swartz") is without equal as a tax transactional attorney. Swartz worked as an associate at CSM in the 1980s and 1990s. Upon information and belief, Swartz accomplished every objective CSM assigned to her, and CSM repeatedly represented to Swartz that CSM would promote her to partner. Upon information and belief, CSM did not have any LAWFUL reason to deny Swartz a CSM partnership. However, CSM denied her, and she was forced to spend the rest of her CSM career as a senior associate. In April, 1999, Cadwalader, Wickersham & Taft offered Swartz a partnership, and she accepted. A lateral move from non-partner to partner at a major firm is almost unheard of - it underscores the fact that EVERYONE both inside and outside CSM was convinced that CSM should have promoted Swartz to partner. Upon information and belief, CSM denied Swartz solely because she is Jewish, and, as a result, it has been very difficult for CSM to attract certain attorneys who are offended by CSM's actions. Upon information and belief, CSM violated DR 1-102(A)(6) of the Code because it "unlawfully discriminate[d] [against Swartz] in the practice of ... promoting ... on the basis of ... race."

80. Henry I. Morgenbesser ("Morgenbesser") is without equal as an executive compensation and benefits transactional attorney. Morgenbesser worked as an attorney in the Department prior to the Employment Period. Upon information and belief, Morgenbesser accomplished every objective CSM assigned to him, and CSM

14

repeatedly represented to Morgenbesser that CSM would promote him to partner. Upon information and belief, CSM did not have any LAWFUL reason to deny Morgenbesser a CSM partnership. However, CSM denied him. White & Case then offered Morgenbesser a partnership, and he accepted. A lateral move from non-partner to partner at a major firm is almost unheard of - it underscores the fact that EVERYONE both inside and outside CSM was convinced that CSM should have promoted Morgenbesser to partner. Upon information and belief, CSM denied Morgenbesser solely because he is Jewish, and, as a result, it has been very difficult for CSM to attract certain attorneys who were offended by CSM's actions. Upon information and belief, CSM violated DR 1-102 (A)(6) of the Code because it "unlawfully discriminate[d] [against Morgenbesser] in the practice of ... promoting ... on the basis of ... race." In particular, CSM's unethical treatment of Morgenbesser made it almost impossible to recruit ANY very high level talent into the Department.

81. Sharon Mendelson ("Mendelson") was an extraordinary tax transactional attorney. Mendelson worked as an associate at CSM prior to and during the Employment Period. Upon information and belief, Mendelson accomplished every objective CSM assigned to her, and CSM repeatedly represented to Mendelson that CSM would promote her to partner. Upon information and belief, LS once told her to refrain from having any more children, and that such inaction would ensure her a partnership. Upon information and belief, CSM did not have any LAWFUL reason to deny Mendelson a CSM partnership, and she consented to not have any additional children. However, CSM denied her, and she was forced to spend the rest of her CSM career as a senior associate. After she was denied partnership, Mendelson had another child. Upon information and belief, CSM denied Mendelson solely because she is Jewish, and, as a result, it has been very difficult for CSM to attract certain attorneys who were offended by CSM's actions. Moreover, it has been very difficult to attract certain women interested in having children, because of the perceived exchange between Mendelson and LS.

82. Upon information and belief, LS actually surrendered his partnership in CSM in 2005 because of CSM's unlawful, unethical treatment of Jewish attorneys, including Swartz, Morganbesser, Mendelson and himself. Leaving the CSM partnership is almost

15

unheard of, except for Jewish partners.

83. Throughout the Employment Period, plaintiff witnessed numerous discriminatory actions by CSM and its partners against Jewish attorneys, which actions each constituted a violation of DR 1-102(A)(6) of the Code. Throughout the Employment Period, plaintiff witnessed numerous CSM partners making racist remarks about Jewish people. Upon objecting to such conduct, plaintiff was routinely advised by CSM partners that he was free to terminate employment if he did not want to be subjected to such actions.

84. Numerous attorneys have disclosed to plaintiff that they would never work for CSM because of CSM's unethical and unlawful mistreatment of Jewish attorneys.

85. CSM materially violated its Obligation to plaintiff by continuously violating the Code in its treatment of Jewish attorneys because CSM made it extremely difficult for plaintiff to provide CSM the Attorney Services and the Specialist Services at the highest level, the level expected by CSM, since (a) plaintiff was denied the privilege and the benefit of working in the Department with those attorneys who were hurt and/or offended by CSM's unlawful, unethical mistreatment of Jewish attorneys (especially Morgenbesser), and who, as a result, either never became employed by CSM or terminated employment with CSM prematurely; (b) plaintiff was required to utilize extraordinary effort to recruit and retain in the Department excellent talent, given the number of attorneys who would not consider CSM due to such mistreatment; and (c) such mistreatment resulted in an extremely challenging work environment.

## H. CSM MATERIALLY VIOLATED ITS OBLIGATION TO PLAINTIFF BY MATERIALLY VIOLATING THE CODE RELATIVE TO ITS MISTREATMENT OF FEMALE ATTORNEYS

86. DR 1-102(A)(6) of the Code, entitled "Misconduct," states: "A lawyer or law firm shall not unlawfully discriminate in the practice of law, including in hiring, promoting or otherwise determining conditions of employment, on the basis of ... sex."

87. Upon information and belief, CSM materially violated DR 1-102(A)(6) of the Code by unlawfully discriminating against female attorneys.

16

88. CSM's unlawful, unethical treatment of female attorneys is self-evident in the numbers. Building a Better Legal Profession ("BBLP") is a national grassroots organization that seeks market-based workplace reforms in large private law firms, by collecting and publicizing firms' self-reported data. On their website as of February 23, 2008, BBLP reports that CSM has just 13.3% female partners, warranting a comparative grade of "D", and only 39.1% female associates, justifying a failing "F" grade. "For nearly two centuries, OUR FIRM has been known as the premier American law firm." Accordingly, female attorneys should WANT to work at CSM. The fact that the number of females who DO work at CSM warrants an "F" grade relative to the other major law firms means that CSM discriminates against females. Each such act of discrimination would constitute a separate violation of DR 1-102(A)(6) of the Code, because it would constitute "unlawful[] discriminat[ion] ... on the basis of ... sex."

89. The unethical treatment of Swartz and Mendelson by CSM, inter alia, has made many female attorneys upset with CSM and unwilling to work for CSM. The impact on the Department was devastating, since Swartz and Mendelson worked in the CSM Tax Group, and the Department was a subunit of the Tax Group.

90. Throughout the Employment Period, plaintiff witnessed numerous discriminatory actions by CSM and its partners against female attorneys, which actions each constituted a violation of DR 1-102(A)(6) of the Code. Throughout the Employment Period, plaintiff witnessed numerous CSM partners making sexist remarks about females, including female non-attorney employees of CSM. Upon objecting to such conduct, plaintiff was routinely advised by CSM partners that he was free to terminate employment if he did not want to be subjected to such actions.

91. Numerous female attorneys have disclosed to plaintiff that they would never work for CSM because of CSM's unethical and unlawful mistreatment of female attorneys. Numerous female attorneys working at CSM have disclosed to plaintiff that CSM partners have treated them unlawfully and unethically based solely upon gender.

92. CSM materially violated its Obligation to plaintiff by continuously violating the Code in its treatment of female attorneys because CSM made it extremely difficult for plaintiff to provide CSM the Attorney

17

Services and the Specialist Services at the highest level, the level expected by CSM, since (a) plaintiff was denied the privilege and the benefit of working in the Department with those attorneys who were hurt and/or offended by CSM's unlawful, unethical mistreatment of female attorneys, and, as a result, either never became employed by CSM or terminated employment with CSM prematurely; (b) plaintiff was required to utilize extraordinary effort to recruit and retain in the Department excellent talent, given the number of attorneys who would not consider CSM due to such mistreatment; and (c) such mistreatment resulted in an extremely challenging work environment.

## I. CSM MATERIALLY VIOLATED ITS OBLIGATION TO PLAINTIFF BY MATERIALLY VIOLATING THE CODE RELATIVE TO ITS MISTREATMENT OF HISPANIC ATTORNEYS

93. DR 1-102(A)(6) of the Code, entitled "Misconduct," states: "A lawyer or law firm shall not unlawfully discriminate in the practice of law, including in hiring, promoting or otherwise determining conditions of employment, on the basis of ... race."

94. Upon information and belief, CSM materially violated DR 1-102 (A)(6) of the Code by unlawfully discriminating against Hispanic attorneys, primarily by refusing to recruit or hire certain attorneys solely because they were Hispanic.

95. CSM's unethical and unlawful mistreatment of Hispanic attorneys is self-evident in the numbers. On their website, as of February 23, 2008, BBLP reports that CSM has NO, or 0%, Hispanic partners, warranting a failing "F" grade, and only 6.2% Hispanic associates. In contrast, according to 2006 U.S. Census Bureau data, Hispanic people make up ALMOST 30% of the population of CSM's home, New York City (approximately 2.3 million Hispanic people out of 8.2 million total people). "For nearly two centuries, OUR FIRM has been known as the premier American law firm." Accordingly, Hispanic attorneys should WANT to work at CSM. The fact that the number of Hispanic attorneys at CSM who have been promoted to partner OVER "NEARLY TWO CENTURIES" is ZERO warrants an "F" grade relative to the other major law firms means that CSM discriminates against Hispanic attorneys. Each such act of discrimination would constitute a separate violation of DR 1-102(A)(6) of the Code, because it would constitute "unlawful[] discriminat[ion] ... on the basis of ... race."

96. Multiple Hispanic attorneys have disclosed to plaintiff that they would never work for CSM because of CSM's unethical and unlawful mistreatment of Hispanic attorneys. Throughout the Employment Period, plaintiff witnessed numerous CSM partners making racist remarks about Hispanic people, including Hispanic non-attorney employees of CSM. Upon objecting to such conduct, plaintiff was routinely advised by CSM partners that he was free to terminate employment if he did not want to be subjected to such actions.

97. CSM materially violated its Obligation to plaintiff by continuously violating the Code in its treatment of Hispanic attorneys because CSM made it extremely difficult for plaintiff to provide CSM the Attorney Services and the Specialist Services at the highest level, the level expected by CSM, since (a) plaintiff was denied the privilege and the benefit of working in the Department with those attorneys who were hurt and/or offended by CSM's unlawful, unethical mistreatment of Hispanic attorneys, and, as a result, either never became employed by CSM or terminated employment with CSM prematurely; (b) plaintiff was required to utilize extraordinary effort to recruit and retain in the Department excellent talent, given the number of attorneys who would not consider CSM due to such mistreatment; and (c) such mistreatment resulted in an extremely challenging work environment.

J. CSM MATERIALLY VIOLATED ITS OBLIGATION TO PLAINTIFF BY MATERIALLY VIOLATING THE CODE RELATIVE TO ITS MISTREATMENT OF BLACK ATTORNEYS

98. DR 1-102(A)(6) of the Code, entitled "Misconduct," states: "A lawyer or law firm shall not unlawfully discriminate in the practice of law, including in hiring, promoting or otherwise determining conditions of employment, on the basis of ... race."

99. Upon information and belief, CSM materially violated DR 1-102 (A)(6) of the Code by unlawfully discriminating against black attorneys, primarily by refusing to recruit, hire or promote certain attorneys solely because they were black.

100. CSM has signaled that it does not want to hire black attorneys by its actions. For example, CSM went so far as to represent clients who propped up the South African apartheid regime, despite the fact that CSM was so successful that it certainly did not have any type of

19

need to represent such clients. This type of action was representative of CSM's treatment of black attorneys - CSM knew that this client representation would offend current and potential black attorneys and make it more difficult to attract and retain black attorneys. Nevertheless, CSM chose to offend black attorneys by accepting the retention. Such retention, of course, resulted in publicity. Such publicity, of course, resulted in further inability to attract and retain black attorneys. In an article published in the November 12, 2007, edition of the New York Sun, reporter Joseph Goldstein discusses an action brought by plaintiffs, who were victims of apartheid violence, against defendants who propped up the South African apartheid regime for decades by providing military goods to the South African security forces, and computing equipment to bureaucrats, which were used to track apartheid's racial categories of whites, coloreds, and Asians. Mr. Goldstein stated that the plaintiffs alleged that the defendant companies played a direct role in apartheid violence. For example, one defendant "recruited white employees to join a citizen commando force" involved in vigilante killings. The plaintiffs stated that the defendants played a significant role in propping up an increasingly isolated South Africa. Following the Sharpeville Massacre in 1960, when police opened fire on a crowd of black protesters, one defendant "devised a package of loans" to South Africa, one group of plaintiffs claimed, that was meant "to replace capital leaving the country because of police brutality." Another group of plaintiffs claimed that bank loans by other defendants "supported the government during the bloodiest period of apartheid in the late 1980s" before its collapse in the early 1990s. Mr. Goldstein concluded by noting that the lawyer for the defendants, Francis Barron, a partner at CSM, had said his clients will ask the Supreme Court to dismiss the suits on foreign policy considerations.

101. CSM's unethical and unlawful mistreatment of black attorneys is also self-evident in the numbers. On their website, as of February 23, 2008, BBLP reports that CSM has just 1.1% black partners and only 5.2% black associates. In contrast, according to 2006 U.S. Census Bureau data, black people make up OVER 25% of the population of CSM's home, New York City (approximately 2.1 million black people out of 8.2 million total people). "For nearly two centuries, OUR FIRM has been known as the premier American law firm." Accordingly, black attorneys should WANT to work at CSM. The fact that the number of black attorneys at CSM who have been promoted to

partner OVER "NEARLY TWO CENTURIES" is ONE means that CSM discriminates against black attorneys. Each such act of discrimination would constitute a separate violation of DR 1-102(A)(6) of the Code, because it would constitute "unlawful[] discriminat[ion] ... on the basis of ... race."

102. Multiple black attorneys have disclosed to plaintiff that they would never work for CSM because of CSM's unethical and unlawful mistreatment of black attorneys.

103. Throughout the Employment Period, plaintiff witnessed numerous discriminatory actions by CSM and its partners against black attorneys, which actions each constituted a violation of DR 1-102(A)(6) of the Code. Throughout the Employment Period, plaintiff witnessed numerous CSM partners making racist remarks about black people, including black non-attorney employees of CSM. Upon objecting to such conduct, plaintiff was routinely advised by CSM partners that he was free to terminate employment if he did not want to be subjected to such actions.

104. CSM materially violated its Obligation to plaintiff by continuously violating the Code in its treatment of black attorneys because CSM made it extremely difficult for plaintiff to provide CSM the Attorney Services and the Specialist Services at the highest level, the level expected by CSM, since (a) plaintiff was denied the privilege and the benefit of working in the Department with those attorneys who were hurt and/or offended by CSM's unlawful, unethical mistreatment of black attorneys, and, as a result, either never became employed by CSM or terminated employment with CSM prematurely; (b) plaintiff was required to utilize extraordinary effort to recruit and retain in the Department excellent talent, given the number of attorneys who would not consider CSM due to such mistreatment; and (c) such mistreatment resulted in an extremely challenging work environment.

K. CSM MATERIALLY VIOLATED ITS OBLIGATION TO PLAINTIFF BY MATERIALLY VIOLATING THE CODE RELATIVE TO SUPERVISORY RESPONSIBILITIES

105. DR 1-104(C) of the Code, entitled "Responsibilities of a Partner or Supervisory Lawyer and Subordinate Lawyers," states: "A law firm shall adequately supervise, as appropriate, the work of partners, associates and nonlawyers who work at the firm."

21

106. Upon information and belief, CSM materially violated DR 1-102 (A)(6) of the Code by failing to adequately supervise, as appropriate, the work of partners, associates and nonlawyers who work at the firm.

107. Immediately prior to the commencement of the Employment Period (i.e., December 26, 2000), the Department: (a) consisted entirely of two experienced associates (LIW and LAP), one junior associate (MEO), one novice associate (CCH), who graduated from law school in 2000, and one novice associate (DJP), who graduated from law school in 1999, and (b) was headed by a tax partner, PG, with minimal executive compensation and benefits experience, who continued her tax practice while running the Department.

108. The near-dead condition of the Department at the commencement of the Employment Period is evident from the fact that within approximately one year from the beginning of such Period three of the five existing associates terminated employment with CSM - LAP, CCH and DJP.

109. During the period immediately prior to the commencement of the Employment Period (the "2000 Period"), CSM, with regard to the Department, materially violated DR 1-104(C) of the Code, because it failed to "adequately supervise, as appropriate, the work of partners [and] associates ... who work[ed] at the firm [in the Department]."

110. MEO, LAP, CCH and/or DJP disclosed to plaintiff that during the 2000 Period: (a) PG was not able to answer most of their questions about executive compensation and benefits matters that they were facing in their work, and was not capable of assisting them or guiding them with their work, because PG was a tax attorney without executive compensation and benefits experience, but with a continuing tax practice; (b) CSM was not capable of assisting PG or guiding her with her Department responsibilities, because CSM did not have ANY partner during the 2000 Period who had any executive compensation and benefits experience (providing additional indicia that the non-promotion of Morgenbesser was not only unlawful, but also unexplainable for lawful reasons, given Morgenbesser's skill and CSM's need); (c) clients were continuously complaining that the Department's work product was poor or failing; (d) the Department was significantly understaffed; (e) the Department had a substantial amount of work, generally requiring the Department attorneys to work

22

seven days per week, for approximately 18 to 24 hours per day; (f) MEO, CCH and DJP, alone or together, were NOT competent to handle most transactions by themselves; (g) MEO, CCH and DJP were forced to handle most transactions by themselves, even if LIW, LAP or PG was nominally assigned to overlook their work, because LIW, LAP and PG each had overwhelming demands on their time; (h) LIW and LAP were not able to, and did not, answer most of MEO's, CCH's and DJP's questions about executive compensation and benefits matters that they were facing in their work, and did not assist them or guide them with their work; (i) MEO, CCH and DJP were forced to conduct due diligence on numerous occasions without any idea whatsoever about what to look for in the documents and facts presented; (j) LIW, LAP, MEO, CCH and DJP were all tremendous pressure; (k) CSM and the CSM partners were fully aware of these facts and did nothing to adequately supervise the Department or its attorneys; and (l) these facts caused LAP, CCH and DJP to terminate employment with CSM soon after the 2000 Period terminated. By knowingly permitting such events and circumstances to occur, CSM materially violated DR 1-102(A)(6) of the Code numerous times, in a manner that had a material adverse effect on clients of the Department.

111. Once the Employment Period commenced, plaintiff expended enormous time and efforts to ensure that MEO, CCH and DJP were no longer left alone. Plaintiff answered ALL of MEO's, CCH's and DJP's questions about executive compensation and benefits matters, and assisted ALL of them and guided ALL of them with their work. Although such efforts by plaintiff were too late to prevent LAP, CCH and DJP from continuing forward with their pre-existing plans to terminate employment with CSM, plaintiff's efforts became well known and enticed new associates to join the Department, secure in the knowledge that plaintiff would always be available to help them and that the events of the 2000 Period would not be repeated.

112. In C.A. No. 20260, before the Court of Chancery of the State of Delaware in and for New Castle County, CSM represented the defendants ("Vivendi"). In its July 6, 2004, Memorandum Opinion regarding the case, such Court stated: "The pleadings show a contract that is unambiguous on its face and the product of long negotiation between sophisticated parties supported by some of the world's most well-regarded investment banks and law firms. [Plaintiff

23

in the case] is not seeking a 'double dip' as Vivendi alleges, but merely what it contracted for. For the foregoing reasons, the plaintiffs' motion for judgment on the pleadings is granted." Upon information and belief: (a) Vivendi lost in excess of $30 million because CSM did not competently read the final draft of such contract before advising Vivendi to execute it; (b) a simple, competent mark-up of such draft by a Tax Partner would have prevented such loss; however, no Tax Partner reviewed such draft; (c) the relevant Tax Partner failed to "adequately supervise, as appropriate, the work of [the tax] associate[] ... who work[ed] at the firm [and on the contract]," creating a material violatation of DR 1-102 (A)(6) of the Code; (d) such associate was not competent to independently review such draft and CSM knew that; (e) CSM also violated DR 1-102(A)(4) of the Code, by engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation, when (i) CSM represented to Vivendi that it had acted competently and (ii) CSM allowed such case to proceed, knowing that there was no possible viable legal claim (ergo, a judgment on the pleadings); and (f) as the community discovered these facts (not from plaintiff, who had no personal knowledge of such matters and who only heard about them from people outside CSM), CSM suffered a substantial reduction in reputation, resulting in significant trouble for plaintiff in dealing with attorneys outside CSM.

113. CSM materially violated its Obligation to plaintiff by continuously violating DR 1-102(A)(6) of the Code because CSM made it extremely difficult for plaintiff to provide CSM the Attorney Services and the Specialist Services at the highest level, the level expected by CSM, since (a) plaintiff was denied the privilege and the benefit of working in the Department with those attorneys who were offended by CSM's unlawful, unethical mistreatment of young associates in the Department and, as a result, either never became employed by CSM or terminated employment with CSM prematurely; (b) plaintiff was required to utilize extraordinary effort to recruit and retain in the Department excellent talent, given the number of attorneys who would not consider CSM due to such mistreatment; and (c) such mistreatment resulted in an extremely challenging work environment, especially early in the Employment Period.

L. CSM MATERIALLY VIOLATED ITS OBLIGATION TO PLAINTIFF BY FORCING PLAINTIFF TO WORK FOR PARTNERS WHO

24

MATERIALLY VIOLATED THE CODE AND NUMEROUS CRIMINAL
STATUTES

114. § 6126(a) of the California Business and Professions Code
provides: "Any person advertising or holding himself or herself out as
practicing or entitled to practice law or otherwise practicing law [in
California] who is not an active member of the [California] State Bar,
or otherwise authorized . . . to practice law in this state at the time of
doing so, is guilty of a misdemeanor."

115. Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court,
17 Cal. 4th 119, 70 Cal. Rptr. 2d 304, 949 P.2d 1, cert. den., 525
U.S. 290, 119 S.Ct. 291, 142 L.Ed.2d 226 (1998), regarded members
of a New York law firm who performed various legal services for a
California based client in California. None of the lawyers who
performed such work were active members of the State Bar of
California. Following the completion of the firm's work, the client sued
the firm for legal malpractice. The firm counterclaimed for payment of
fees. The client defended against the fee claim on the basis that the
firm had engaged in the unlawful practice of law in violation of § 6125
of the California Business and Professions Code, which provided that
"No person shall practice law in California unless that person is an
active member of the State Bar." The California Supreme Court held
that the firm could not recover fees for any of the legal work firm
members did in California.

116. Upon information and belief, during the Employment Period,
three of the Tax Partners, PG, MS and SG, who were NOT members
of the California State Bar, represented DreamWorks Animation SKG
Inc., a California based client, and (a) held themselves out to such
client as practicing or entitled to practice law or otherwise practicing
law in California, rendering them guilty of a misdemeanor, and (b)
performed various legal services for such client in California, and
unethically and unlawfully asked for and received fees from such
client for the performance of such services.

117. Upon information and belief, the Tax Partners, who plaintiff was
obligated to work for and report to, engaged in numerous criminal
acts and ethics violations during the Employment Period. Similar laws
were present in numerous other jurisdictions where the Tax Partners
performed services. For example, Opinion 38, issued June 25, 2002,
by the New Jersey Committee on the Unauthorized Practice of Law,

25

stated that only two narrow exceptions permit the hiring of a non-New Jersey lawyer for estate work. First, the New Jersey and out-of-state issues in the estate must be so tangled and interwoven as to make use of New Jersey counsel impractical and inefficient. Second, there must be out-of-state issues and a long-standing lawyer-client relationship that is so close that using a New Jersey firm would be economically inefficient. "In the absence of circumstances such as those outlined above, the provision of legal services to a New Jersey estate by an out-of-state attorney constitutes the unauthorized practice of law," the opinion concluded. In addition, the existence of federal tax issues does NOT constitute license for an out-of-state firm to do the work, according to the Committee.

118. Upon information and belief, during the Employment Period, numerous CSM Partners, because CSM represents numerous clients in numerous states and countries, violated numerous State and Foreign criminal laws and ethics rules and standards (similar to such sections of the California Business and Professions Code) by performing services which were deemed to result in the unauthorized practice of law because such Partners were not admitted to practice in the jurisdictions where such services were deemed to occur.

119. DR 3-101(B) of the Code provides: "A lawyer shall not practice law in a jurisdiction where to do so would be in violation of regulations of the profession in that jurisdiction."

120. By such conduct relative to other jurisdictions, the Tax Partners engaged in criminal behavior and materially violated DR 3-101(B) of the Code. And as a result, CSM also materially violated DR 1-102(A)(3) of the Code, which states that "a law firm shall not engage in illegal conduct that adversely reflects on the [law firm's] honesty, trustworthiness or fitness as [a law firm]." The criminal behavior constituted "illegal conduct" and it DID reflect adversely on CSM's honesty, trustworthiness AND fitness, since society would certainly expect that a law firm that "for nearly two centuries, ... has been known as the premier American law firm," would BE AWARE OF AND OBEY those CRIMINAL laws specifying where such firm may or may not practice law.

121. CSM materially violated its Obligation to plaintiff by permitting the Tax Partners to continuously violate DR 3-101(B) of the Code because CSM made it extremely difficult for plaintiff to provide CSM

26

the Attorney Services and the Specialist Services at the highest level, the level expected by CSM, since plaintiff was required to work with and follow the orders of the Tax Partners, who were guilty of numerous criminal laws and ethics standards. Plaintiff had the right to report to CSM partners who were not criminals, but was denied such right throughout the Employment Period.

## M. CSM MATERIALLY VIOLATED ITS OBLIGATION TO PLAINTIFF BY ENGAGING IN CRIMINAL CONDUCT REGARDING THE PLAN

122. CSM maintained and was a fiduciary with respect to the Savings Plan for Senior Attorneys and Associates of CSM (the "Plan").

123. Plaintiff was a participant in the Plan during the Employment Period.

124. During the Employment Period, the Plan was subject to 29 USC § 1022.

125. 29 USC § 1022(a) required CSM to furnish a summary plan description ("SPD") of the Plan to participants upon request.

126. Despite repeated requests, CSM failed to furnish an SPD of the Plan to plaintiff, thereby violating 29 USC § 1022(a).

127. 29 USC § 1022(b) requires each SPD to contain the information set forth in 29 USC § 1022(b) and the information set forth in 29 CFR § 2520.102-3.

128. 29 USC § 1022(b) and 29 CFR § 2520.102-3(e) require the SPD to include "the type of administration of the plan," but, upon information and belief, the SPD for the Plan does not include such information.

129. 29 USC § 1022(b) and 29 CFR § 2520.102-3(j) require the SPD to include "the plan's requirements respecting eligibility for participation and for benefits" and "a statement describing the plan's normal retirement age, ... and a statement describing any other conditions which must be met before a participant will be eligible to receive benefits," but, upon information and belief, the SPD for the Plan does not include such information.

130. 29 USC § 1022(b) and 29 CFR § 2520.102-3(k) require the SPD to include "a statement describing any joint and survivor benefits

27

provided under the plan, including any requirement that an election be made as a condition to select or reject the joint and survivor annuity," but, upon information and belief, the SPD for the Plan does not include such information.

131. 29 USC § 1022(b) and 29 CFR § 2520.102-3(l) require the SPD to include "a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reduction, or recovery (e.g., by exercise of subrogation or reimbursement rights) of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits required by paragraphs (j) and (k) of this section ... [and] a summary of any plan provisions governing the authority of the plan sponsors or others to terminate the plan or amend or eliminate benefits under the plan and the circumstances, if any, under which the plan may be terminated or benefits may be amended or eliminated; a summary of any plan provisions governing the benefits, rights and obligations of participants and beneficiaries under the plan on termination of the plan or amendment or elimination of benefits under the plan, including, in the case of an employee pension benefit plan, a summary of any provisions relating to the accrual and the vesting of pension benefits under the plan upon termination; and a summary of any plan provisions governing the allocation and disposition of assets of the plan upon termination," but, upon information and belief, the SPD for the Plan does not include such information.

132. 29 USC § 1022(b) and 29 CFR § 2520.102-3(m) require the SPD to include, "if the benefits of the plan are not insured ..., a statement of this fact, and reason for the lack of insurance," but, upon information and belief, the SPD for the Plan does not include such information.

133. 29 USC § 1022(b) and 29 CFR § 2520.102-3(n) require the SPD to include "a description and explanation of the plan provisions for determining years of service for eligibility to participate, vesting, and breaks in service, and years of participation for benefit accrual," but, upon information and belief, the SPD for the Plan does not include such information.

134. 29 USC § 1022(b) and 29 CFR § 2520.102-3(q) require the SPD to include "the identity of any funding medium used for the

accumulation of assets through which benefits are provided," but, upon information and belief, the SPD for the Plan does not include such information.

135. 29 USC § 1022(b) and 29 CFR § 2520.102-3(s) require the SPD to include "the procedures governing claims for benefits (including ... procedures for filing claim forms, providing notifications of benefit determinations, and reviewing denied claims in the case of any plan), applicable time limits, and remedies available under the plan for the redress of claims which are denied in whole or in part," but, upon information and belief, the SPD for the Plan does not include such information.

136. 29 USC § 1131, entitled "Criminal penalties," falls within part 5 of subtitle B of subchapter I of chapter 18 of title 29, and provides: "Any person who willfully violates any provision of part 1 of this subtitle, or any regulation or order issued under any such provision, shall upon conviction be fined not more than $100,000 or imprisoned not more than 10 years, or both; except that in the case of such violation by a person not an individual, the fine imposed upon such person shall be a fine not exceeding $500,000." As used in such section, "this subtitle" refers to subtitle B of subchapter I of chapter 18 of title 29.

137. 29 USC § 1022 falls within "part 1 of this subtitle," as used in 29 USC § 1131, because 29 USC § 1022 falls within part 1 of subtitle B of subchapter I of chapter 18 of title 29; accordingly, if CSM "willfully violate[d] any provision" of 29 USC § 1022, then CSM committed a crime and is subject to the criminal penalties set forth in 29 USC § 1131.

138. As a direct and proximate result of the facts detailed above, CSM violated numerous provisions of 29 USC § 1022.

139. CSM's violations of numerous provisions of 29 USC § 1022 were willful, since CSM consists of attorneys who must be presumed aware of the laws they are subject to.

140. Since CSM willfully violated numerous provisions of 29 USC § 1022, CSM is guilty of committing numerous crimes and is subject to the criminal penalties set forth in 29 USC § 1131. And as a result, CSM also materially violated DR 1-102(A)(3) of the Code, which states that "a law firm shall not engage in illegal conduct that

29

adversely reflects on the [law firm's] honesty, trustworthiness or fitness as [a law firm]." The criminal conduct constituted "illegal conduct" and it DID reflect adversely on CSM's honesty, trustworthiness AND fitness, since society would certainly expect that a law firm that "for nearly two centuries, ... has been known as the premier American law firm," would BE AWARE OF AND OBEY those CRIMINAL laws protecting such firm's own employees.

141. CSM materially violated its Obligation to plaintiff by willfully violating numerous provisions of 29 USC § 1022 and thereby committing numerous crimes, subjecting it to the criminal penalties set forth in 29 USC § 1131, because CSM made it extremely difficult for plaintiff to provide CSM the Attorney Services and the Specialist Services at the highest level, the level expected by CSM, since plaintiff was required to work with and follow the orders of the CSM Partners, who were guilty of numerous crimes. Plaintiff had the right to report to CSM partners who were not criminals, but was denied such right throughout the Employment Period.

## N. CSM MATERIALLY VIOLATED ITS OBLIGATION TO PLAINTIFF BY ENGAGING IN UNETHICAL CONDUCT REGARDING THE PLAN

142. 29 USC § 1104(c)(1)(B) provides that in the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary of Labor), then "no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control."

143. CSM would not be liable for plaintiff's investment losses under the Plan if and only if, inter alia, the Plan permits plaintiff and other Plan participants to exercise control over the assets in their accounts.

144. 29 CFR § 2550.404c-1(b)(2)(B) states that for purposes of 29 USC § 1104(c)(1)(B), "a plan provides a participant or beneficiary an opportunity to exercise control over assets in his account only if," inter alia, "the participant or beneficiary is provided or has the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan, and incidents of ownership appurtenant to such investments."

Plaintiff was never provided with, or given the opportunity to obtain, such information while he participated in the Plan during the Employment Period, and, upon information and belief, no Plan participant or beneficiary was ever provided with, or given the opportunity to obtain, such information.

145. 29 CFR § 2550.404c-1(b)(2)(B)(1) states that for purposes of 29 USC § 1104(c)(1)(B), "a plan provides a participant or beneficiary an opportunity to exercise control over assets in his account only if," inter alia, "the participant or beneficiary is provided by an identified plan fiduciary (or a person or persons designated by the plan fiduciary to act on his behalf): (i) an explanation that the plan is intended to constitute a plan described in section 404(c) of the Employee Retirement Income Security Act, and title 29 of the Code of Federal Regulations, §2550.440c–1, and that the fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participant or beneficiary; (ii) a description of the investment alternatives available under the plan and, with respect to each designated investment alternative, a general description of the investment objectives and risk and return characteristics of each such alternative, including information relating to the type and diversification of assets comprising the portfolio of the designed investment alternative; (iii) identification of any designated investment managers; (iv) an explanation of the circumstances under which participants and beneficiaries may give investment instructions and explanation of any specified limitations on such instructions under the terms of the plan, including any restrictions on transfer to or from a designated investment alternative, and any restrictions on the exercise of voting, tender and similar rights appurtenant to a participant's or beneficiary's investment in an investment alternative; (v) a description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees); and ... (ix) subsequent to an investment in an investment alternative, any materials provided to the plan relating to the exercise of voting, tender or similar rights which are incidental to the holding in the account of the participant or beneficiary of an ownership interest in such alternative to the extent that such rights are passed through to participants and beneficiaries under the terms

31

of the plan, as well as a description of or reference to plan provisions relating to the exercise of voting, tender or similar rights." Plaintiff was never provided with such information while he participated in the Plan during the Employment Period, and, upon information and belief, no Plan participant or beneficiary was ever provided with such information.

146. 29 CFR § 2550.404c-1(b)(2)(B)(2) states that for purposes of 29 USC § 1104(c)(1)(B), "a plan provides a participant or beneficiary an opportunity to exercise control over assets in his account only if," inter alia, "the participant or beneficiary is provided by an identified plan fiduciary (or a person or persons designated by the plan fiduciary to act on his behalf), either directly or upon request, the following information, which shall be based on the latest information available to the plan: (i) a description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative; (ii) copies of any prospectuses, financial statements and reports, and of any other materials relating to the investment alternatives available under the plan, to the extent such information is provided to the plan; (iii) a list of the assets comprising the portfolio of each designated investment altenaive which constitute plan assets within the meaning of 29 CFR 2510.3–101, the value of each such asset (or the proportion of the investment alternative which it comprises), and, with respect to each such asset which is a fixed rate investment contract issued by a bank, savings and loan association or insurance company, the name of the issuer of the contract, the term of the contract and the rate of return on the contract; (iv) information concerning the value of shares or units in designated investment alternatives available to participants and beneficiaries under the plan, as well as the past and current investment performance of such alternatives, determined, net of expenses, on a reasonable and consistent basis; and (v) information concerning the value of shares or units in designated investment alternatives held in the account of the participant or beneficiary." Plaintiff requested but was never provided with such information while he participated in the Plan during the Employment Period.

32

147. As a direct and proximate result of the facts detailed above, CSM was NOT relieved of ANY liability for plaintiff's investment losses under the Plan, because, inter alia, the Plan failed to permit plaintiff and other Plan participants the required ability to exercise control over the assets in their Plan accounts.

148. DR 1-102(A)(4) of the Code provides that "a law firm shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

149. In his January 16, 2008, letter to The Honorable Naomi Reice Buchwald, CSM partner Robert H. Baron represents to the Court that, presumably under 29 USC § 1104(c)(1)(B), CSM "is not liable for [plaintiff's] poor investment choices [under the Plan]." However, as a direct and proximate result of the facts detailed above, CSM was NOT relieved of ANY liability for plaintiff's investment losses under the Plan. Accordingly, Mr. Baron's representation to the Court is false. Moreover, it must be presumed that Mr. Baron's misrepresentation to the Court was made knowingly and willingly, since he certainly must have researched the area before addressing the Court about it.

150. As a direct and proximate result of the facts detailed above, CSM and CSM partner Robert H. Baron materially violated DR 1-102 (A)(4) of the Code by engaging, or directing or permitting Mr. Baron to "engage, in conduct involving dishonesty, fraud, deceit, or misrepresentation," since Mr. Baron knowingly and dishonestly misrepresented to the Court that CSM was relieved of liability for plaintiff's Plan investment losses. Mr. Baron apparently intended to commit a fraud upon the Court through such deceitful misconduct. CSM thereby materially and deliberately violated its Obligation to plaintiff because the fraud victimized plaintiff directly.

151. As a direct and proximate result of the facts detailed above, CSM also materially violated DR 1-102(A)(3) of the Code, which states that "a law firm shall not engage in illegal conduct that adversely reflects on the [law firm's] honesty, trustworthiness or fitness as [a law firm]." The conduct of misrepresenting to a Court CSM's liability or lack of liability constituted "illegal conduct" and it DID reflect adversely on CSM's honesty, trustworthiness AND fitness, since society would certainly expect that a law firm that "for nearly two centuries, ... has been known as the premier American

law firm," would NOT ATTEMPT TO COMMIT A FRAUD UPON A COURT. CSM thereby materially and deliberately violated its Obligation to plaintiff because the fraud victimized plaintiff directly.

O. PLAINTIFF SUFFERED LOSSES UNDER THE PLAN AS A RESULT OF MATERIAL FIDUCIARY BREACHES BY CSM

152. 29 USC § 1104(a)(1) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."

153. 29 USC § 1104(a)(1)(A) provides that "a fiduciary shall discharge his duties with respect to a plan for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan."

154. 29 USC § 1104(a)(1)(B) provides that "a fiduciary shall discharge his duties with respect to a plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

155. CSM materially violated 29 USC § 1104(a)(1), 29 USC § 1104 (a)(1)(A) and 29 USC § 1104(a)(1)(B) during the Employment Period, subsequent to January 1, 2002, by: (a) willfully violating numerous provisions of 29 USC § 1022; (b) failing to appoint competent co-fiduciaries, because CSM partners and employees unfamiliar with the fiduciary responsibility rules were appointed as Plan fiduciaries; (c) failing to cause the Plan to satisfy the tax qualification rules, because numerous violations of such rules, upon information and belief, exist; (d) failing to select co-fiduciaries with appropriate due diligence, because, upon information and belief, CSM does not invite multiple potential fiduciaries to compete for fiduciary positions; (e) failing to monitor co-fiduciaries appropriately, because, upon information and belief, CSM does not possess the expertise necessary to monitor investment choices and managers competently and did not retain expert independent advisors to assist them in monitoring choices and managers; (f) failing to permit Plan participants to invest in stocks on a daily basis, since the Plan covers only professionals who require such an option to maximize their potential gains; (g) failing to provide a procedure for establishing and carrying out a funding policy consistent with Plan objectives; (h) failing to have a clear description

34

of any procedure for allocating responsibilities for the operation and administration of the Plan; (i) failing to examine all or selected expenses paid or incurred by the Plan for each year in an attempt to identify expenses which were not incurred exclusively to provide benefits to participants and their beneficiaries or to defray reasonable plan administrative costs; (j) failing to examine frequently enough income and expense statements and the general ledger accounts for unusual investment choice expenses; (k) failing to explore the management of Plan operations by examining whether cash is deposited promptly; investment certificates are properly safeguarded; assets are appropriately insured; reserves and retentions held by insurance carriers are not unreasonable; and, the tax qualified status of the Plan is maintained; (l) failing to analyze Plan investments to ascertain extent of diversification opportunities for participants (i) among types of investments (i.e., stocks, bonds, real estate, etc.), (ii) within types (i.e., is common stock in funds used all of one or two companies) and (iii) within geographical areas of investment; (m) failing to determine if investment portfolio of fund choices appears to adhere to investment policy in fund instruments, minutes of meetings, etc.; (n) failing to monitor whether any plan funds are invested in assets which are beyond the reach of United States Courts); and (o) failing to monitor whether selected allocations of fiduciary responsibilities to both named fiduciaries and other fiduciaries have been allocated in accordance with the instruments under which the Plan is maintained.

156. Such material fiduciary breaches by CSM has caused plaintiff $15,000.00 in losses, because the underlying misconduct by CSM prevented the Plan from being operated prudently and thereby caused a lack of required investment opportunities.

157. CSM is responsible for such Plan losses, because CSM is not relieved of any liability for participant losses under the Plan.

158. 29 USC § 1109 provides that "any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate,

including removal of such fiduciary." Accordingly, the Court is authorized, using its equitable powers, to redress the injury to plaintiff. 29 U.S.C. § 1132 provides that a civil action may be brought by a participant or beneficiary (i) to recover benefits due to him under the terms of his plan, (ii) to enforce his rights under the terms of the plan, (iii) to clarify his rights to future benefits under the terms of the plan, (iv) for appropriate relief under 29 USC § 1109, (v) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (vi) to obtain other appropriate equitable relief.

## P. THE UNCLEAN HANDS DOCTRINE MAY NOT BE INVOKED BECAUSE CSM HAS NOT BEEN SUFFICIENTLY INJURED BY ANY OF PLAINTIFF'S CONDUCT

159. In <u>390 West End Associates v. Baron</u>, 711 N.Y.S.2d 176, 178 (A.D. 1 Dept. 2000), the Court held: "To invoke the doctrine of unclean hands, defendant must show that plaintiff was guilty of immoral or unconscionable conduct when the agreement was made, *and* that defendant was injured thereby." The Court held that in that case such doctrine could NOT be invoked because plaintiff had actually "helped defendant make a substantial profit."

160. In <u>Black v. Nat. Org'n. of New Apostolic Church</u>, 481 N.Y.S.2d 99, 100 (A.D. 2 Dept. 1984), the Court held: "We further find that defendants' claim that the clean hands doctrine should be invoked is without merit because they fail to even assert that they were injured by the alleged wrongful conduct."

161. Even if plaintiff has engaged in wrongful conduct, CSM was NOT injured thereby.

162. A claim by CSM that the doctrine of unclean hands should be invoked by this Court relative to the claims specified herein would be without merit if CSM could not establish (a) that it was sufficiently injured by plaintiff's conduct and (b) that, since plaintiff has "helped [CSM] make a substantial profit," the injury sustained by CSM was greater than the "profit" conferred upon CSM by plaintiff.

163. CSM cannot possibly establish that it was sufficiently injured by plaintiff's conduct because, to do so, CSM, inter alia, would have to prove that plaintiff's conduct injured CSM's prestige. At the end of the Employment Period, before there was any adverse publicity concerning plaintiff, The Vault's Prestige Rankings ranked CSM

36

number 2. In each subsequent ranking, CSM has remained number 2. In addition, in The Vault's Prestige Rankings by Partners, CSM is currently number 1. Accordingly, CSM cannot possibly prove that plaintiff's conduct injured CSM's prestige, since CSM's prestige has increased or remained the same ever since the adverse publicity regarding plaintiff commenced. Consequently, CSM cannot possibly establish that it was injured by plaintiff's conduct enough to invoke the doctrine of unclean hands.

164. CSM cannot possibly establish that it was sufficiently injured by plaintiff's conduct because, to do so, CSM, inter alia, would have to prove that CSM has ceased to be the premier American law firm as a result of plaintiff's conduct. On the CSM website, CSM currently confirms: "For nearly two centuries, OUR FIRM has been known as the premier American law firm." Accordingly, CSM believes that its prestige, its reputation AND its place in America has not changed at all as a result of any actions by plaintiff or any adverse publicity concerning plaintiff. Accordingly, CSM cannot possibly prove that plaintiff's conduct injured CSM, since CSM's position in America has remained the same ever since the adverse publicity regarding plaintiff commenced. Consequently, CSM cannot possibly establish that it was injured by plaintiff's conduct enough to invoke the doctrine of unclean hands.

165. CSM cannot possibly establish that it was sufficiently injured by plaintiff's conduct because, to do so, CSM, inter alia, would have to prove that plaintiff's conduct injured CSM's profitability. According to the American Lawyer (May 2007 edition), Profits Per Partner at CSM were $3,015,000.00 in 2006, which was UP 16% from 2005. 2005 Profits Per Partner, in turn, were UP 17.9% from 2004. Since CSM's profits have increased to record amounts each year subsequent to the Employment Period, CSM's profitability has not been adversely impacted at all as a result of any actions by plaintiff or any adverse publicity concerning plaintiff. Accordingly, CSM cannot possibly prove that plaintiff's conduct injured CSM, since CSM's profitability has increased ever since the adverse publicity regarding plaintiff commenced. Consequently, CSM cannot possibly establish that it was injured by plaintiff's conduct enough to invoke the doctrine of unclean hands.

166. CSM cannot possibly establish that it was sufficiently injured by plaintiff's conduct because, to do so, CSM, inter alia, would have to

prove that plaintiff's conduct injured CSM such that CSM's future profitability was at risk. However, CSM is completely confident that it will continue to be remarkably successful. Evidence of this is found in an article published in the June 25, 2007, edition of the New York Observer, in which reporter John Koblin disclosed: "[CSM] is staying right at home in their Death Star. The white shoe law firm has signed a 15-year renewal at the Worldwide Plaza at 825 Eighth Avenue that will cost the firm $900 million. That would make the deal one of the most expensive real estate committments in history." CSM clearly would not sign such a renewal unless it was confident that its prestige and profitability were going to continue undamaged in any way. Accordingly, CSM cannot possibly prove that plaintiff's conduct injured CSM, since CSM's future is as bright as ever. Consequently, CSM cannot possibly establish that it was injured by plaintiff's conduct enough to invoke the doctrine of unclean hands.

167. CSM cannot possibly establish that it was sufficiently injured by plaintiff's conduct because, to do so, CSM, inter alia, would have to prove that plaintiff's conduct injured CSM such that CSM's recruiting has materially deteriorated. However, CSM cannot establish that because CSM has had remarkable success in recruiting subsequent to the adverse publicity regarding plaintiff.

168. A claim by CSM that the doctrine of unclean hands should be invoked by this Court relative to the claims specified herein would nevertheless be without merit even if CSM COULD establish that it was sufficiently injured by plaintiff's conduct, because, as a direct and proximate result of the facts detailed above, plaintiff has "helped [CSM] make a substantial profit," such that any injury sustained by CSM could not possibly be greater than the "profit" conferred upon CSM by plaintiff. If plaintiff had not saved the Department, the Department would have been eliminated, and CSM's prestige, profitability and recruiting success would all be substantially lower today.

## Q. IT IS TOO LATE FOR CSM TO DENY ITS OBLIGATION TO HONOR ITS CONTRACTS WITH PLAINTIFF

169. In Spyder Enterprises, Inc. v. Ward, 872 F. Supp. 8, 13 (E.D.N.Y. 1995), the Court held: "A party seeking to rescind a contract must do so promptly once that party becomes cognizant of its breach."

170. After any misconduct by plaintiff had already been much publicized, on January 23, 2007, CSM made certain payments to plaintiff, which payments were required pursuant to contract, not statute. CSM did not reserve a right to object later to any breach of contract by plaintiff.

171. As a direct and proximate result of the facts detailed above, CSM no longer has any right to object to plaintiff's claims herein, based on any facts that were known, contemplated or alleged on January 23, 2007. If CSM asserts that certain facts were not known until after such date, then CSM nevertheless may not rely on such facts to deny its obligations to plaintiff to the extent that the subsequent facts had already been alleged or contemplated as of such date, because CSM could have refused to make such payments to plaintiff UNTIL the status of the alleged or contemplated facts was KNOWN.

R. THE UNCLEAN HANDS DOCTRINE MAY NOT BE INVOKED BECAUSE NONE OF PLAINTIFF'S ALLEGED MISCONDUCT IS CONNECTED TO THE SUBJECT MATTER OF THIS ACTION

172. In Isaacson v. Isaacson, 28 N.Y.S. 2d 517, 521 (Queens Cty. Sup. Ct. 1941), the Court held: "It is axiomatic that a plaintiff must come into a court of equity with clean hands, but this maxim ... does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern."

173. In Nishman v. DeMarco, 62 N.Y.2d 926, the New York Court of Appeals confirmed that the doctrine of unclean hands is ONLY applicable when the conduct relied on is DIRECTLY related to the subject matter in litigation.

174. A claim by CSM that the doctrine of unclean hands should be invoked by this Court relative to the claims specified herein would therefore be without merit if CSM could not establish that the conduct of plaintiff relied upon by CSM is DIRECTLY related to the subject matter in litigation. Accordingly, such doctrine may NOT be invoked because CSM cannot possibly prove that any misconduct by plaintiff was DIRECTLY related to the Specialist Services or the Attorney Services performed by plaintiff for CSM during the Employment Period, since: (a) if plaintiff had not saved the Department, the

39

Department would have been eliminated, and CSM's prestige, profitability and recruiting success would all be substantially lower today - thus, no misconduct by plaintiff adversely affected the net results of plaintiff's work for CSM; (b) CSM was not required to refund any fees charged to clients for Attorney Services because of any misconduct by plaintiff; (c) no misconduct by plaintiff adversely affected the Attorney Services plaintiff provided since plaintiff WAS authorized to practice law at all times when he performed Attorney Services - no document or transaction became void retroactively as a result of plaintiff's disbarment; (d) no misconduct by plaintiff adversely affected the Specialist Services plaintiff provided - the incredible results of such Services were not changed in any way; (e) a March 17, 2006, National Law Journal article even pointed out that, at the height of the adverse publicity concerning plaintiff, there was not any harm to CSM because "the behavior is UNRELATED to the practice itself" - they also quoted a CSM summer associate, who confirmed that publicity regarding plaintiff's conduct "doesn't color my desire to work there;" (f) NO misconduct of plaintiff DIRECTLY related to CSM, plaintiff's work at CSM or any CSM client; and (g) plaintiff's conduct did not cause CSM to lose any clients or employees.

175. As a direct and proximate result of the facts detailed above, any claim by CSM that the doctrine of unclean hands should be invoked by this Court relative to the claims specified herein would be without merit since CSM could NOT deny that "any misconduct [by plaintiff], however gross, ... is unconnected with the matter in litigation, and [constitutes conduct] with which the opposite party has no concern."

S. THE UNCLEAN HANDS DOCTRINE MAY NOT BE INVOKED BECAUSE CSM IS MORE GUILTY OF MISCONDUCT THAN PLAINTIFF

176. In Furman v. Furman, 34 N.Y.S. 2d 699, 704 (1941), the New York County Supreme Court held: "It is true that where the parties are not equal in guilt (in pari delicto) but where one of them, although participating in the wrong, is less guilty than the other, the party more at fault cannot employ the doctrine of pari delicto to shield his deliberate invasion of the rights of the former. In such a situation, the parties are said to be in particeps criminis and not in pari delicto, AND A LAW COURT WILL GRANT RELIEF TO THE LESS GUILTY OF THE PARTIES WHO HAS SUFFERED A DELIBERATE

40

WRONG."

177. As a direct and proximate result of the facts detailed above, CSM has "deliberate[ly] invade[d] ... the rights of [plaintiff] ... [and plaintiff] HAS SUFFERED [MANY] DELIBERATE WRONG[S]" because: (a) CSM materially and deliberately violated its Obligation to plaintiff by continuously violating the Code in its treatment of Jewish attorneys; (b) CSM materially and deliberately violated its Obligation to plaintiff by continuously violating the Code in its treatment of female attorneys; (c) CSM materially and deliberately violated its Obligation to plaintiff by continuously violating the Code in its treatment of Hispanic attorneys; (d) CSM materially and deliberately violated its Obligation to plaintiff by continuously violating the Code in its treatment of black attorneys; (e) CSM materially and deliberately violated its Obligation to plaintiff by continuously violating DR 1-102(A)(6) of the Code; (f) CSM materially and deliberately violated its Obligation to plaintiff by permitting the Tax Partners to continuously violate DR 3-101(B) of the Code and by requiring plaintiff to work with and follow the orders of the Tax Partners, who were guilty of numerous criminal laws and ethics standards; (g) CSM materially and deliberately violated its Obligation to plaintiff by willfully violating numerous provisions of 29 USC § 1022 and thereby committing numerous crimes, subjecting it to the criminal penalties set forth in 29 USC § 1131, and by requiring plaintiff to work with and follow the orders of the CSM Partners, who were guilty of numerous crimes; (h) since CSM and CSM partner Robert H. Baron have already, in this action, materially and deliberately violated DR 1-102 (A)(4) of the Code by engaging, or directing or permitting Mr. Baron to "engage, in conduct involving dishonesty, fraud, deceit, or misrepresentation," CSM has thereby materially and deliberately violated its Obligation to plaintiff, because the subject fraud victimized plaintiff directly; (i) since CSM also, in this action, materially and deliberately violated DR 1-102(A)(3) of the Code, CSM has thereby materially and deliberately violated its Obligation to plaintiff, because the subject fraud victimized plaintiff directly; and, (j) CSM materially and deliberately breached its fiduciary obligations with regard to the Plan, thereby causing plaintiff $15,000.00 in losses.

178. Since CSM has so "deliberate[ly] invade[d] ... the rights of [plaintiff] ... [and plaintiff] HAS SUFFERED [SO MANY] DELIBERATE

41

WRONG[S]" because of CSM's misconduct, this Court must "GRANT RELIEF TO [PLAINTIFF,] THE LESS GUILTY OF THE PARTIES" - plaintiff is clearly the less guilty because his misconduct: (a) DID NOT injure CSM's prestige; (b) DID NOT affect CSM's status as "the premier American law firm;" (c) DID NOT injure CSM's profitability; (d) DID NOT adversely impact CSM's future profitability; (e) DID NOT affect CSM's recruiting; (f) DID NOT adversely affect the net results of plaintiff's work for CSM; (g) DID NOT require CSM to refund any fees charged to clients for Attorney Services; (g) DID NOT adversely affect the Attorney Services plaintiff provided since plaintiff WAS authorized to practice law at all times when he performed Attorney Services; (h) DID NOT adversely affect the Specialist Services plaintiff provided - the incredible results of such Services were not changed in any way; (i) DID NOT DIRECTLY relate to CSM, plaintiff's work at CSM or any CSM client; (j) DID NOT cause CSM to lose any clients or employees; and (k) DID NOT commence prior to the commencement of the Employment Period or prior to the date CSM offered plaintiff employment.

## T. THE UNCLEAN HANDS DOCTRINE MAY NOT BE INVOKED BECAUSE IT WOULD NOT BE APPROPRIATE IN THIS ACTION

179. In Anonymous v. Anonymous, 62 N.Y.S. 2d 130, 134 (1946), the Bronx County Supreme Court held: "[T]he doctrine of clean hands has no application [where] the hardship or inequity of a particular situation must yield to the paramount public policy of the state."

180. In Furman v. Krauss, 26 N.Y.S.2d 121, 124 (1941), the New York County Supreme Court held that the doctrine of unclean hands "should not be invoked where ... the consequences of its application would be to produce a result which is contrary to good conscience and public policy and would to a greater extent offend them."

181. Annual Profits Per Partner at CSM were $3,015,000.00 in 2006. Plaintiff does not have any employment, income or assets, but does have an innocent wife and five innocent young children. CSM does not deny that it was obligated to pay plaintiff the claimed amounts - CSM merely asserts that it does not have to and does not want to. CSM does not deny that plaintiff provided to CSM all of the substantial benefits specified herein. CSM cannot assert that any of the benefits it derived from plaintiff have been diminished or lost. "The paramount public policy of the state" is for an employer to pay

42

an employee for his services. "The consequences of [the] application [of the clean hands doctrine here] would be to produce a result which is contrary to good conscience and public policy and would to a greater extent offend them" because good conscience would not permit plaintiff's innocent family to have to seek public assistance while CSM is permitted to retain the wonderful fruit of plaintiff's labors without any obligation to pay plaintiff for such labors, even though CSM is "the premier American law firm" and the CSM partners are earning $3,015,000.00 per year.

## U. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

182. CSM and the CSM partners engaged in a series of intentional actions (the "Acts") throughout the Employment Period and thereafter, through January 16, 2008, intending to bring about emotional distress in plaintiff, or exhibiting a reckless disregard for the likelihood of causing emotional distress in plaintiff.

183. The Acts were composed of conduct by CSM and the CSM partners that was both extreme and outrageous. The Acts, individually or in the aggregate as an intentional pattern, were heinous, beyond the standards of civilized decency and utterly intolerable in a civilized society. Many of the Acts were criminal or otherwise illegal. The Acts constituted a pattern of conduct, not just an isolated incident. Plaintiff was vulnerable when some of the Acts took place, and CSM defendant knew it. CSM was in a position of power. Racial epithets were used by CSM during some of the Acts.

184. The Acts actually caused plaintiff's emotional distress. The emotional distress suffered by plaintiff was severe, as quantified by the intensity, duration and physical manifestations of the distress.

185. The Acts constituted a pattern of abuse and fraud, and plaintiff did not discover such pattern until 2008. Such pattern could not have been discovered, even with reasonable diligence, until 2008, because CSM and the CSM partners concealed many of the Acts and their intent.

186. The Acts were: (a) CSM materially and deliberately violated its Obligation to plaintiff by continuously violating the Code in its treatment of Jewish attorneys, in its treatment of female attorneys, in its treatment of Hispanic attorneys and in its treatment of black attorneys; (b) CSM materially and deliberately violated its Obligation

43

to plaintiff by continuously violating DR 1-102(A)(6) of the Code; (c) CSM materially and deliberately violated its Obligation to plaintiff by permitting the Tax Partners to continuously violate DR 3-101(B) of the Code and by requiring plaintiff to work with and follow the orders of the Tax Partners, who were guilty of numerous criminal laws and ethics standards; (d) CSM materially and deliberately violated its Obligation to plaintiff by willfully violating numerous provisions of 29 USC § 1022 and thereby committing numerous crimes, subjecting it to the criminal penalties set forth in 29 USC § 1131, and by requiring plaintiff to work with and follow the orders of the CSM Partners, who were guilty of numerous crimes; (e) since CSM and CSM partner Robert H. Baron have already, in this action, materially and deliberately violated DR 1-102(A)(4) of the Code by engaging, or directing or permitting Mr. Baron to "engage, in conduct involving dishonesty, fraud, deceit, or misrepresentation," CSM has thereby materially and deliberately violated its Obligation to plaintiff, because the subject fraud victimized plaintiff directly; (f) since CSM also, in this action, materially and deliberately violated DR 1-102(A)(3) of the Code, CSM has thereby materially and deliberately violated its Obligation to plaintiff, because the subject fraud victimized plaintiff directly; (g) CSM materially and deliberately breached its fiduciary obligations with regard to the Plan, thereby causing plaintiff $15,000.00 in losses, (h) CSM refused to pay plaintiff the amounts claimed herein; (i) upon information and belief, CSM, in 2006, caused the New York County District Attorney to charge plaintiff with crimes as of dates earlier than the District Attorney intended, and concealed this Act; (i) CSM disposed of plaintiff's personal property unlawfully in 2006 or 2007; (j) upon information and belief, CSM employed an entire force to "spy" on plaintiff and other CSM employees, and concealed such Acts by not listing the members of such force on the employee roster and not permitting such members to eat at the employee cafeteria or interact with other employees; (k) one Tax Partner discussed details of such Partner's subscription to "Hustler" extensively with the Department, creating an extremely stressful work environment; (l) a companion of one Tax Partner routinely sexually harassed female employees of the Department, creating an extremely stressful work environment, and such Partner was aware of such conduct but did nothing about it; (m) one Department employee who had been coerced into an affair with a "fast track" associate when she was a student was left very distressed when the relationship terminated; the "fast track" associate then left the firm;

the female accepted full time employment with the understanding that the male would not be permitted to return; CSM then rehired the male, knowingly devastating the female and thereby creating an extremely stressful work environment; (n) upon information and belief, certain Tax Partners urged and instructed associates to overbill, in violation of DR 2-106(A) of the Code, creating an extremely stressful work environment; (o) certain CSM Partners urged and instructed associates to violate DR 5-105(A) of the Code, by representing certain executives at the same time as the shareholders of the companies they worked for, creating an extremely stressful work environment; and (p) the Tax Partners engaged in other conduct which caused Sen. Carl Levin to identify CSM as one of the key entities responsible for "eating away at the fabric of the U.S. tax system, and undermining U.S. laws intended to safeguard our capital markets and financial systems from financial crime;" coupled with the negative reputation of the Tax Partners derived from the incident regarding Vivendi, this created an extremely stressful work environment.

## VII. FIRST CAUSE OF ACTION - 2004 BREACH OF CONTRACT

187. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

188. As a direct and proximate result of the facts detailed above, in relation to the year 2004, CSM has materially breached: (a) CSM's Compensation Promise to plaintiff; (b) CSM's Guarantee to plaintiff; and (c) CSM's Representation to plaintiff.

189. As a direct and proximate result of the facts detailed above, in relation to the year 2004, plaintiff experienced a financial loss and damages in the sum of $350,000.00, the excess of the total then-current dollar value of the Consideration that was actually paid and provided to LIW in respect of the year 2004 over the total then-current dollar value of the Consideration that was actually paid and provided to plaintiff in respect of the year 2004.

190. Despite plaintiff's repeated demands therefore, CSM has refused and continues to refuse, without just cause or justification, to pay to plaintiff any part or parts of the $350,000.00 sum so owing.

191. CSM's refusal to pay to plaintiff the $350,000.00 sum so owing constitutes a material breach of contract.

45

192. As a direct and proximate result of CSM's material breach of contract, plaintiff has been required to incur certain legal fees, costs and expenses, and will hereafter be further required to incur additional such fees, costs and expenses.

193. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $350,000.00, together with interest thereon, accruing subsequent to December 31, 2004.

194. Plaintiff is also entitled to receive punitive and special damages in relation to such material breach of contract by CSM because CSM's actions constituted fraud and misrepresentations, and were motivated by extreme recklessness and indifference to plaintiff's contractual rights.

VIII. SECOND CAUSE OF ACTION - 2005 BREACH OF CONTRACT

195. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

196. As a direct and proximate result of the facts detailed above, in relation to the year 2005, CSM has materially breached: (a) CSM's Compensation Promise to plaintiff; (b) CSM's Guarantee to plaintiff; and, (c) CSM's Representation to plaintiff.

197. As a direct and proximate result of the facts detailed above, in relation to the year 2005, plaintiff experienced a financial loss and damages in the sum of $350,000.00, the excess of the total then-current dollar value of the Consideration that was actually paid and provided to LIW in respect of the year 2005 over the total then-current dollar value of the Consideration that was actually paid and provided to plaintiff in respect of the year 2005.

198. Despite plaintiff's repeated demands therefore, CSM has refused and continues to refuse, without just cause or justification, to pay to plaintiff any part or parts of the $350,000.00 sum so owing.

199. CSM's refusal to pay to plaintiff the $350,000.00 sum so owing constitutes a material breach of contract.

200. As a direct and proximate result of CSM's material breach of contract, plaintiff has been required to incur certain legal fees, costs

46

and expenses, and will hereafter be further required to incur additional such fees, costs and expenses.

201. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $350,000.00, together with interest thereon, accruing subsequent to December 31, 2005.

202. Plaintiff is also entitled to receive punitive and special damages in relation to such material breach of contract by CSM because CSM's actions constituted fraud and misrepresentations, and were motivated by extreme recklessness and indifference to plaintiff's contractual rights.

IX. THIRD CAUSE OF ACTION - 2006 BREACH OF CONTRACT

203. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

204. Upon information and belief, the total then-current dollar value of the Consideration that was actually paid and provided to LIW in respect of the period that commenced on January 1, 2006, and terminated on March 2, 2006, exceeded the total then-current dollar value of the Consideration that was actually paid and provided to plaintiff in respect of such period by $50,000.00.

205. As a direct and proximate result of the facts detailed above, in relation to the period that commenced on January 1, 2006, and terminated on March 2, 2006, CSM has materially breached: (a) CSM's Compensation Promise to plaintiff; (b) CSM's Guarantee to plaintiff; and, (c) CSM's Representation to plaintiff.

206. As a direct and proximate result of the facts detailed above, in relation to the period that commenced on January 1, 2006, and terminated on March 2, 2006, plaintiff experienced a financial loss and damages in the sum of $50,000.00, the excess of the total then-current dollar value of the Consideration that was actually paid and provided to LIW in respect of such period over the total then-current dollar value of the Consideration that was actually paid and provided to plaintiff in respect of such period.

207. Despite plaintiff's repeated demands therefore, CSM has refused and continues to refuse, without just cause or justification, to

47

pay to plaintiff any part or parts of the $50,000.00 sum so owing.

208. CSM's refusal to pay to plaintiff the $50,000.00 sum so owing constitutes a material breach of contract.

209. As a direct and proximate result of CSM's material breach of contract, plaintiff has been required to incur certain legal fees, costs and expenses, and will hereafter be further required to incur additional such fees, costs and expenses.

210. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $50,000.00, together with interest thereon, accruing subsequent to March 2, 2006.

211. Plaintiff is also entitled to receive punitive and special damages in relation to such material breach of contract by CSM because CSM's actions constituted fraud and misrepresentations, and were motivated by extreme recklessness and indifference to plaintiff's contractual rights.

## X. FOURTH CAUSE OF ACTION - BREACH OF MAKE-UP BONUS PROMISE

212. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

213. On a certain date during the Employment Period, subsequent to January 1, 2002, CSM promised all of its attorney employees a make-up bonus (the "Make-Up Bonus"). The Make-Up Bonus due to plaintiff was $50,000.00. The Make-Up Bonus promise to plaintiff constituted part of the then-applicable Compensation Promise, but was never paid to plaintiff.

214. As a direct and proximate result of the facts detailed above, CSM has materially breached its promise to pay plaintiff the Make-Up Bonus.

215. As a direct and proximate result of the facts detailed above, in relation to the Make-Up Bonus, plaintiff experienced a financial loss and damages in the sum of $50,000.00.

216. Despite plaintiff's repeated demands therefore, CSM has refused and continues to refuse, without just cause or justification, to

pay to plaintiff any part or parts of the $50,000.00 sum so owing.

217. CSM's refusal to pay to plaintiff the $50,000.00 sum so owing constitutes a material breach of contract.

218. As a direct and proximate result of CSM's material breach of contract, plaintiff has been required to incur certain legal fees, costs and expenses, and will hereafter be further required to incur additional such fees, costs and expenses.

219. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $50,000.00.

## XI. FIFTH CAUSE OF ACTION - BREACH OF PRO-RATA BONUS PROMISE

220. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

221. Throughout the Employment Period, CSM and certain Tax Partners, including PG and LS, continuously (including in 2005) promised to pay plaintiff a pro-rata annual bonus (the "Pro-Rata Bonus") in respect of any year with respect to which plaintiff did not remain employed by CSM for the complete year. The Pro-Rata Bonus due to plaintiff in respect of the period commencing on January 1, 2006, and terminating on March 1, 2006, was $15,000.00. The Pro-Rata Bonus promise to plaintiff in respect of the period commencing on January 1, 2006, and terminating on March 1, 2006, constituted part of the then-applicable Compensation Promise, but was never paid to plaintiff.

222. As a direct and proximate result of the facts detailed above, CSM has materially breached its promise to pay plaintiff the Pro-Rata Bonus.

223. As a direct and proximate result of the facts detailed above, in relation to the Pro-Rata Bonus, plaintiff experienced a financial loss and damages in the sum of $15,000.00.

224. Despite plaintiff's repeated demands therefore, CSM has refused and continues to refuse, without just cause or justification, to pay to plaintiff any part or parts of the $15,000.00 sum so owing.

225. CSM's refusal to pay to plaintiff the $15,000.00 sum so owing constitutes a material breach of contract.

226. As a direct and proximate result of CSM's material breach of contract, plaintiff has been required to incur certain legal fees, costs and expenses, and will hereafter be further required to incur additional such fees, costs and expenses.

227. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $15,000.00

## XII. SIXTH CAUSE OF ACTION - BREACH OF UNPAID TIME-OFF PAYMENT PROMISE

228. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

229. Throughout the Employment Period, CSM and certain Tax Partners, including PG and LS, continuously (including in 2005) promised to pay plaintiff, upon termination of employment with CSM, a cash amount (the "Time-Off Payment") to compensate plaintiff for all of the time off that plaintiff accrued throughout the Employment Period but did not use, including, without limitation, vacation, sick leave, holidays, and bereavement leave. PG promised plaintiff that the Time-Off Payment would be calculated: (a) based on ALL of plaintiff's unused time off; (b) without regard to conditions and limitations set forth in CSM documents (such as those stating that certain unused time off would be lost if not used by certain dates); and (c) using plaintiff's compensation data at termination of employment (i.e., if plaintiff had "X" total hours coming and plaintiff's final compensation rate was "$Y" per hour, then the Time-Off Payment would equal X multiplied by $Y). In 2007, CSM paid plaintiff a portion of the Time-Off Payment, but only in respect of certain vacation days accrued in 2004, 2005 and 2006. The unpaid portion of the Time-Off Payment due to plaintiff is $120,000.00. The unpaid portion of the Time-Off Payment promise to plaintiff constituted part of the then-applicable Compensation Promise, but was never paid to plaintiff.

230. As a direct and proximate result of the facts detailed above, CSM has materially breached its promise to pay plaintiff the unpaid

*50*

portion of the Time-Off Payment.

231. As a direct and proximate result of the facts detailed above, in relation to the unpaid portion of the Time-Off Payment, plaintiff experienced a financial loss and damages in the sum of $120,000.00.

232. Despite plaintiff's repeated demands therefore, CSM has refused and continues to refuse, without just cause or justification, to pay to plaintiff any part or parts of the $120,000.00 sum so owing.

233. CSM's refusal to pay to plaintiff the $120,000.00 sum so owing constitutes a material breach of contract.

234. As a direct and proximate result of CSM's material breach of contract, plaintiff has been required to incur certain legal fees, costs and expenses, and will hereafter be further required to incur additional such fees, costs and expenses.

235. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $120,000.00, plus interest thereon from March 1, 2006.

236. Plaintiff is also entitled to receive punitive and special damages in relation to such material breach of contract by CSM because CSM's actions constituted fraud and misrepresentations, and were motivated by extreme recklessness and indifference to plaintiff's contractual rights.

XIII. SEVENTH CAUSE OF ACTION - FIDUCIARY BREACHES CAUSING PLAN LOSSES

237. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

238. As a direct and proximate result of the facts detailed above, CSM has materially breached its fiduciary responsibilities with respect to the Plan.

239. As a direct and proximate result of the facts detailed above, plaintiff experienced a financial loss and damages in connection with his participation in the Plan in the sum of $15,000.00.

240. Despite plaintiff's repeated attempts to appeal the amount he received under the Plan, CSM has refused and continues to refuse,

without just cause or justification, to timely consider such appeal or to pay to plaintiff any part or parts of the $15,000.00 sum so owing.

241. As a direct and proximate result of CSM's material fiduciary breaches with regard to the Plan, there is now due and owing from CSM to plaintiff the sum of $15,000.00.

## XIV. EIGHTH CAUSE OF ACTION - 2004 BREACH OF CONTRACT

242. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

243. Plaintiff's provision of the Specialist Services to CSM was separate and distinct for all purposes from plaintiff's provision of the Attorney Services to CSM. CSM could, and would, have employed plaintiff throughout the Employment Period solely for his Specialist Services even if plaintiff was not an attorney. CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff relative to plaintiff's Specialist Services were separate, independent and distinct from CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff relative to plaintiff's Attorney Services. Plaintiff did NOT have an Obligation to CSM whenever he was performing Specialist Services. CSM must NOT be relieved of any of its financial liabilities to plaintiff relative to his provision of Specialist Services even if plaintiff breached his Obligation to CSM relative to his provision of Attorney Services. 85% of CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff related to plaintiff's Specialist Services while 15% of CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff related to plaintiff's Attorney Services. CSM's Guarantees and Representations to plaintiff relative to plaintiff's Specialist Services were separate, independent and distinct from CSM's Guarantees and Representations to plaintiff relative to plaintiff's Attorney Services. 85% of CSM's Guarantees and Representations to plaintiff related to plaintiff's Specialist Services while 15% of CSM's Guarantees and Representations to plaintiff related to plaintiff's Attorney Services.

244. If it is determined that plaintiff's conduct justifies relieving CSM of any of its obligations to plaintiff, then such relief must only apply to

52

the obligations relative to the Attorney Services.

245. In such event, plaintiff repeats the First Cause of Action, but, in the alternative, demands only 85% of the amounts specified therein.

246. As a direct and proximate result of CSM's material breach of contract, in relation to the year 2004, there is now due and owing from CSM to plaintiff the sum of $297,500.00, together with interest thereon, accruing subsequent to December 31, 2004.

## XV. NINTH CAUSE OF ACTION - 2005 BREACH OF CONTRACT

247. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

248. Plaintiff's provision of the Specialist Services to CSM was separate and distinct for all purposes from plaintiff's provision of the Attorney Services to CSM. CSM could, and would, have employed plaintiff throughout the Employment Period solely for his Specialist Services even if plaintiff was not an attorney. CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff relative to plaintiff's Specialist Services were separate, independent and distinct from CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff relative to plaintiff's Attorney Services. Plaintiff did NOT have an Obligation to CSM whenever he was performing Specialist Services. CSM must NOT be relieved of any of its financial liabilities to plaintiff relative to his provision of Specialist Services even if plaintiff breached his Obligation to CSM relative to his provision of Attorney Services. 85% of CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff related to plaintiff's Specialist Services while 15% of CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff related to plaintiff's Attorney Services. CSM's Guarantees and Representations to plaintiff relative to plaintiff's Specialist Services were separate, independent and distinct from CSM's Guarantees and Representations to plaintiff relative to plaintiff's Attorney Services. 85% of CSM's Guarantees and Representations to plaintiff related to plaintiff's Specialist Services while 15% of CSM's Guarantees and Representations to

*53*

plaintiff related to plaintiff's Attorney Services.

249. If it is determined that plaintiff's conduct justifies relieving CSM of any of its obligations to plaintiff, then such relief must only apply to the obligations relative to the Attorney Services.

250. In such event, plaintiff repeats the Second Cause of Action, but, in the alternative, demands only 85% of the amounts specified therein.

251. As a direct and proximate result of CSM's material breach of contract, in relation to the year 2005, there is now due and owing from CSM to plaintiff the sum of $297,500.00, together with interest thereon, accruing subsequent to December 31, 2005.

## XVI. TENTH CAUSE OF ACTION - 2006 BREACH OF CONTRACT

252. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

253. Plaintiff's provision of the Specialist Services to CSM was separate and distinct for all purposes from plaintiff's provision of the Attorney Services to CSM. CSM could, and would, have employed plaintiff throughout the Employment Period solely for his Specialist Services even if plaintiff was not an attorney. CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff relative to plaintiff's Specialist Services were separate, independent and distinct from CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff relative to plaintiff's Attorney Services. Plaintiff did NOT have an Obligation to CSM whenever he was performing Specialist Services. CSM must NOT be relieved of any of its financial liabilities to plaintiff relative to his provision of Specialist Services even if plaintiff breached his Obligation to CSM relative to his provision of Attorney Services. 85% of CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff related to plaintiff's Specialist Services while 15% of CSM's Compensation Arrangements for plaintiff, Compensation Promises to plaintiff and payment and provision of Consideration to plaintiff related to plaintiff's Attorney Services. CSM's Guarantees and Representations to plaintiff relative to plaintiff's Specialist Services were separate, independent and

54

distinct from CSM's Guarantees and Representations to plaintiff relative to plaintiff's Attorney Services. 85% of CSM's Guarantees and Representations to plaintiff related to plaintiff's Specialist Services while 15% of CSM's Guarantees and Representations to plaintiff related to plaintiff's Attorney Services.

254. If it is determined that plaintiff's conduct justifies relieving CSM of any of its obligations to plaintiff, then such relief must only apply to the obligations relative to the Attorney Services.

255. In such event, plaintiff repeats the Third Cause of Action, but, in the alternative, demands only 85% of the amounts specified therein.

256. As a direct and proximate result of CSM's material breach of contract, in relation to the period that commenced on January 1, 2006, and terminated on March 2, 2006, there is now due and owing from CSM to plaintiff the sum of $42,500.00, together with interest thereon, accruing subsequent to March 2, 2006.

## XVII. ELEVENTH CAUSE OF ACTION - BREACH OF MAKE-UP BONUS PROMISE

257. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

258. Plaintiff repeats the Fourth Cause of Action, but, in the alternative, demands only 85% of the amounts specified therein.

259. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $42,500.00.

## XVIII. TWELFTH CAUSE OF ACTION - BREACH OF PRO-RATA BONUS PROMISE

260. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

261. Plaintiff repeats the Fifth Cause of Action, but, in the alternative, demands only 85% of the amounts specified therein.

262. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $12,750.00

## XIX. THIRTEENTH CAUSE OF ACTION - BREACH OF UNPAID TIME-OFF PAYMENT PROMISE

263. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

264. Plaintiff repeats the Sixth Cause of Action, but, in the alternative, demands only 85% of the amounts specified therein.

265. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $102,000.00, plus interest thereon from March 1, 2006.

## XX. FOURTEENTH CAUSE OF ACTION - 2004

266. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

267. In Kaye v. Grossman, 202 F.3d 611, 616 (2000), the Second Circuit held: "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."

268. As a direct and proximate result of the facts detailed above: (a) CSM benefitted substantially from plaintiff's labor; (b) such benefit to CSM was at plaintiff's expense, since plaintiff was required to work incredibly hard to overcome the obstacles placed in his way by CSM to perform his services; and (c) equity and good conscience require that CSM pay plaintiff what it promised him and owes him.

269. Plaintiff performed Services for CSM in good faith. CSM requested and accepted such Services. Plaintiff expected to be compensated for such Services. The amounts claimed herein constitute reasonable value and reasonable compensation for the services rendered.

270. As a direct and proximate result of the facts detailed above, the doctrine of unclean hands may not be invoked to deny payment to plaintiff.

271. Plaintiff repeats the First Cause of Action, but, in the alternative, demands the amounts specified therein based on unjust enrichment, equity, quantum meruit, restitution, quasi-contract, and implied

contract.

272. As a direct and proximate result of CSM's actions, there is now due and owing from CSM to plaintiff the sum of $350,000.00, together with interest thereon, accruing subsequent to December 31, 2004.

## XXI. FIFTEENTH CAUSE OF ACTION - 2005

273. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

274. In Kaye v. Grossman, 202 F.3d 611, 616 (2000), the Second Circuit held: "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."

275. As a direct and proximate result of the facts detailed above: (a) CSM benefitted substantially from plaintiff's labor; (b) such benefit to CSM was at plaintiff's expense, since plaintiff was required to work incredibly hard to overcome the obstacles placed in his way by CSM to perform his services; and (c) equity and good conscience require that CSM pay plaintiff what it promised him and owes him.

276. Plaintiff performed Services for CSM in good faith. CSM requested and accepted such Services. Plaintiff expected to be compensated for such Services. The amounts claimed herein constitute reasonable value and reasonable compensation for the services rendered.

277. As a direct and proximate result of the facts detailed above, the doctrine of unclean hands may not be invoked to deny payment to plaintiff.

278. Plaintiff repeats the Second Cause of Action, but, in the alternative, demands the amounts specified therein based on unjust enrichment, equity, quantum meruit, restitution, quasi-contract, and implied contract.

279. As a direct and proximate result of CSM's actions, there is now due and owing from CSM to plaintiff the sum of $350,000.00, together with interest thereon, accruing subsequent to December 31, 2005.

## XXII. SIXTEENTH CAUSE OF ACTION - 2006

280. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

281. In Kaye v. Grossman, 202 F.3d 611, 616 (2000), the Second Circuit held: "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."

282. As a direct and proximate result of the facts detailed above: (a) CSM benefitted substantially from plaintiff's labor; (b) such benefit to CSM was at plaintiff's expense, since plaintiff was required to work incredibly hard to overcome the obstacles placed in his way by CSM to perform his services; and (c) equity and good conscience require that CSM pay plaintiff what it promised him and owes him.

283. Plaintiff performed Services for CSM in good faith. CSM requested and accepted such Services. Plaintiff expected to be compensated for such Services. The amounts claimed herein constitute reasonable value and reasonable compensation for the services rendered.

284. As a direct and proximate result of the facts detailed above, the doctrine of unclean hands may not be invoked to deny payment to plaintiff.

285. Plaintiff repeats the Third Cause of Action, but, in the alternative, demands the amounts specified therein based on unjust enrichment, equity, quantum meruit, restitution, quasi-contract, and implied contract.

286. As a direct and proximate result of CSM's actions, there is now due and owing from CSM to plaintiff the sum of $50,000.00, together with interest thereon, accruing subsequent to March 2, 2006.

## XXIII. SEVENTEENTH CAUSE OF ACTION - MAKE-UP BONUS

287. Plaintiff repeats the Fourth Cause of Action, but, in the alternative, demands the amounts specified therein based on unjust enrichment, equity, quantum meruit, restitution, quasi-contract, and implied contract.

288. As a direct and proximate result of CSM's actions, there is now due and owing from CSM to plaintiff the sum of $50,000.00.

## XXIV. EIGHTEENTH CAUSE OF ACTION - PRO-RATA BONUS

289. Plaintiff repeats the Fifth Cause of Action, but, in the alternative, demands the amounts specified therein based on unjust enrichment, equity, quantum meruit, restitution, quasi-contract, and implied contract.

290. As a direct and proximate result of CSM's actions, there is now due and owing from CSM to plaintiff the sum of $15,000.00

## XXV. NINETEENTH CAUSE OF ACTION - UNPAID TIME-OFF PAYMENT

291. Plaintiff repeats the Sixth Cause of Action, but, in the alternative, demands the amounts specified therein based on unjust enrichment, equity, quantum meruit, restitution, quasi-contract, and implied contract.

202. As a direct and proximate result of CSM's material breach of contract, there is now due and owing from CSM to plaintiff the sum of $120,000.00, plus interest thereon from March 1, 2006.

## XXVI. TWENTIETH CAUSE OF ACTION - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

293. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

294. As a direct and proximate result of the facts detailed above, CSM intentionally inflicted severe emotional distress on plaintiff, causing plaintiff to experience an invasion of privacy, psychological pain, emotional distress, mental anguish, embarrassment, humiliation and financial loss.

295. The conduct of CSM, as described herein, amounted to intentional infliction of emotional distress and an abusive pattern of harassment, causing plaintiff to suffer economic and emotional harms.

296. As a direct and proximate result of the facts detailed above, plaintiff is entitled to damages in the sum of $3,015,000.00.

59

297. Despite plaintiff's repeated demands therefore, CSM has refused and continues to refuse, without just cause or justification, to pay to plaintiff any part or parts of the $3,015,000.00 sum so owing.

298. As a direct and proximate result of CSM's actions, there is now due and owing from CSM to plaintiff the sum of $3,015,000.00, together with interest thereon, accruing subsequent to January 16, 2008.

299. Plaintiff is also entitled to receive punitive and special damages in relation to such misconduct because CSM's actions constituted fraud and misrepresentations, and were motivated by an intention to cause extreme emotional distress.

WHEREFORE, plaintiff demands a jury trial and the following relief against CSM:

a. Compensatory damages in the amounts specified herein;

b. Punitive and special damages in an amount to be determined by a jury;

c. Costs and interest;

d. Equitable relief as specified herein; and

e. Such other and further relief as this Court may deem just and proper.


I declare under penalty of perjury that the foregoing is true and correct.


Dated: Poughkeepsie, New York
      February 28, 2008

*James P. Colliton*

**James P. Colliton**
**Plaintiff pro se**
**28 Millbank Road**
**Poughkeepsie, New York 12603**
**(845) 518-0754**

60